1          UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF NORTH CAROLINA

3                          )
   U.S. TOBACCO COOPERATIVE,   )
4  INC.,                     )   DOCKET NO. 5:19-cv-00430-BO
                             )
5              Plaintiff,    )
                             )
6  vs.                       )
                             )
7  CERTAIN UNDERWRITERS AT    )
   LLOYD'S, SUBSCRIBING TO    )
8  POLICY NUMBERS             )
   B1353DC1703690000 AND      )
9  B1353DC1602041000

10             Defendants.

11         TRANSCRIPT OF SETTLEMENT CONFERENCE
      BEFORE MAGISTRATE JUDGE ROBERT T. NUMBERS, II
12          MONDAY, MAY 3, 2021; 1:36 PM
                RALEIGH, NORTH CAROLINA
13

14  FOR THE PLAINTIFF:
       McGuire Woods LLP
15       By:  Mark E. Anderson, Esq.
            Amy E. Dehnel, Esq.
            Shelby S. Guilbert, Jr.
16       501 Fayetteville Street
         Suite 500
17       Raleigh, NC 27601

18
   FOR THE DEFENDANTS:
19       Hill Rivkins LLP
         By:  James A. Saville, Esq.
20       45 Broadway
         Suite 1500
21       New York, NY 10006

22       Clark, Newton & Evans, PA
         By:  Seth P. Buskirk, Esq.
23            Don T. Evans, Jr., Esq.
         509 Princess Street
24       Wilmington, NC 27401

25  Audio Operator:              CLERK'S OFFICE PERSONNEL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

eScribers, LLC
7227 N. 16th Street
Suite 207
Phoenix, AZ 85020
973-406-2250
www.escribers.net

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

1        P R O C E E D I N G S

2            THE CLERK:  All rise.  This Honorable United States

3    District Court for the Eastern District of North Carolina is

4    now in session, the Honorable Robert T. Numbers, II presiding.

5    Please be seated and come to order.

6            THE COURT:  Good afternoon, everyone.

7            IN UNISON:  Good afternoon, Your Honor.

8            THE COURT:  We are here in the United States District

9    Court for the Eastern District of North Carolina, sitting in

10   Raleigh for a hearing in the case of U.S. Tobacco Cooperative,

11   Inc. v. Certain Underwriters of Lloyd's Subscribing to Policy

12   Numbers B1353DC1703690000 and B1353DC1602041000, case number

13   5:19-cv-430.

14           I'd like to begin by asking Counsel to identify

15   themselves for the record beginning with Counsel for the

16   plaintiffs.

17           MR. GUILBERT:  Good afternoon, Your Honor.  Shelby

18   Guilbert from McGuire Woods.

19           MS. DEHNEL:  Any Dehnel from McGuire Woods.

20           MR. ANDERSON:  Mark Anderson, McGuire Woods, Raleigh

21   office.

22           THE COURT:  Good afternoon.

23           MR. SAVILLE:  Good afternoon, Your Honor.  James

24   Saville, Hill Rivkins, New York, lead counsel for the

25   defendants.

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 3 of 64

1          MR. EVANS:  Good morning, Your Honor.  Don Evans, I'm
2     local counsel for the defendants, along with Seth Boskirk here
3     who is also local counsel.

4          THE COURT:  All right.  Good afternoon, everyone.

5          MR. SAVILLE:  Good afternoon, Judge.

6          So we're here on a -- related to a motion to compel
7     that was filed by U.S. Tobacco in which I granted the order
8     and set a hearing to discuss what sanctions, if any, are
9     appropriate in this case given what occurred in the course of
10    discovery.

11         Before we dig into the merits, I want to start by
12    asking -- I'll hear from plaintiff's counsel first on this --
13    what is the current status of discovery and the compliance
14    with the order I entered?

15         MR. GUILBERT:  Your Honor, we don't think that the
16    defendants have complied with the court order, and I'd be
17    happy to go into as much or as little detail as the Court
18    would like this afternoon.  We're prepared to walk through the
19    responses.  We've brought copies of the supplemental discovery
20    requests that were submitted that, suffice it to say, we don't
21    think that the defendants have complied with the order.

22         THE COURT:  Well, let's start with -- just give me an
23    overview of what your views of it since -- and, if necessary,
24    we'll dig into it.

25         MR. GUILBERT:  Okay.  And we've got one slide that I

1    think people can help us walk through where we think things
2    currently stand that, I think, provides a good overview.  And
3    if you'd like more detail as we get into this, I'm happy to
4    provide it.

5            So I think that the first problem that we had with
6    the responses is that we've been trying to get interrogatory
7    responses from the defendants for a year and a half as Your
8    Honor noted in the order.  And the order that Your Honor
9    entered on April 9th said that all of the defendants were
10   supposed to actually respond to interrogatories.  They were
11   supposed to respond.  They're supposed to submit verified
12   interrogatory responses.  So we don't think that the insurers
13   have complied.

14           The responses that we were provided, and first of
15   all, not verified.  There's a red flag there.

16           Secondly, their joint responses submitted on behalf
17   of all thirteen defendants in the case, we don't have
18   individual interrogatory responses from all the defendants
19   which is something that we've been asking for, and we've been
20   told we were going to receive throughout the case, and don't
21   really understand what's at issue there.

22           We do have, what appears to be, some slightly amended
23   interrogatory responses.  They look very similar to what we
24   had received before, but they still have some of the same
25   problems that we had with the first set of interrogatory

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 5 of 64

1   responses.

2           For example, there's still no explanation, we have an

3   interrogatory -- standard interrogatory to explain the factual

4   or legal basis for the defenses in the case.  There is still

5   no answer for, I think, affirmative defenses 3, 4, or 13.

6   There's just no response.

7           So we think that certain of those defenses, at least

8   now, we should be talking about striking defenses at this

9   point if the insurers don't want to respond.  And I think

10  another issue that we noted when we were here in December is

11  that -- I guess we were doing it virtually -- is that we have

12  deposition testimony that is at odds with the answers in the

13  interrogatories.  You can't really reconcile the two.  We

14  thought that they were ordered to go back and amend the

15  responses that that was going to be addressed.  It has not

16  been.

17          And what we've done -- and if I can hand this up to

18  Your Honor.

19          I don't know -- do you have a copy first, Jim?

20          With our motion to compel that we filed -- I guess

21  the second motion to compel, there is an exhibit C, Your

22  Honor, that identified all the specific deficiencies with

23  respect to each of the responses we had received.  And I think

24  what was done is we've taken what was exhibit C, we just added

25  another column that explains why for each of the responses we

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 6 of 64

1  don't think that they've complied with what Your Honor ordered
2  the insurers to do.  So that's the story on interrogatory
3  responses.

4        The order also addressed the need for the insurers to
5  rectify certain issues that we have identified in December of
6  2019 with the initial disclosure.  So the insurers did not
7  comply with the order which directed them to do so.

8        I think that the disclosure specifically that we've
9  been focused on since December relates to reinsurance polices.
10 We think that -- and as your order found, the insurers were
11 required to disclose the reinsurance policies with their
12 initial disclosure.  They didn't do that.  They've been
13 ordered to do so, and they're disclosure now is just unchanged
14 from what we had back in January of last year.

15        Now, we do know that they have some insurance or
16 reinsurance policies.  We'd like to see them, because there's
17 a separate interrogatory response that says that insurers all
18 maintain reinsurance programs that may be called upon to
19 reimburse insurers.  So we know they got them.  They haven't
20 given them to us.

21        And beyond that, they did not produce -- and we have
22 a separate request for this.  It was just related to the
23 initial disclosures because we want the policies.  We also
24 want to see the reports that the claim adjusters have been
25 submitting to the reinsurers.  And those communications are

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO   Document 90   Filed 05/11/21   Page 7 of 64

1  not privileged.  We expect that there would be reports saying

2  well, this is what we saw when we went out to the

3  Cooperative's warehouses.  This is what we think the loss is.

4  These are the challenges with respect to the claim.  They've

5  been ordered to provide that information.

6          We saw one document that appeared to relate to the

7  need to report to reinsurers.  We don't have the reports,

8  though.  There should be if all the insurers have reinsurance

9  that may be called upon to pay for damages that may be entered

10  in this case, that may be awarded for bad faith and it's

11  reinsurance for bad faith typically in these policies.  We

12  want to see what communications exist and we don't have them.

13          I think with respect to the document request and the

14  production issues, I think there the insurers did not comply

15  with the order there.  Once again, instead of getting written

16  discovery responses from each of the insurers, we had a joint

17  amended response, and it's still -- it's filled with

18  boilerplate objections.  So if you look at the responses,

19  they're almost identical to what we had before.  Less than

20  twelve general boilerplate objections.  We have no idea what's

21  still being withheld.

22          There were some additional documents that were

23  produced.  Some documents were produced, we don't know on

24  behalf of which insurer.  We think it's only from Aegis, but

25  there's a Bates prefix, DEF.  So presumably, those have been

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 8 of 64

 1  produced on behalf of all defendant insurers.  And there are
 2  about 600 additional pages as far as we can tell.  The rest of
 3  the production, there are documents from Marine Reporting
 4  International which was a loss adjuster the insurers retained.
 5  They produced some additional documents.  But what it looks
 6  like is that we do not, and we still do not have documents
 7  from all of the insurers.  So there's no way to tell.

 8          In fact, they keep saying there is an agreed upon
 9  electronically stored information order that says we're
10  supposed to unitize documents, produce metadata.  I mean, we
11  don't have any of that either.  So it's really hard for us to
12  figure out where the documents did come from.  We just have a
13  few large PDFs.  So it's really hard to reconcile where the
14  documents came from.

15          The written responses that were amended do not
16  identify Bates ranges of documents that have now been
17  produced.  I think the Court ordered that that was supposed to
18  be included in the amended responses.  It has not been.

19          I think the depositions that reveal very specific
20  categories of responsive documents that have not been
21  produced, and these are not just documents that would be nice
22  to have.  We've deposed the lead claim handler for AEGIS who
23  said I got claim diary.  Claim diary has not been produced to
24  us.  That's a core document that contained his work on claims
25  investigation.  Still don't have it.  And the list goes on and

1    on, and that's detailed at exhibit E to this binder that, I

2    think, did the same thing and went through each of the

3    document requests and identifies why we think even at the

4    April 9th order and supplemental production that we did

5    receive that the insurers have not complied.

6          Now, Your Honor may remember that there was another

7    category of documents the insurers were ordered to produce

8    that relates to their mold expert, Dr. Heard, from London.

9    And we did receive a copy of a draft cause and origin report

10   that was drafted in 2018.  So we did receive that.  It was

11   telling because the bottom line conclusion is that one -- a

12   couple of the key defenses that the insurers have been

13   asserting in this case that she thought back in 2018 that it

14   would be speculative to reach the conclusion.  It's one of the

15   defenses that they've raised is that the mold that we found on

16   our products started growing before it came into the

17   warehouses and that mold is an inherent characteristic in

18   tobacco.  She said that she couldn't conclude that, and that

19   would be speculative.

20         Now, that's not in her expert report that was

21   submitted as an exhibit as a rebuttal expert report, but she's

22   now a fact witness in this case, and we need to depose her.

23   But the problem is we still don't have her documents.  We've

24   got a handful of emails that were sent from Paula Cook at

25   Marine Reporting International back to Stephanie Heard, and a

1  couple of invoices.  They identify a bunch of names of people

2  that we had no idea were even working on this file.  But we

3  don't have those documents either.

4       I think that the privilege logs, those are still a

5  mess.  I think that what it looks like the insurers have done

6  is I think the Court has overruled the work product objection

7  based on the anticipation of litigation date.  And what it

8  appears that the insurers have done is that they've deleted

9  work product claims, so that's out, but they just added the

10 words "legal advice" to most of the entries on the log, and we

11 got the privilege logs are also in the binder.  It looks like

12 the logs are shorter than they were before.  So then it's a

13 guess that some documents may have fallen off the log or

14 they're not claiming privilege over them, but it doesn't

15 appear that we have all those documents.  Maybe, but there's

16 really no way to tell because they did not do what was also in

17 the order which was to say what documents are being produced,

18 what documents are still being withheld.  We can't really

19 figure that out.

20      We are open to meeting and conferring with the

21 insurers on that issue, but we'd like some direction from the

22 Court to fix this in the first instance before we sit down and

23 talk with them.

24      A couple other issues that we've identified.  The

25 Court ordered the insurers to produce information about

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 11 of 64

1    similar claims that these insurers have dealt with before,

2    specifically related to mold issues under marine cargo

3    policies, and also bad faith cases.

4          We asked for -- had interrogatory asking for all the

5    bad faith claims in the last ten years.  We have a specific

6    document request for documents relating to interest coverage

7    for mold damage claims.

8          They told us about one case that's pending now

9    against Lloyd's in Lake Charles, Louisiana.  It looks like it

10   has nothing to do with mold.  It looks like it has to do with

11   an explosion that occurred.  They're bad faith claims.  So

12   we're looking into that, but we expected that if they had any

13   other claims like this that either tell us what they were, or

14   they tell us they don't have them, that they don't have these

15   types of claims, they ought to just be telling us that and

16   that would be the way to address that issue.  But we don't

17   have documents for that case, and we don't think that they've

18   responded.

19         Last couple issues, minor issues, but there was a

20   direction from the Court with respect to some documents that

21   plaintiffs inadvertently produced to the insurers.  We did

22   receive confirmation from Mr. Saville that his clients had

23   complied with the Court's directive, but didn't really comply

24   with the letter of the order.  The order suggested that this

25   needed to be verified under oath or under penalty of perjury

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 12 of 64

1    we got an affirmation of.  I got no reason to doubt what Mr.

2    Saville said in his affirmation, but just another example of

3    noncompliance with the Court's order.

4            And similarly, with respect to the issue pertaining

5    to Mitsui which is one of the defendants.  We received an

6    email from Mr. Saville stating that Mitsui states we agree to

7    be bound with respect to Mitsui about emails they -- we assume

8    he meant to say that Mitsui agrees to be bound by the

9    testimony of MS Amlin in this case.  That's not what the email

10   said that we received, and we're happy to clear that up if

11   that's what Mr. Saville intended to say that they intend to be

12   bound by MS Amlin, we'll take him at his word.  But this is

13   another example of what we think is serial examples of

14   noncompliance with the Court's directive.

15           So I think that just scratches the surface, and be

16   happy to go into more detail, but I think that's it in a

17   nutshell, Your Honor.

18           THE COURT:  Mr. Saville, what do you say in response?

19           MR. SAVILLE:  Your Honor, a couple quick things.

20           Everything that has to do with this case is me.

21   Local counsel has nothing to do with it.  They've been purely

22   local in that regard.  Gave me some guidance early on as to

23   what to do.  And if I had questions, they did a great job in

24   complying with that.

25           Brody Karn is behind me.  He's also with our firm.

1    He's not admitted.  He's a new attorney who really dealt with

2    the privilege log issues and he's dug into all of that.  But

3    in terms of the direction of the case, the supervision, that's

4    all on me.

5         The testimony -- we'll start at the bottom and work

6    our way up, Your Honor -- the testimony of the 30(b)(6)

7    witness, we said we agree to be bound by the testimony of

8    James Lawson.  The question was because one of the syndicates

9    is in runoff, what -- and doesn't have any underwriters,

10   they're no longer there, whether that syndicate would be

11   agreed to be bound by the testimony of the underwriter for a

12   different syndicate who worked there at the time.

13        And so we specifically said in connection with the

14   Court order, we agreed to be bound by the testimony of James

15   Lawson with respect to the underwriting topics.  So we believe

16   we have complied with that.

17        The destruction of the PII, I simply -- we went

18   through and deleted things off our system, threw out copies,

19   and the Court, under 28 U.S.C. 1746 an affirmation under oath,

20   "I affirm the foregoing is under oath is true and correct"

21   should be sufficient to satisfy that issue.  So that's been

22   done.

23        Information regarding similar claims, we've looked at

24   similar claims that are mold warehouse tobacco.  They haven't

25   had any.  And I'm glad to deal with Mr. Guilbert on that on a

1    separate issue, but there's been nothing there.

2            The privilege logs, we were very specific, Your

3    Honor.  We put them all out.  We numbered them from 1 to 300,

4    let's say, for entry.  So we had some correlation to that.

5            On the revised privilege logs, we amended the

6    responses, as we should, and based on the Court's orders we

7    deleted line items.  However, we kept the same numbering.

8            So when you looked at them, you could go all right, 1

9    through 10 on the revised is 1, 7, and 8, so you knew exactly

10    what documents were coming out of it.  That's what we thought

11    was the simplest and most direct way to address the issues

12    with the privilege log in order that we can keep track of

13    them.

14            With respect to the Heard documents, in accordance

15    with the order, we have just given everything that's out there

16    in terms of the Heard file.  The same with the MRI (ph.)

17    documents in terms of turning them over.  A lot of those

18    documents were within, I think, the scope of the privilege

19    logs, so those have all been produced.

20            I'm having -- I realize that this is late in the day,

21    Your Honor, but I'm happy to go through and designate by Bates

22    numbers which documents came from which entry on the privilege

23    log.  It's -- they were pretty well described by to, from, cc,

24    date, and topic.  And as I mentioned, we took it out.  And so

25    therefore, you'd be able to just correlate the two.  But if we

1  have to, we'll go through and just -- it's simple enough for

2  us.  We can go by the Bates numbers on it.

3       Rule 26 disclosures, we're happy to produce the

4  reinsurance policy.  The difficulty with this is we provided a

5  description.  It's not a one-for-one as Your Honor is probably

6  familiar with reinsurance.  This case may never even give rise

7  to reinsurance.  It might have nothing to do with reinsurance.

8  There's reinsurance out there, but depending on the year

9  unless the quota is met, reinsurance is never implicated.

10      THE COURT:  Well, you have an idea of what the scope

11 of damages could be here if you don't prevail, right?  It's --

12      MR. SAVILLE:  Yes, but then -- you're correct, Your

13 Honor, and then it's broken down by syndicate -- has two

14 percent of that.  So that two percent might not even give rise

15 to their overall look in terms of their ability for the

16 reinsurance, and these are all London insurers, Your Honor.

17 They're not going anywhere.

18      As Your Honor is familiar, I'm sure, we have the lead

19 and we have followers.  There's two leads on this, and there's

20 followers.  There's an agreement party.  The lead underwriter

21 adjusters have been deposed.  The second -- the lead on the

22 second side underwriter adjusters have been deposed.  The

23 agreement party's underwriters adjusters have been deposed.

24 All those documents are out there.  The Following Market

25 doesn't do anything.

1        As one of the underwriters' representatives

2   testified, this I under a Rutherford facility.  So as soon as

3   the lead agrees, it's automatic.  There's nothing else that's

4   done.

5        She testified that listen, I don't really know much

6   about it.  Here's the policy.  I know who these guys are, but

7   once the lead committed us to this under this particular

8   facility, there is no choice.

9        This case has always been about whether moisture

10  would be considered an external cause.  That's it.  Full stop,

11  Your Honor.  There's no debate as to any other issue from our

12  perspective.

13       We've taken the view that moisture, ambient moisture

14  is not an external cause.  Obviously, U.S. Tobacco has taken a

15  different view.  All of this other information while clearly

16  within a broad scope of discovery is totally irrelevant to

17  that issue.  Whether there's some underwriter down the chain

18  has any information is not relevant to anything.  They don't

19  have a choice.  And if they had an objection to the way the

20  case was being handled, that would be sent up to the lead and

21  that would have been produced, because that was within the

22  scope of it.  There had been no such documentation of that at

23  all.  And therefore, we believe we've complied with all the

24  discovery requests.

25       The reason why we did a joint interrogatory response,

1   Your Honor, was for this very reason.  The followers are

2   guided by the lead.  They don't have any independent

3   information as to what the case is about, what's going on,

4   what the facts of it are.  That's the whole purpose of the

5   system.  That's why the lead takes the lead, has an agreement

6   party that'll say yes or no or this is what we're going to do

7   and, therefore, that's where they go.

8           I would be happy to print out thirteen separate

9   copies and just have them all Underwriter 1, Underwriter 2, if

10  that's what's required.  But they're going to be identical

11  because there is no independent information had by the

12  Following Market on any of this information.  The people, the

13  men and the women with the knowledge of this have all been

14  deposed.  All the documents related to that have all been

15  produced.

16          With respect to the last thing that I see, Your

17  Honor, the Heard documents, whatever we've had we produced on

18  them.

19          So admittedly, Your Honor, this is less -- this is

20  not a window or a mirror or perfection in terms of the way

21  this has gone, and that's fully on me.  If there's anyone to

22  blame, I take the full responsibility for that.  These local

23  guys have done a fantastic job, but we believe we've complied

24  with everything that's out there, and that's been our

25  position.

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 18 of 64

1          I'm happy to answer any questions you have.

2          THE COURT:  Well, what U.S. Tobacco heard and what

3     your -- what's the best way to go about resolving the concerns

4     you have?  Mr. Saville's telling me everything's been

5     produced, so how do we satisfy you that that's correct?

6          MR. GUILBERT:  Well, I think first of all, I

7     understand now that there's no debate that this case is only

8     about whether there was an external cause.  If that's the case

9     then the number of the insurer's primary defenses that it had

10    not been explained or it should be stricken or withdrawn

11    voluntarily by the insurers, for they just haven't answered or

12    explained the basis for these defenses.

13         So for example, the affirmative defense number 3, in

14    this case, says that the plaintiffs have not complied with

15    conditions precedent to coverage and, therefore, there's no

16    coverage in this case.  No explanation for that in the

17    interrogatory responses.  It should be out at this point.

18         There was another contingent interrogatory, they

19    didn't mention this one, that said if you contend that there

20    was prejudice, that you're prejudiced by the timing of the

21    notice in this case.  Now, there's a late notice defense in

22    this case, but very forgiving language in the policy that says

23    that the insurers have to prove that they were prejudiced.

24    They haven't answered that or explained the basis for how they

25    were prejudiced.  Those are the types of defenses that, I

1  would think if you're not going to answer them, they should be

2  out.

3          THE COURT:  I've got plenty to deal with with what

4  I've got here.  I don't necessarily want to open up a whole

5  new can of worms, and if you feel like filing a Rule 11

6  motion, go through the process to do that.  If you feel like

7  filing a motion for summary judgment, do ahead and do that.

8  And that's all stuff that you can deal with.  I'm talking

9  about what we got here today.

10          I mean, Mr. Saville's talked about he's willing to

11  put together thirteen different copies of interrogatory

12  responses.  Do you want that?

13          MR. GUILBERT:  Well, I think that we should have

14  responses from everyone, and not sure that those will be

15  identical.  I heard him to say that all of the insurers are

16  bound.  Well, we've deposed some of the insurers, not all of

17  them.

18          We have, for example, one insurer who said that he

19  disagreed with denials of request for admission that we

20  understand have been prepared by AEGIS, the lead.  So here,

21  you've got a Following Market insurer who has a different

22  understanding of the facts in this case.  And that's why I'm

23  suspect of the notion that we can just have a signature from

24  each of the thirteen insurers and that's going to take care of

25  the issue.

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO   Document 90   Filed 05/11/21   Page 20 of 64

1          I think that the real issue is that they're -- is

2    discoverable information from the lead, and if they do have

3    reporting obligations to all the other insurers.  And one

4    specific example that we talked about -- and this goes back to

5    the Rule 26(f) conference in this case -- and I recognize that

6    there are thirteen insurers here.  One way to communicate with

7    each other is they use what's called the Xchanging Claim

8    system in London and that's how they submit reports back-and-

9    forth to each other.

10         Now, we got a screen shot finally of two different

11   Xchanging Claims system database entries, but we don't have

12   what you would suspect -- or expect to receive with a claim

13   that's worth in excess of ten million dollars.  There would be

14   more communications.

15         And so I'm just skeptical of the notion that every

16   insurer is going to be completely on board with the AEGIS

17   insurer who is really the only one who's fully answered and

18   provided documents.

19         THE COURT:  Well, let's -- I mean, let's get to the

20   point that I -- of the issue here.  I mean, you -- what I'm

21   hearing from you is you would like to see thirteen separate

22   responses to the interrogatories, each with a verification; is

23   that correct?

24         MR. GUILBERT:  Yes, Your Honor.

25         THE COURT:  All right.  Mr. Saville, is that

                eScribers, LLC | (973) 406-2250
             operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 21 of 64

 1    something you can do?

 2              MR. SAVILLE:  Yes, Your Honor, we will.

 3              THE COURT:  All right.  Then let's go ahead --

 4              MR. SAVILLE:  And they will change because we

 5    identified all the witnesses across the board.  So he's right.

 6    For AEGIS, I'm not going to name the Mitsui guy who would have

 7    knowledge; I'll do that on Mitsui.  On the joint one, I named

 8    everybody.  So we'll take care of that.

 9              THE COURT:  All right.  And then --

10              MR. SAVILLE:  The privilege log issue, Your Honor, we

11    could do that as well.  I mean, that's --

12              THE COURT:  I mean, it does sound like from what

13    you've explained, it sounds like you should be able to say

14    well, number 8's not there because we're no longer claiming

15    privilege on number 8 or the judge waived the privilege.

16    Something like that.

17              MR. SAVILLE:  That's exactly what we did --

18              THE COURT:  All right.

19              MR. SAVILLE:  -- what we did, Your Honor.

20              THE COURT:  Then be sure to have that conversation.

21    I mean, you're all here today.  It would be useful to,

22    perhaps, have that conversation today while you're all present

23    and face-to-face.

24              It sounds like on similar claims the issue is there

25    aren't any similar claims that they've located.  What is

1   USTC --

2            MR. SAVILLE:  Your Honor -- oh, I'm sorry.

3            MR. ANDERSON:  No, it's good.

4            MR. SAVILLE:  We've taken similar claims as mold

5   damage, tobacco and a warehouse.  If tobacco was on a ship and

6   a wave hit it, it got wet and moldy, that, in our view, is not

7   a similar claim.  So we've looked at well, have you had

8   tobacco warehouse mold claims and we've gotten back with no at

9   this point.

10           If the scope should be something broader, I'm happy

11  to consider that, Your Honor, but that's the interpretation we

12  had of it.

13           MR. GUILBERT:  Okay.  Your Honor, that's not the

14  request.  The request is broader and is not limited to just

15  tobacco claims.  So I think that there's a -- they should

16  answer the interrogatory that we sent to them.

17           And if could just go back to the privilege log issue.

18  I mean, of course, happy to work through document issue with

19  them, but there's a larger issue.  We do have an order that

20  says how electronic documents should be collected and

21  produced, and the insurers have not complied with that.

22           So if they're going to go back and do things with

23  their privilege log, tell us which documents have come off the

24  log and reproduce documents, they should be complying with the

25  order that was agreed to rather than just producing random PDF

1   documents that are hard to decipher and match up with the

2   privilege log.

3          Now, that's something that normally you would be able

4   to work through in a meet and confer process, but they need to

5   do it right the first time.

6          THE COURT:  So what I've heard from Mr. Saville, or

7   what I understand him to have said, was that they've now

8   numbered everything that was on the privilege log and the

9   things they've taken off, there should be a gap on the

10  privilege log for whatever -- like I said, I think number 8 is

11  no longer there.  And what is your concern with that?  I

12  admittedly, have not reviewed that electronic discovery order

13  recently, so maybe I'm just not remembering what's pertinent

14  about it, but what is your problem with that method of

15  production?

16         MR. GUILBERT:  Because we can't match up what's come

17  off the log and what supposedly has been produced to us with

18  what the log had on it before.  We just haven't been able to

19  figure it out.  Now, if they want to walk us through it and

20  show that they've done it, then that's fine.  But we've gone

21  through that exercise with the defendants in this case

22  multiple times.  I think the last time we tried it was in

23  November or December, and we didn't really get anywhere.

24         THE COURT:  Mr. Saville, can you sit down with them

25  and walk them through what's come off the log?

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO   Document 90   Filed 05/11/21   Page 24 of 64

1          MR. SAVILLE:  Mr. Karn and I will.  Mr. Karn has the

2    detailed knowledge of that.  I don't -- I know how it worked,

3    I don't know anything after that, Your Honor.

4          THE COURT:  With respect to request for production,

5    and what I've heard from U.S. Tobacco is the same concern over

6    a joint response.  Was individualized responses going to be --

7          MR. SAVILLE:  We'll segregate them out, Your Honor.

8          THE COURT:  All right.  Have I covered all the issues

9    that you've raised here?

10         MR. GUILBERT:  Yes, Your Honor.  And I think we went

11   into much greater detail than -- if you could refer to exhibit

12   E which is in your notebook.  I think it goes point by point

13   through each of the document requests on why we don't think

14   that they're in compliance.  So we'd still like them to

15   comply --

16         MR. SAVILLE:  Your Honor --

17         MR. GUILBERT:  -- as they were directed to.

18         MR. SAVILLE:  I'm sorry, Shelby.

19         Your Honor, I'll use that as a guide.  I'll go

20   through it.

21         THE COURT:  Okay.  All right.

22         Next item I had on my agenda was the role of local

23   counsel here.  Mr. Saville has noted that their role here is

24   generally as uninvolved with what's going on here in terms of

25   substance and simply --

1              MR. SAVILLE:  I confirm that, Your Honor.

2              THE COURT:  -- they're complying with the rule.

3              MR. SAVILLE:  Absolutely.

4              THE COURT:  All right.  So Mr. Saville, obviously,

5       we're here -- well, the order was on the second motion to

6       compel.  Judge Boyle issued an order previously on the first

7       motion to compel in which he kind of said, as I read it, you

8       all should have worked this out, so we're going to deny it

9       without prejudice.  But he did caution the parties, and

10      particularly the defendants of the need to comply with

11      legitimate discovery or sanctions would ensue, and I just

12      wanted to get your -- what you understood that order to mean

13      in terms of how to conduct discovery going forward.

14             MR. SAVILLE:  Your Honor, we understood it as it was

15      read.  It was our understanding that we were compliant

16      throughout the -- we've taken the view, as I've explained,

17      that it -- the discovery refers to the lead -- the second lead

18      and the agreement party and that's all been done.  All those

19      depositions have been taken.  All those interrog-- depositions

20      have been taken.

21             THE COURT:  But what I'm trying to get at is when

22      Judge Boyle issued this order back in October of 2020, what --

23      I mean, what did you understand him to say in terms of the

24      need to comply with the rules going forward?

25             MR. SAVILLE:  That there was, in fact, a need based

1    on what he saw, Your Honor.

2            THE COURT:  And you understand the sanctions that are

3    available to the Court to punish noncompliance with discovery,

4    right?

5            MR. SAVILLE:  Fully do, Your Honor, yes.

6            THE COURT:  And you understand among those are

7    designating certain facts in the case as true?

8            MR. SAVILLE:  Correct, Your Honor.

9            THE COURT:  And you understand that the Court could

10   prohibit a party from introducing certain matters into

11   evidence?

12           MR. SAVILLE:  Correct, Your Honor.

13           THE COURT:  And you understand the Court could strike

14   pleadings?

15           MR. SAVILLE:  Yes, Your Honor.

16           THE COURT:  And you understood that the Court could

17   order entry of a default judgment?

18           MR. SAVILLE:  Correct, Your Honor.

19           THE COURT:  All right.  Explain to me why there was

20   such an issue with complying with the Court's local rules and

21   the federal rules with respect to post-removal proceedings.

22   There seem to be a number of missed deadlines and other things

23   like that.  What was the problem?

24           MR. SAVILLE:  There was no problem per se, Your

25   Honor.  I think it was a day or so on corporate -- if I

1   remember, it was corporate disclosures or something along that

2   line.  There were also ongoing discussions among the parties

3   and meetings among the principals.  So it wasn't as if we

4   filed a notice for removal and ignored the case.  There was

5   many other things that were going on at the time.  And the --

6   without going into too much detail, those discussions and

7   meetings, the idea was to get those done before there would be

8   a need to file anything.

9        And as they pertained to settlement, you won't -- I

10  don't believe you'll see anything of that in the record, but

11  that was the idea is that all right, we've removed it, let's

12  see if we could have a sit-down, we could talk.  That didn't

13  go anywhere.  But the dates, the way it was keyed is I frankly

14  didn't leave enough time from the time we had the sit-down to

15  a day later, or two days later having to file the corporate

16  disclosure or the financial terms or something along that

17  line, Your Honor.

18       THE COURT:  Well, it looks like the notice of removal

19  that needed to be filed in state court, or showing it complied

20  with state court --

21       MR. SAVILLE:  Yes.

22       THE COURT:  -- was filed three months later.  The

23  financial disclosures were filed a month late.  That's not a

24  day or two; that's a substantial period of time.  So why was

25  the deadline so hard to comply with?

                      eScribers, LLC | (973) 406-2250
                 operations@escribers.net | www.escribers.net
        Case 5:19-cv-00430-BO   Document 90   Filed 05/11/21   Page 28 of 64

1          MR. SAVILLE:  I have no excuse for that, Your Honor.
2      I couldn't tell you other than it was probably a holiday
3      season, gathering information.

4          THE COURT:  Well, what about filing the answer?  I
5      mean, the answer was late and there was repeated statements
6      about we'll file it, we'll file it, and they reminded it, and
7      you said we'll file it, and it never got filed.  I mean,
8      obviously, they didn't move for default there, and eventually
9      you did get around to filing it, but what was the problem with
10     getting it filed either on time or the way you told opposing
11     counsel you'd do it?

12         MR. SAVILLE:  There was no problem per se, Your
13     Honor, other than the timing of it.  And again, that is on me.
14     That key to the meetings that were had, I don't remember those
15     dates perfectly.  But there were meetings ongoing.  So as
16     opposed to incurring the cost that might be incurred going
17     forward, we dedicated the time and effort into seeing if we
18     could set this up to have a meeting among the parties which,
19     in fact, went forward.

20         So on its face, Your Honor, it clearly looks like I
21     sat on my hands and did nothing for thirty days or sixty days
22     or whatever that time frame is.  Behind the scenes, however,
23     there were sit-downs and discussions about the possibility of
24     resolving the case with the plaintiff, and that's what was
25     going on in the background at that time.

1          THE COURT:  Moving on beyond that, I mean, one of the

2     things that sticks out to me here is that out of the thirteen

3     insurers, only one ever got around to -- well, until, perhaps,

4     recently -- ever got around to filing discovery -- or

5     interrogatory responses, and I'm curious why the other twelve

6     didn't.

7          MR. SAVILLE:  Your Honor, the one reason is we took

8     it as the whole idea of the lead and the Following Market, and

9     other than that was me just not chasing it up, to be frank

10    with you.  We took the approach that well, listen, if the

11    leads had responded, everyone's been deposed, we just -- till

12    this second order came out, we did not act with respect to the

13    Following Market, Your Honor, and that's on me.

14         THE COURT:  Well, and I mean, you've mentioned that

15    several times.  Why was that not brought up early on and,

16    perhaps, a Rule 26 report or early protective order?  I mean,

17    that's the way to handle this appropriately, not to just

18    disregard the obligation and never going to respond because

19    you don't think you have to.

20         MR. SAVILLE:  Understood, Your Honor.  And I don't

21    recall.  But usually, one of the objections is we're answering

22    on behalf of the leads and not the followers in terms when it

23    comes to the document side of that.  And I don't recall off

24    the top of my head that was done.  But this is -- and maybe it

25    was just being too familiar with the normal progress of one of

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 30 of 64

 1  these coverage litigations in the fact that it's the lead and

 2  the agreement, and I just didn't perceive to say oh, we need

 3  everything from the Following Market on that, but that's all I

 4  could offer you, Your Honor.

 5          THE COURT:  Well, why did it take AEGIS until several

 6  months after the deadline to serve its responses?

 7          MR. SAVILLE:  I have no excuse for that, Your Honor.

 8          THE COURT:  And I have effectively the same questions

 9  on the request for production response.

10          MR. SAVILLE:  That's --

11          THE COURT:  It seems that only four of the thirteen

12  got around to filing it, and -- or serving them until,

13  perhaps, recently with the order on the second motion to

14  compel.  So what's the issue there?

15          MR. SAVILLE:  The discovery responses were, as I

16  recall, were timely filed, or a day late, and then we produced

17  the whole series of documents with respect to that.

18          On the second motion that there's no excuse, Your

19  Honor, now that I see your point, that's on me.

20          THE COURT:  Well, and part of what came up during

21  some of the deposition testimony that was included with the

22  second motion was indications that readily available sources

23  of responsive documents hadn't been searched.

24          MR. SAVILLE:  Yeah.

25          THE COURT:  What is the -- your viewpoint on that?

1          MR. SAVILLE:  As I recall, everything was searched.

2    Whether or not that eventually got to me, I don't have any

3    understanding of that, Your Honor, but we asked for those --

4    the standard searches on policies, names, people, that type of

5    stuff, and we produced what we got back.

6          THE COURT:  So --

7          MR. SAVILLE:  So if there are claim snapshots, or

8    what those documents were Mr. Guilbert described and we got

9    them, we produced them.  If there are others out there, I'll

10   double-check to make sure we've got whatever it is.  Not

11   every -- for example, the -- it's in ECF which has been

12   produced, an electronics claims file, which everybody has

13   access to.  So if it's -- it's just one document.  The broker

14   has input, and that type of information has been out there,

15   and that doc has been produced.

16         THE COURT:  Does U.S. Tobacco agree that they

17   searched all the things they should have searched?  I mean,

18   your -- what you provided the Court were these deposition

19   testimonies, people saying well, there's this file over here

20   and it hasn't been searched.  So which one of you is telling

21   me the truth?

22         MR. GUILBERT:  Your Honor, we don't think that

23   they -- they've gone into all these sources.  We went through

24   testimony.  Ms. Dehnel's here with me.  She took most of the

25   depositions, and asked about specific sources.

1          So I mentioned earlier, Mr. Foulger who is even in

2     AEGIS, the lead claim handler said he's got a claim diary.  We

3     don't have it.  We had specific testimony from other witnesses

4     who said well, we have an underwriting database, that that

5     database would have emails and other responsive information.

6     "Were you ever asked to go collect information from that

7     repository?"  Answer, "No."

8          And so, I don't think it's the case that we still

9     have everything.  And I think going back to the suggestion

10    that there was ever an agreement that we would only take

11    the -- only needed the lead insurer's information, we

12    specifically talked about this at the Rule 26(f) conference

13    and said that we expect to receive the documents and

14    information from all thirteen of the defendants in this case,

15    and we were told that that was going to be forthcoming.

16         So I don't think that we have all of this information

17    that the testimony revealed that was never collected.

18         THE COURT:  So Mr. Saville, what you told me is

19    you've asked your clients to do the standard searches,

20    whatever that entailed --

21         MR. SAVILLE:  Right.

22         THE COURT:  -- and what the deposition testimony said

23    was they didn't search certain databases.  So how do I

24    reconcile those two?

25         MR. SAVILLE:  They're -- for one of two reasons, Your

1    Honor.

2              First is the witness isn't necessarily the person

3    that has searched the databases.  There's an IT person that

4    that search is conducted by.  And then all of that information

5    is gathered, sent to us, and produced.  So when a particular

6    witness may or may not know, I can't say as I stand here now,

7    whether that witness actually participated in it, whether he

8    didn't.  I just -- I don't know.  I don't know the answer to

9    that.  And I'm happy to go through and have each of the

10   insurers submit a two paragraph affirmation that said searches

11   have been conducted and this is the result of the searches

12   have been provided type of scenario.

13             THE COURT:  Were these 30(b)(6) deponents?

14             MR. GUILBERT:  Yes, and Your Honor, that's what I

15   want to say.

16             MR. SAVILLE:  Yeah.

17             MR. GUILBERT:  These are all designees on document-

18   related topics.  It's too late for that.

19             THE COURT:  The privilege logs, obviously, are a big

20   issue here.  But again, there was no -- from what I've seen in

21   the record here, there was no privilege log produced until the

22   first motion to compel was filed, as opposed to producing it

23   at or near the time documents were withheld.  So why was that

24   the case?

25             MR. SAVILLE:  I don't know, Your Honor.  I'll be

1    honest with you.  I don't have an answer for that.

2          THE COURT:  One of the issues that was raised is in

3    your response to the second motion to compel, you indicated

4    you were serving an updated privilege log concurrently with

5    that filing and it turns out it didn't happen that way.  It

6    was served -- part of the log was served, I think, the next

7    day, and then further logs were served, I think, the next week

8    or, perhaps, the week after that.  What's with that

9    discrepancy?

10          MR. SAVILLE:  That's just a time issue, Your Honor.

11    We underestimated the amount of time.  We're looking through

12    it, processing the documents, and unfortunately, it took

13    longer than we had hoped, longer than we expected.  But we got

14    all the privilege logs out there.  We got them and that they

15    were compliant.

16          Obviously, now that Your Honor's ruled, we're going

17    to adjust it to go by the documents that are out there.  But

18    it's not a question of intentionally hiding or failing to

19    produce anything, it's more a question of just the timing of

20    it, and the ability to process all of that information.

21          THE COURT:  Well, as you read the record as a whole,

22    it seems the only time there was any real movement on the part

23    of the insurers was when there was either the court deadline

24    or a deadline to respond to a motion, and that was a repeated

25    theme as you look at the way things happened here, and that is

1    disturbing to me that it didn't seem things were getting done

2    the way they were supposed to, only when matters -- when push

3    came to shove and you would have to answer to the Court in one

4    form or the other that anything got done, because all the

5    disclosures seem to happen on the eve of a filing or a court

6    hearing.

7            MR. SAVILLE:  More recently, that could be true, Your

8    Honor.  All initially throughout this whole thing, the

9    documents were produced, the depositions went forward, it's --

10   I don't have any explanation for what you're particularly

11   pointing at right now, Your Honor.

12           THE COURT:  Part of what I'm concerned about here, is

13   I read the correspondence between the parties.  It seems like

14   there were oftentimes promises made or assurances given from

15   your side that didn't come to fruition, and you are here in

16   our court and are subject to our rules which are the North

17   Carolina Rules of Professional Conduct.  So do you believe

18   you've complied with your duty of candor to the opposing

19   party?

20           MR. SAVILLE:  Yes, I did, Your Honor.  It always came

21   down to a matter of timing which as I believe all of those

22   reflect.  And I was always too aggressive in terms of hey, we

23   can get it to you tomorrow type of approach when, in fact, it

24   would take three or four days, or in terms of the timing of

25   it, it was never anything where I said, oh, I've got this

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 36 of 64

1    document, I'm going to make sure I don't give it to him

2    because I'm going to intentionally hide that, I think it was

3    just a question of the volume of information and the inability

4    to process this probably as quickly as we should have.

5         THE COURT:  Well, it seems that -- there seem to be

6    on very many occasions in which, again, promises were made or

7    assurances given, and they weren't kept, and I just have

8    trouble seeing it over and over again.  I certainly understand

9    the realities of litigating and how on occasion you may

10   misjudge things, but it seemed to be a regular occurrence here

11   which again seems to indicate more of a -- that wasn't an

12   accident that it was going on, or that it was, perhaps, part

13   of a pattern here.

14        MR. SAVILLE:  Your Honor, it's -- we're all still

15   remote up in New York, and that's no excuse, and I haven't

16   mentioned it to them, but that plays a role in the timing,

17   trying to get it in.  I got in when we can.  It's remote.

18   That doesn't change the result, Your Honor.  I'm not trying to

19   suggest it does, but just to offer some insight as to what

20   I've got going.

21        THE COURT:  Well, I have several cases where we're

22   dealing with counsel from New York and other places that have

23   been hard hit with COVID and --

24        MR. SAVILLE:  Understood.

25        THE COURT:  -- and people are practicing remotely and

1   certainly, again, some disruption or some slow down would

2   certainly be understandable.  But again, it appears from the

3   record here it was a regular occurrence.  But along -- in the

4   same vein, I'm concerned about candor to the tribunal, and I

5   noted that in my order.

6           I'm looking at your opposition to the second motion

7   to compel, and again it's the issue of supplemental privilege

8   logs have been produced contemporaneously with this filing,

9   and that did not happen.  They had not been produced as you

10  represented to the Court.  You've indicated that's an issue of

11  misjudging or timing.  But again, it's not as if you said it

12  will be produced in three days and it wasn't.

13          MR. SAVILLE:  Nothing --

14          THE COURT:  You said it had been produced.  So how do

15  I --

16          MR. SAVILLE:  You're correct, Your Honor.

17          THE COURT:  How do I reconcile that?

18          MR. SAVILLE:  You can't, Your Honor.  It's something

19  that at the time that that was going in we thought we were

20  where we needed to be and we weren't.

21          THE COURT:  I'm looking at your opposition to

22  plaintiff's first motion to compel, which was filed in, I

23  believe, early May, and it said, "Certified responses to

24  interrogatories will be produced promptly" and as we went

25  through the rest of this case, that didn't seem to be the

1    reality.  So I'm wondering how do I reconcile that statement
2    made to the Court with the reality that only one of the
3    insurers ever responded until the second order came out.
4              MR. SAVILLE:  Other than what I've explained, Your
5    Honor, no.  Nothing further, I should say.
6              THE COURT:  And in response to your second motion to
7    compel, you told the Court that interrogatory responses have
8    been served and are undergoing amendment to the extent
9    required.  But again, that didn't seem to the case.  So how do
10   you explain that?
11             MR. SAVILLE:  They were being amended.  They weren't
12   served until recently, Your Honor.  That's -- there is no
13   ability to reconcile that.
14             THE COURT:  At the December hearing, you told the
15   Court that you would amend discovery responses and provide
16   certified answers.  And again, I take it that has not
17   happened --
18             MR. SAVILLE:  No, Your Honor.
19             THE COURT:  -- until, perhaps, recently.
20             MR. SAVILLE:  Correct.  And as I mentioned, we'll go
21   through and have them individually certified, Your Honor.
22             THE COURT:  Well, that's certainly one issue.  I
23   mean, the other issue is, again, there are repeated statements
24   to the Court that turned out not to be true.  And I'm trying
25   to understand as an officer of the court, as someone who's

1  bound by the professional rules of this court, how do I -- how

2  do I deal with that?

3          MR. SAVILLE:  Your Honor, I have no explanation other

4  than it's a time issue, and grossly underestimated what was

5  required to take time on it and it just --

6          THE COURT:  So you've taken a lot of this on

7  yourself.  In terms of -- as I look at the possible options of

8  sanctions, there's, obviously, sanctions against attorneys and

9  there's sanctions against parties.  Do you care to opine on

10  the division of the responsibility for the shortcomings that

11  the Court has identified?

12          MR. SAVILLE:  Your Honor, the shortcomings are all

13  mine.  I mean, I'm not making any statement -- any other

14  representation other than that.  There's -- that's on me.

15          THE COURT:  Well, if that's the case, then why should

16  we continue to allow you appear in this case?

17          MR. SAVILLE:  Other than my representation that going

18  forward I'm the attorney that's most familiar with it, I think

19  the client would be prejudiced and then we'll -- you won't be

20  seeing me stand up here again like this.

21          THE COURT:  Why should I not refer this to the

22  court's disciplinary process given the misrepresentations that

23  have been made to the Court and the overall way discovery's

24  been conducted here?

25          MR. SAVILLE:  I don't believe that's necessary, Your

1    Honor.  Discovery's been conducted in good faith.  The

2    representations were made in good faith.  I understand the

3    particular points that you brought up and it's just a question

4    of -- it's always been a question of timing to get it done.

5           THE COURT:  Well, we're here in May of 2021, and my

6    understanding is these discovery requests were served in

7    December of 2019.  I mean, that's a long time for it to take

8    to get a set of responses out.  And it only -- it's taken two

9    motions to compel to get things done, and it sounds like we're

10   not even where we need to be in terms of getting responses

11   out.  So what would you -- how would you -- what's your

12   position on why that's okay?

13          MR. SAVILLE:  It's certainly not okay, Your Honor,

14   and I -- other than my explanations to you, I don't believe

15   it's okay.  I don't believe that's the way the cases should be

16   litigated.  Unfortunately, this is one that went that

17   direction.

18          THE COURT:  Well, because, I mean, I've got -- we are

19   an incredibly busy court.  We have many litigants in front of

20   us, and I'm trying to figure out in terms of dissuading other

21   litigants from taking this course of action here, how do I

22   make it known to the public at large, the bar at large, that

23   this sort of conduct is not acceptable in this court in terms

24   of discovery and taking four -- what, fourteen, sixteen months

25   to respond to discovery.

1          Certainly, we have the tool of entering a default
2    judgment against your clients, why is that not appropriate
3    here?

4          MR. SAVILLE:  Because there's been participation in
5    discovery, Your Honor.  If anything, they're -- that has to do
6    with me.  The client shouldn't be penalized for having a
7    default judgment entered when they've complied in good faith
8    with ninety-five percent of everything that's been asked of
9    them.  The depositions have all been completed, as we
10   mentioned.  I would be surprised if we're standing in front of
11   you again -- excuse me -- in front of the district court and
12   the jury at the time of trial and anything other than what was
13   done last summer really plays a role in the outcome of this
14   case at all.

15         I think default is an extreme remedy at this point.
16   I don't believe it's warranted under the facts and
17   circumstances of this case.

18         THE COURT:  Well, what about limiting the materials
19   you could present in motions or at trial to things that were
20   disclosed in a timely manner?  So anything that you didn't
21   disclose after January 2020 doesn't get to be able to be used
22   by you?

23         MR. SAVILLE:  Again, Your Honor, that's an extreme
24   remedy, or extreme penalty for the situation that we're in.  I
25   don't believe that would be fair to the clients.  I don't

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 42 of 64

 1  believe -- it couldn't be a just result in terms of where we

 2  are right now.

 3          THE COURT:  Well, since U.S. Tobacco's had to wait

 4  well over a year to get discovery, why wouldn't it be fair?  I

 5  mean, whether it's -- you are -- you claim it's your fault,

 6  but the client hired you and they have to bear with the

 7  decisions you make.  And here, it appears that for one reason

 8  or another, we're now sixteen months into this, seventeen

 9  months into this, and they still don't have the discovery

10  responses that they are entitled to.  And so perhaps your

11  client needs to suffer the consequences of their attorney's

12  actions in this case.

13          MR. SAVILLE:  I don't believe the remedies of default

14  or striking particular pleadings or affirmative defenses or

15  discovery after a certain date would be an appropriate remedy

16  in this particular case.

17          The depositions have been done.  The documents have

18  been produced.  Experts have done reports.  And we're at that

19  point, Your Honor.  If there's any penalty, it should lie at

20  my feet, not in terms of penalizing the client in striking an

21  answer or a default or anything along that line.  That

22  wouldn't be fair or equitable in this circumstance at all.

23          THE COURT:  Well, it guess it depends on how you look

24  at it.  I mean, it seems -- from what I've seen -- and I

25  expressed this in my order -- it seemed that you or your

1   clients didn't think you had to comply with the rules of

2   discovery at all.  It seemed like it was totally optional on

3   whether you wanted to do it or not, and only when pressed did

4   you do anything.  So if that -- if that's the case, how do

5   I -- what message to I send to the bar if I just say, oh,

6   here's some attorneys' fees.  On the whole, it's -- it doesn't

7   seem to send the right message if there's not an extreme

8   penalty here.

9           MR. SAVILLE:  I believe the attorneys' fees or

10  shifting the costs is an extreme message in this circumstance,

11  Your Honor.

12          THE COURT:  As I reviewed U.S. Tobacco's pleadings,

13  they always ask for whatever other sanctions the Court

14  imposed.  I mean, what is USTC's position on appropriate

15  sanctions here, and if you think it's something like default

16  or limiting evidence or limiting pleadings, what prejudice has

17  your client suffered?

18          MR. GUILBERT:  Your Honor, our client has incurred a

19  lot of fees just chasing the insurers' trying to responses to

20  discovery requests.  And I'd be happy to put together what

21  that looks like in terms of time and costs to file multiple

22  motions to compel, try to meet and confers, send deficiency

23  letters.  So that's something that we could put together, and

24  I think that is real prejudice.  But I think beyond that, our

25  clients are eager to move the case forward.

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO   Document 90   Filed 05/11/21   Page 44 of 64

1        So I think that one sanction that the Court might

2    consider is, I think at this point, this really should be the

3    trial around damages and a trial about bad faith at this

4    point.

5        I think that we're not getting discovery about the

6    affirmative defenses in this case that have been asserted, and

7    at some point, we should just move forward to a damages trial.

8        THE COURT:  Well, I mean, you mention the fees and

9    all that, I certainly don't quibble with that, but is there

10   any other prejudice that your client has suffered?

11       MR. GUILBERT:  I think prejudice is the time value of

12   money and -- we do have a claim for pre-judgment interest in

13   this case.  We do have a bad faith claim in this case.  It's

14   one of the remedies you get for this type of conduct, and as

15   to the treble damages penalty, we intend to seek that.  But I

16   think just to -- having to wait and wait and wait, I think, at

17   some point it's more than just fees.  And I think that it does

18   get harder as more time goes by with witnesses and people who

19   knew on the insurer's side haven't been to the site in five

20   years.  Maybe we can cross-examine them and do that at trial

21   to establish that they don't remember or don't have a

22   recollection and the jury can do with that what it may, but I

23   think the more time that goes by it gets harder to try this

24   case.

25       THE COURT:  Realistically, who is -- who does the

1   damages award go to if you were to prevail at trial, right?

2   Obviously, USTC, but then what happens to that money?  Does it

3   go to the various cooperative -- members of the cooperative or

4   what happens to that?

5           MR. GUILBERT:  And Your Honor, I don't know where the

6   funds would go once it goes to the cooperative, or what they

7   do with the funds.  I know they've got a board of directors

8   now and they would be looking at that.

9           THE COURT:  And which affirmative defenses do you

10  contend should be stricken at this point?

11          MR. GUILBERT:  Oh, I think most of them, Your Honor.

12  I think I mentioned some by specific number earlier where

13  there was just no response from any of the insurers.  And keep

14  in mind here that twelve -- and it's still our position that

15  twelve of the thirteen never answered interrogatories

16  including interrogatories didn't even state the basis for the

17  claims or defenses in this case.

18          So twelve of thirteen haven't answered.  We got

19  answers that aren't under oath as they were ordered to do.

20  We've got some where they just chosen not to answer at all

21  whether these affirmative defenses.  Maybe they're just to --

22  there was a little bit of kitchen sink approach with the

23  answer that we received.  Some defenses that hadn't been

24  articulated in prior coverage letters, but they're in the

25  answer, right.  And sure, we could file a motion for summary

 1   judgment, but if they're not going to answer and explain the

 2   basis for the defense after being asked to do so for fifteen

 3   months, at some point those defenses should be out of the

 4   case.

 5              I think that there is a -- I mentioned a notice

 6   defense.  I think that there's now deposition testimony that

 7   can't be reconciled with the defense.  So that's one that I

 8   think should be gone.

 9              We thought that when we got the amended responses

10   that they would explain -- either explain the basis for that

11   defense or how to reconcile the testimony or it would be out,

12   but that's not what happened.

13              There's a duration of cover exclusion in the

14   insurance policy that they have to clearly establish.  And

15   that the mold was growing on the tobacco before it came into

16   the warehouse.

17              We got the lead claim adjuster in his deposition said

18   that he could not clearly establish that the mold started

19   growing on the tobacco before it entered the warehouse.

20   That's 30(b)(6) are out.

21              We also now have the Heard report saying it could be

22   speculative to reach that conclusion, and that was her report

23   that was hidden from us for the last two years that we didn't

24   get until we got your order two weeks ago.  So that's another

25   type of defense and the list goes on.

                    eScribers, LLC | (973) 406-2250
                  operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 47 of 64

1        There's an inherent vice argument that tobacco is
2    just inherently moldy and there's an inherent vice.  Well, we
3    now know that from a handful of the new documents that were
4    produced to us that insurers, after this loss occurred,
5    thought about adding an inherent vice exclusion to the policy.
6    It's not in ours.  But those are the types of defenses, that
7    if they're going to go back and seriously redo the
8    interrogatory responses, some of those defenses should be out
9    of the case now, or they should explain how they plan to prove
10   them, but they haven't done either.  They haven't reconciled
11   them with the testimony, the documents, and I don't think that
12   they can.  So those should be out.
13           THE COURT:  Anything else U.S. Tobacco wants to add
14   to that?
15           MR. GUILBERT:  No, Your Honor.  Anyone else?
16           THE COURT:  Mr. Saville, anything else on your behalf
17   or on behalf of the clients?
18           MR. SAVILLE:  Your Honor, the only last thing is the
19   interrogatory responses, we believe, with respect to the
20   affirmative defenses, I think, as Mr. Guilbert might have
21   pointed out, there's one that says we incorporate the terms
22   and conditions of the policy.  One is a condition precedent
23   which is out because we haven't responded -- not that we
24   haven't responded to, but we don't believe there was any issue
25   with that.

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 48 of 64

1        But with respect to the others, they've all been

2   identified in here in terms of the reason and the factual

3   basis for why they've asserted them.  And there's been six

4   witnesses or five witnesses that have explained ad nauseum the

5   basis for all those assertions.  So with that, Your Honor,

6   there's nothing further.  Thank you.

7        MR. GUILBERT:  I think, you know, one thing that I've

8   omitted is that I think at some point we -- and depending on

9   which defenses are in the case, there may be some need for us

10  to supplement our expert reports that we had submitted.  We

11  were in the process of expert discovery when Your Honor

12  decided to hold the case in abeyance while we resolved these

13  issues.  I think that amendment with some of the documents we

14  received, I think that we might want to supplement some of our

15  reports.  In particular, our bad faith expert.  And also one

16  of our experts on some of the mold information we have from

17  Dr. Heard.

18       We don't think that that should entitle the insurers

19  at this point or another round of rebuttal expert reports.  We

20  want to get this case moving, but that's something else that

21  we will need to do.  We spent a lot of money in the first

22  round trying to put all that together.  And there are,

23  probably, one or two other depositions that we're going to

24  need just from a fact deposition prospective.  So we'll have

25  to build that into the schedule.

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 49 of 64

1          THE COURT:  Well, certainly, and if there are

2     outstanding issues, I would say after the parties meet and

3     confer about it if you can't reach an agreement, pass it to

4     the Court and we'll take a look at it.  Obviously, there

5     should be -- we should be at a point relatively soon where the

6     discovery record should be about as complete as it's going to

7     be and then you can make the decisions on what needs to happen

8     in terms of experts and motions practice and all that.

9          MR. SAVILLE:  Your Honor, they're not going to have

10    an issue from us in terms of scheduling and things need to be

11    done.

12         THE COURT:  As indicated in my earlier order, I

13    believe this is an egregious situation.  It appears the

14    discovery was slow-walked to an extreme, and I think it's just

15    not acceptable for an attorney to practice in this court

16    whether members of the bar or members who are -- attorneys who

17    are appearing by special appearance to conduct discovery in

18    that way.  It's unacceptable for clients to attempt to conduct

19    discovery in that way.  It slows down litigation.  It does not

20    help achieve a just, speedy, and effective administration of

21    justice as the federal rules envision, and it simply slows

22    down the process, makes it more expensive, prevents the court

23    from moving things forward to the resolution of the case,

24    whatever it is.

25         So the conduct here is completely unacceptable from

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 50 of 64

1    the Court's viewpoint.  And I'm obviously not privy to

2    conversations between local counsel and out-of-state counsel,

3    but certainly part of the role of local counsel is conveying

4    the court's expectations of foreign counsel to them, and

5    certainly this does not appear to -- this conduct does not

6    comply with this Court's expectations, and it would be my hope

7    that local counsel would note that for foreign counsel.  And

8    even though they're not subject to sanction, still it's your

9    role to do more than simply be a drop box for out-of-state

10   counsel, particularly when things like this are going on that

11   indicate conduct that is really detrimental to the

12   administration of justice.

13           I'm going to take this matter under advisement and

14   issue an order in the near term outlining what the sanctions

15   here will be.

16           Since the parties are here, they should meet and

17   confer on any outstanding issues, the ones we discussed here

18   today, and try to reach a resolution promptly.

19           While I'm not a hundred percent certain how I'm going

20   to rule here in terms of sanctions, if there are any further

21   discovery disputes, both parties -- or discovery issues,

22   failure to comply with my orders, and that sort of thing, the

23   parties should be aware that all sanctions are on the table.

24           It's a default judgment if the plaintiffs were to run

25   afoul of the rules, and a dismissal of the complaint.  This

1    case needs to move forward promptly.  It needs to do so

2    without further difficulty.  And it's my expectation that all

3    the attorneys as officers of the court and as professionals

4    will get it done, and that clients on either side will not

5    stand in the way of further discovery occurring in a timely

6    manner.  So that will be all for today.  We'll be in recess.

7              THE CLERK:  All rise.  This court is now in recess.

8                        (Court is adjourned)

9                           * * * * *

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 52 of 64

1          CERTIFICATE OF TRANSCRIBER

2

3          I, Ellen S. Kolman, court-approved transcriber, in

4   and for the United States District Court for the Eastern

5   District of North Carolina, do hereby certify that pursuant to

6   Section 753, Title 28, United States Code, that the foregoing

7   is a true and correct transcript from the official electronic

8   sound recording of the proceedings held in the above-entitled

9   matter and that the transcript page format is in conformance

10  with the regulations of the Judicial Conference of the United

11  States.

12

13          Dated this 10th day of May, 2021.

14

15

16  /s/
    _____
17  ELLEN S. KOLMAN, CET-568

18  COURT-APPROVED TRANSCRIBER

19

20

21

22

23

24

25

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 53 of 64

**A**

abeyance (1)
49:12
ability (3)
16:15;35:20;39:13
able (5)
15:25;22:13;24:3,
18;42:21
Absolutely (1)
26:3
acceptable (2)
41:23;50:15
access (1)
32:13
accident (1)
37:12
accordance (1)
15:14
achieve (1)
50:20
across (1)
22:5
act (1)
30:12
action (1)
41:21
actions (1)
43:12
actually (2)
5:10;34:7
ad (1)
49:4
add (1)
48:13
added (2)
6:24;11:9
adding (1)
48:5
additional (3)
8:22;9:2,5
address (2)
12:16;15:11
addressed (2)
6:15;7:4
adjourned (1)
52:8
adjust (1)
35:17
adjuster (2)
9:4;47:17
adjusters (4)
7:24;16:21,22,23
administration (2)
50:20;51:12
admission (1)
20:19
admitted (1)
14:1
admittedly (2)
18:19;24:12
advice (1)

**11:10**

advisement (1)
51:13
Aegis (7)
8:24;9:22;20:20;
21:16;22:6;31:5;
33:2
affirm (1)
14:20
affirmation (4)
13:1,2;14:19;
34:10
affirmative (7)
6:5;19:13;43:14;
45:6;46:9,21;48:20
afoul (1)
51:25
afternoon (8)
3:6,7,17,22,23;4:4,
5,18
again (16)
8:15;29:13;34:20;
37:6,8,11;38:1,2,7,
11;39:9,16,23;40:20;
42:11,23
against (1)
12:9;40:8,9;42:2
agenda (1)
25:22
aggressive (1)
36:22
ago (1)
47:24
agree (3)
13:6;14:7;32:16
agreed (4)
9:8;14:11,14;
23:25
agreement (7)
16:20,23;18:5;
26:18;31:2;33:10;
50:3
agrees (2)
13:8;17:3
ahead (2)
20:7;22:3
allow (1)
40:16
almost (1)
8:19
along (5)
4:2;28:1,16;38:3;
43:21
always (5)
17:9;36:20,22;
41:4;44:13
ambient (1)
17:13
amend (2)
6:14;39:15
amended (7)
5:22;8:17;9:15,18;
15:5;39:11;47:9

amendment (2)
39:8;49:13
Amlin (2)
13:9,12
among (4)
27:6;28:2,3;29:18
amount (1)
35:11
Anderson (3)
3:20,20;23:3
answered (5)
19:11,24;21:17;
46:15,18
anticipation (1)
11:7
appear (3)
11:15;40:16;51:5
appearance (1)
50:17
appeared (1)
8:6
appearing (1)
50:17
appears (5)
5:22;11:8;38:2;
43:7;50:13
approach (3)
30:10;36:23;46:22
appropriate (4)
4:9;42:2;43:15;
44:14
appropriately (1)
30:17
April (2)
5:9;10:4
argument (1)
48:1
around (5)
29:9;30:3,4;31:12;
45:3
articulated (1)
46:24
asserted (2)
45:6;49:3
asserting (1)
10:13
assertions (1)
49:5
assume (1)
13:7
assurances (2)
36:14;37:7
attempt (1)
50:18
attorney (3)
14:1;40:18;50:15
attorneys (3)
40:8;50:16;52:3
attorneys' (2)
44:6,9
attorney's (1)
43:11
automatic (1)

**17:3**

available (2)
27:3;31:22
award (1)
46:1
awarded (1)
8:10
aware (1)
51:23

**B**

B1353DC1602041000 (1)
3:12
B1353DC1703690000 (1)
3:12
back (12)
6:14;7:14;10:13,
25;21:4;23:8,17,22;
26:22;32:5;33:9;
48:7
back-and- (1)
21:8
background (1)
29:25
bad (8)
8:10,11;12:3,5,11;
45:3,13;49:15
bar (1)
41:22;44:5;50:16
based (3)
11:7;15:6;26:25
basis (8)
6:4;19:12,24;
46:16;47:2,10;49:3,5
Bates (4)
8:25;9:16;15:21;
16:2
bear (1)
43:6
begin (1)
3:14
beginning (1)
3:15
behalf (6)
5:16;8:24;9:1;
30:22;48:16,17
behind (2)
13:25;29:22
best (1)
19:3
beyond (3)
7:21;30:1;44:24
big (1)
34:19
binder (2)
10:1;11:11
bit (1)
46:22
blame (1)
18:22
board (1)
21:16;22:5;46:7

boilerplate (2)
8:18,20
Boskirk (1)
4:2
both (1)
51:21
bottom (2)
10:11;14:5
bound (8)
13:7,8,12;14:7,11,
14;20:16;40:1
box (1)
51:9
Boyle (2)
26:6,22
broad (1)
17:16
broader (2)
23:10,14
Brody (1)
13:25
broken (1)
16:13
broker (1)
32:13
brought (3)
4:19;30:15;41:3
build (1)
49:25
bunch (1)
11:1
busy (1)
41:19

**C**

called (3)
7:18;8:9;21:7
came (9)
9:14;10:16;15:22;
30:12;31:20;36:3,
20;39:3;47:15
can (16)
5:1;6:17;9:2;
15:12;16:2;20:5,8,
23;22:1;24:24;
36:23;37:17;45:20,
22;48:12;50:7
candor (2)
36:18;38:4
care (3)
20:24;22:8;40:9
cargo (1)
12:2
Carolina (3)
3:3,9;36:17
case (55)
3:10,12;4:9;5:17,
20;6:4,8;10:10;13,
22;12:8,17;13:9,20;
14:3;16:6;17:9,20;
18:3;19:7,8,14,16,
21,22;20:22;21:5;

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 54 of 64

(1) abeyance - case

24:21;27:7;28:4;
29:24;33:8,14;
34:24;38:25;39:9;
40:15,16;42:14,17;
43:12,16;44:4,25;
45:6,13,13,24;46:17;
47:4;48:9;49:9,12,
20;50:23;52:1
**cases (3)**
12:3;37:21;41:15
**categories (1)**
9:20
**category (1)**
10:7
**cause (4)**
10:9;17:10,14;
19:8
**caution (1)**
26:9
**cc (1)**
15:23
**Certain (8)**
3:11;6:7;7:5;27:7,
10;33:23;43:15;
51:19
**certainly (10)**
37:8;38:1,2;39:22;
41:13;42:1;45:9;
50:1;51:3,5
**Certified (3)**
38:23;39:16,21
**chain (1)**
17:17
**challenges (1)**
8:4
**change (2)**
22:4;37:18
**characteristic (1)**
10:17
**Charles (1)**
12:9
**chasing (2)**
30:9;44:19
**choice (2)**
17:8,19
**chosen (1)**
46:20
**circumstance (2)**
43:22;44:10
**circumstances (1)**
42:17
**claim (15)**
7:24;8:4;9:22,23,
23;21:7,12;23:7;
32:7;33:2,2;43:5;
45:12,13;47:17
**claiming (2)**
11:14;22:14
**claims (18)**
9:24;11:9;12:1,5,
7,11,13,15;14:23,24;
21:11;22:24,25;23:4,
8,15;32:12;46:17

**clear (1)**
13:10
**clearly (4)**
17:15;29:20;
47:14,18
**CLERK (2)**
3:2;52:7
**client (8)**
40:19;42:6;43:6,
11,20;44:17,18;
45:10
**clients (9)**
12:22;33:19;42:2,
25;44:1,25;48:17;
50:18;52:4
**collect (1)**
33:6
**collected (2)**
23:20;33:17
**column (1)**
6:25
**coming (1)**
15:10
**committed (1)**
17:7
**communicate (1)**
21:6
**communications (3)**
7:25;8:12;21:14
**compel (13)**
4:6;6:20,21;26:6,
7;31:14;34:22;35:3;
38:7,22;39:7;41:9;
44:22
**complaint (1)**
51:25
**complete (1)**
50:6
**completed (1)**
42:9
**completely (1)**
21:16;50:25
**compliance (2)**
4:13;25:14
**compliant (2)**
26:15;35:15
**complied (14)**
4:16,21;5:13;7:1;
10:5;12:23;14:16;
17:23;18:23;19:14;
23:21;28:19;36:18;
42:7
**comply (10)**
7:7;8:14;12:23;
25:15;26:10,24;
28:25;44:1;51:6,22
**complying (4)**
13:24;23:24;26:2;
27:20
**concern (2)**
24:11;25:5
**concerned (1)**
36:12;38:4

**concerns (1)**
19:3
**conclude (1)**
10:18
**conclusion (3)**
10:11,14;47:22
**concurrently (1)**
35:4
**condition (1)**
48:22
**conditions (2)**
19:15;48:22
**conduct (9)**
26:13;36:17;
41:23;45:14;50:17,
18,25;51:5,11
**conducted (4)**
34:4,11;40:24;
41:1
**confer (3)**
24:4;50:3;51:17
**conference (2)**
21:5;33:12
**conferring (1)**
11:20
**confers (1)**
44:22
**confirm (1)**
26:1
**confirmation (1)**
12:22
**connection (1)**
14:13
**consequences (1)**
43:11
**consider (2)**
23:11;45:2
**considered (1)**
17:10
**contained (1)**
9:24
**contemporaneously (1)**
38:8
**contend (2)**
19:19;46:10
**contingent (1)**
19:18
**continue (1)**
40:16
**conversation (2)**
22:20,22
**conversations (1)**
51:2
**conveying (1)**
51:3
**Cook (1)**
10:24
**Cooperative (4)**
3:10;46:3,3,6
**Cooperative's (1)**
8:3
**copies (4)**
4:19;14:18;18:9;

20:11
**copy (2)**
6:19;10:9
**core (1)**
9:24
**corporate (3)**
27:25;28:1,15
**correlate (1)**
15:25
**correlation (1)**
15:4
**correspondence (1)**
36:13
**cost (1)**
29:16
**costs (2)**
44:10,21
**Counsel (17)**
3:14,15,24;4:2,3,
12;13:21;25:23;
29:11;37:22;51:2,2,
3,4,7,7,10
**couple (5)**
10:12;11:1,24;
12:19;13:19
**course (3)**
4:9;23:18;41:21
**Court (117)**
3:3,6,8,9,22;4:4,
16,17,22;9:17;11:6,
22,25;12:20;13:18;
14:14,19;16:10;
19:2;20:3;21:19,25;
22:3,9,12,18,20;
24:6,24;25:4,8,21;
26:2,4,21;27:2,3,6,9,
9,13,13,16,16,19;
28:18,19,20,22;29:4;
30:1,14;31:5,8,11,
20,25;32:6,16,18;
33:18,22;34:13,19;
35:2,21,23;36:3,5,
12,16;37:5,21,25;
38:10,14,17,21;39:2,
6,7,14,15,19,22,24,
25;40:1,6,11,15,21,
23;41:5,18,23;42:11,18;43:3,23;
44:12,13;45:1,8,25;
46:9;48:13,16;50:1,
4,12,15,22;52:3,7,8
**Court's (9)**
12:23;13:3,14;
15:6;27:20;40:22;
51:1,4,6
**cover (1)**
47:13
**coverage (5)**
12:6;19:15,16;
31:1;46:24
**covered (1)**
25:8
**COVID (1)**

37:23
**cross-examine (1)**
45:20
**curious (1)**
30:5
**current (1)**
4:13
**currently (1)**
5:2

## D

**damage (2)**
12:7;23:5
**damages (6)**
8:9;16:11;45:3,7,
15;46:1
**database (3)**
21:11;33:4,5
**databases (2)**
33:23;34:3
**date (3)**
11:7;15:24;43:15
**dates (2)**
28:13;29:15
**day (6)**
15:20;27:25;
28:15,24;31:16;35:7
**days (5)**
28:15;29:21,21;
36:24;38:12
**deadline (4)**
28:25;31:6;35:23,
24
**deadlines (1)**
27:22
**deal (4)**
14:25;20:3,8;40:2
**dealing (1)**
37:22
**dealt (2)**
12:1;14:1
**debate (2)**
17:11;19:7
**December (6)**
6:10;7:5,9;24:23;
39:14;41:7
**decided (1)**
49:12
**decipher (1)**
24:1
**decisions (2)**
43:7;50:7
**dedicated (1)**
29:17
**DEF (1)**
8:25
**default (9)**
27:17;29:8;42:1,7,
15;43:13,21;44:15;
51:24
**defendant (1)**
9:1

**defendants (12)**
3:25;4:2,16,21;
5:7,9,17,18;13:5;
24:21;26:10;33:14
**defense (7)**
19:13,21;47:2,6,7,
11,25
**defenses (20)**
6:4,5,7,8;10:12,15;
19:9,12,25;43:14;
45:6;46:9,17,21,23;
47:3;48:6,8,20;49:9
**deficiencies (1)**
6:22
**deficiency (1)**
44:22
**DEHNEL (2)**
3:19,19
**Dehnel's (1)**
32:24
**deleted (3)**
11:8;14:18;15:7
**denials (1)**
20:19
**deny (1)**
26:8
**depending (2)**
16:8;49:8
**depends (1)**
43:23
**deponents (1)**
34:13
**depose (1)**
10:22
**deposed (7)**
9:22;16:21,22,23;
18:14;20:16;30:11
**deposition (7)**
6:12;31:21;32:18;
33:22;47:6,17;49:24
**depositions (8)**
9:19;26:19,19;
32:25;36:9;42:9;
43:17;49:23
**described (2)**
15:23;32:8
**description (1)**
16:5
**designate (1)**
15:21
**designating (1)**
27:7
**designees (1)**
34:17
**destruction (1)**
14:17
**detail (5)**
4:17;5:3;13:16;
25:11;28:6
**detailed (2)**
10:1;25:2
**detrimental (1)**
51:11

**diary (3)**
9:23,23;33:2
**different (3)**
14:12;17:15;
20:11,21;21:10
**difficulty (2)**
16:4;52:2
**dig (2)**
4:11,24
**direct (1)**
15:11
**directed (2)**
7:7;25:17
**direction (4)**
11:21;12:20;14:3;
41:17
**directive (2)**
12:23;13:14
**directors (1)**
46:7
**disagreed (1)**
20:19
**disciplinary (1)**
40:22
**disclose (2)**
7:11;42:21
**disclosed (1)**
42:20
**disclosure (5)**
7:6,8,12,13;28:16
**disclosures (5)**
7:23;16:3;28:1,23;
36:5
**discoverable (1)**
21:2
**discovery (32)**
4:10,13,19;8:16;
17:16,24;24:12;
26:11,13,17;27:3;
30:4;31:15;39:15;
41:6,24,25;42:5;
43:4,9,15;44:2,20;
45:5;49:11;50:6,14,
17,19;51:21,21;52:5
**discovery's (1)**
40:23;41:1
**discrepancy (1)**
35:9
**discuss (1)**
4:8
**discussed (1)**
51:17
**discussions (3)**
28:2,6;29:23
**dismissal (1)**
51:25
**disputes (1)**
51:21
**disregard (1)**
30:18
**disruption (1)**
38:1
**dissuading (1)**

41:20
**District (5)**
3:3,3,8,9;42:11
**disturbing (1)**
36:1
**division (1)**
40:10
**doc (1)**
32:15
**document (10)**
8:6,13;9:24;10:3;
12:6;23:18;25:13;
30:23;32:13;37:1
**document- (1)**
34:17
**documentation (1)**
17:22
**documents (46)**
8:22,23;9:3,5,6,10,
12,14,16,20,21;10:7,
23;11:3,13,15,17,18;
12:6,17,20;15:10,14,
17,18,22;16:24;
18:14,17;21:18;
23:20,23,24;24:1;
31:17,23;32:8;
33:13;34:23;35:12,
17;36:9;43:17;48:3,
11;49:13
**dollars (1)**
21:13
**Don (1)**
4:1
**done (21)**
6:17,24;11:5,8;
14:22;17:4;18:23;
24:20;26:18;28:7;
30:24;36:1,4;41:4,9;
42:13;43:17,18;
48:10;50:11;52:4
**double-check (1)**
32:10
**doubt (1)**
13:1
**down (8)**
11:22;16:13;
17:17;24:24;36:21;
38:1;50:19,22
**Dr (1)**
10:8;49:17
**draft (1)**
10:9
**drafted (1)**
10:10
**drop (1)**
51:9
**dug (1)**
14:2
**duration (1)**
47:13
**during (1)**
31:20
**duty (1)**

36:18

# E

**eager (1)**
44:25
**earlier (3)**
33:1;46:12;50:12
**early (4)**
13:22;30:15,16;
38:23
**Eastern (2)**
3:3,9
**ECF (1)**
32:11
**effective (1)**
50:20
**effectively (1)**
31:8
**effort (1)**
29:17
**egregious (1)**
50:13
**either (8)**
9:11;11:3;12:13;
29:10;35:23;47:10;
48:10;52:4
**electronic (2)**
23:20;24:12
**electronically (1)**
9:9
**electronics (1)**
32:12
**else (5)**
17:3;48:13,15,16;
49:20
**email (2)**
13:6,9
**emails (1)**
10:24;13:7;33:5
**enough (2)**
16:1;28:14
**ensue (1)**
26:11
**entailed (1)**
33:20
**entered (5)**
4:14;5:9;8:9;42:7;
47:19
**entering (1)**
42:1
**entitle (1)**
49:18
**entitled (1)**
43:10
**entries (2)**
11:10;21:11
**entry (3)**
15:4,22;27:17
**envision (1)**
50:21
**equitable (1)**
43:22

**establish (3)**
45:21;47:14,18
**Evans (2)**
4:1,1
**eve (1)**
36:5
**even (8)**
10:3;11:2;16:6,14;
33:1;41:10;46:16;
51:8
**eventually (2)**
29:8;32:2
**everybody (2)**
22:8;32:12
**everyone (3)**
3:6;4:4;20:14
**everyone's (1)**
30:11
**everything's (1)**
19:4
**evidence (2)**
27:11;44:16
**exactly (2)**
15:9;22:17
**example (7)**
6:2;13:2,13;19:13;
20:18;21:4;32:11
**examples (1)**
13:13
**excess (1)**
21:13
**exclusion (2)**
47:13;48:5
**excuse (5)**
29:1;31:7,18;
37:15;42:11
**exercise (1)**
24:21
**exhibit (5)**
6:21,24;10:1,21;
25:11
**exist (1)**
8:12
**expect (3)**
8:1;21:12;33:13
**expectation (1)**
52:2
**expectations (2)**
51:4,6
**expected (2)**
12:12;35:13
**expensive (1)**
50:22
**expert (7)**
10:8,20,21;49:10,
11,15,19
**Experts (3)**
43:18;49:16;50:8
**explain (7)**
6:3;27:19;39:10;
47:1,10,10;48:9
**explained (7)**
19:10,12,24;

Case 5:19-cv-00430-BO   Document 90   Filed 05/11/21   Page 56 of 64

22:13;26:16;39:4;
49:4
**explains (1)**
6:25
**explanation (4)**
6:2;19:16;36:10;
40:3
**explanations (1)**
41:14
**explosion (1)**
12:11
**expressed (1)**
43:25
**extent (1)**
39:8
**external (3)**
17:10,14;19:8
**extreme (6)**
42:15,23,24;44:7,
10;50:14

## F

**face (1)**
29:20
**face-to-face (1)**
22:23
**facility (2)**
17:2,8
**fact (7)**
9:8;10:22;26:25;
29:19;31:1;36:23;
49:24
**facts (4)**
18:4;20:22;27:7;
42:16
**factual (2)**
6:3;49:2
**failing (1)**
35:18
**failure (1)**
51:22
**fair (3)**
42:25;43:4,22
**faith (11)**
8:10,11;12:3,5,11;
41:1,2;42:7;45:3,13;
49:15
**fallen (1)**
11:13
**familiar (4)**
16:6,18;30:25;
40:18
**fantastic (1)**
18:23
**far (1)**
9:2
**fault (1)**
43:5
**federal (2)**
27:21;50:21
**feel (2)**
20:5,6

**fees (5)**
44:6,9,19;45:8,17
**feet (1)**
43:20
**few (1)**
9:13
**fifteen (1)**
47:2
**figure (4)**
9:12;11:19;24:19;
41:20
**file (11)**
11:2;15:16;28:8,
15;29:6,6,7;32:12,
19;44:21;46:25
**filed (11)**
4:7;6:20;28:4,19,
22,23;29:7,10;31:16;
34:22;38:22
**filing (9)**
20:5,7;29:4,9;
30:4;31:12;35:5;
36:5;38:8
**filled (1)**
8:17
**finally (1)**
21:10
**financial (2)**
28:16,23
**fine (1)**
24:20
**firm (1)**
13:25
**first (13)**
4:12;5:5,14,25;
6:19;11:22;19:6;
24:5;26:6;34:2,22;
38:22;49:21
**five (2)**
45:19;49:4
**fix (1)**
11:22
**flag (1)**
5:15
**focused (1)**
7:9
**followers (4)**
16:19,20;18:1;
30:22
**Following (6)**
16:24;18:12;
20:21;30:8,13;31:3
**foregoing (1)**
14:20
**foreign (2)**
51:4,7
**forgiving (1)**
19:22
**form (1)**
36:4
**forth (1)**
21:9
**forthcoming (1)**

33:15
**forward (10)**
26:13,24;29:17,
19;36:9;40:18;
44:25;45:7;50:23;
52:1
**Foulger (1)**
33:1
**found (2)**
7:10;10:15
**four (3)**
31:11;36:24;41:24
**fourteen (1)**
41:24
**frame (1)**
29:22
**frank (1)**
30:9
**frankly (1)**
28:13
**front (3)**
41:19;42:10,11
**fruition (1)**
36:15
**Full (2)**
17:10;18:22
**fully (3)**
18:21;21:17;27:5
**funds (2)**
46:6,7
**further (6)**
35:7;39:5;49:6;
51:20;52:2,5

## G

**gap (1)**
24:9
**gathered (1)**
34:5
**gathering (1)**
29:3
**Gave (1)**
13:22
**general (1)**
8:20
**generally (1)**
25:24
**gets (1)**
45:23
**given (6)**
4:9;7:20;15:15;
36:14;37:7;40:22
**glad (1)**
14:25
**goes (7)**
9:25;21:4;25:12;
45:18,23;46:6;47:25
**Good (13)**
3:6,7,17,22,23;4:1,
4,5;5:2;23:3;41:1,2;
42:7
**granted (1)**

4:7
**great (1)**
13:23
**greater (1)**
25:11
**grossly (1)**
40:4
**growing (3)**
10:16;47:15,19
**guess (4)**
6:11,20;11:13;
43:23
**guidance (1)**
13:22
**guide (1)**
25:19
**guided (1)**
18:2
**GUILBERT (23)**
3:17,18;4:15,25;
14:25;19:6;20:13;
21:24;23:13;24:16;
25:10,17;32:8,22;
34:14,17;44:18;
45:11;46:5,11;48:15,
20;49:7
**guy (1)**
22:6
**guys (2)**
17:6;18:23

## H

**half (1)**
5:7
**hand (1)**
6:17
**handful (2)**
10:24;48:3
**handle (1)**
30:17
**handled (1)**
17:20
**handler (2)**
9:22;33:2
**hands (1)**
29:21
**happen (4)**
35:5;36:5;38:9;
50:7
**happened (3)**
35:25;39:17;47:12
**happens (2)**
46:2,4
**happy (12)**
4:17;5:3;13:10,16;
15:21;16:3;18:8;
19:1;23:10,18;34:9;
44:20
**hard (5)**
9:11,13;24:1;
28:25;37:23
**harder (2)**

45:18,23
**head (1)**
30:24
**hear (1)**
4:12
**Heard (11)**
10:8,25;15:14,16;
18:17;19:2;20:15;
24:6;25:5;47:21;
49:17
**hearing (5)**
3:10;4:8;21:21;
36:6;39:14
**help (2)**
5:1;50:20
**Here's (2)**
17:6;44:6
**hey (1)**
36:22
**hidden (1)**
47:23
**hide (1)**
37:2
**hiding (1)**
35:18
**Hill (1)**
3:24
**hired (1)**
43:6
**hit (2)**
23:6;37:23
**hold (1)**
49:12
**holiday (1)**
29:2
**honest (1)**
35:1
**Honor (88)**
3:7,17,23;4:1,15;
5:8,8,6;18,22;7:1;
10:6;13:17,19;14:6;
15:3,21;16:5,13,16,
18;17:11;18:1,17,19;
21:24;22:2,10,19;
23:2,11,13;25:3,7,
10,16,19;26:1,14;
27:1,5,8,12,15,18,25;
28:17;29:1,13,20;
30:7,13,20;31:4,7,
19;32:3,22;34:1,14,
25;35:10;36:8,11,20;
37:14,18;38:16,18;
39:5,12,18,21;40:3,
12;41:1,13;42:5,23;
43:19;44:11,18;46:5,
11;48:15,18;49:5,11;
50:9
**Honorable (2)**
3:2,4
**Honor's (1)**
35:16
**hope (1)**
51:6

hoped (1)
35:13
hundred (1)
51:19

**I**

idea (6)
8:20;11:2;16:10;
28:7,11;30:8
identical (3)
8:19;18:10;20:15
identified (6)
6:22;7:5;11:24;
22:5;40:11;49:2
identifies (1)
10:3
identify (3)
3:14;9:16;11:1
ignored (1)
28:4
II (1)
3:4
implicated (1)
16:9
imposed (1)
44:14
inability (1)
37:3
inadvertently (1)
12:21
Inc (1)
3:11
included (2)
9:18;31:21
including (1)
46:16
incorporate (1)
48:21
incredibly (1)
41:19
incurred (2)
29:16;44:18
incurring (1)
29:16
independent (2)
18:2,11
indicate (2)
37:11;51:11
indicated (3)
35:3;38:10;50:12
indications (1)
31:22
individual (1)
5:18
individualized (1)
25:6
individually (1)
39:21
information (21)
8:5;9:9;11:25;
14:23;17:15,18;18:3,
11,12;21:2;29:3;

32:14;33:5,6,11,14,
16;34:4;35:20;37:3;
49:16
inherent (4)
10:17;48:1,2,5
inherently (1)
48:2
initial (3)
7:6,12,23
initially (1)
36:8
input (1)
32:14
insight (1)
37:19
instance (1)
11:22
instead (1)
8:15
insurance (2)
7:15;47:14
insurer (5)
8:24;20:18,21;
21:16,17
insurers (39)
5:12;6:9;7:2,4,6,
10,17,19;8:8,14,16;
9:1,4,7;10:5,7,12;
11:5,8,21,25;12:1,
21;16:16;19:11,23;
20:15,16,24;21:3,6;
23:21;30:3;34:10;
35:23;39:3;46:13;
48:4;49:18
insurers' (1)
44:19
insurer's (3)
19:9;33:11;45:19
intend (2)
13:11;45:15
intended (1)
13:11
intentionally (2)
35:18;37:2
interest (2)
12:6;45:12
International (2)
9:4;10:25
interpretation (1)
23:11
interrog- (1)
26:19
interrogatories (6)
5:10;6:13;21:22;
38:24;46:15,16
interrogatory (19)
5:6,12,18,23,25;
6:3,3;7:2,17;12:4;
17:25;19:17,18;
20:11;23:16;30:5;
39:7;48:8,19
into (17)
4:11,17,24;5:3;

10:16;12:12;13:16;
14:2;25:11;27:10;
28:6;29:17;32:23;
43:8;9;47:15;49:25
introducing (1)
27:10
investigation (1)
9:25
invoices (1)
11:1
irrelevant (1)
17:16
issue (29)
5:21;6:10;11:21;
12:16;13:4;14:21;
15:1;17:11,17;
20:25;21:1,20;22:10,
24;23:17,18,19;
27:20;31:14;34:20;
35:10;38:7,10;39:22,
23;40:4;48:24;
50:10;51:14
issued (2)
26:6,22
issues (14)
7:5;8:14;11:24;
12:2,19,19;14:2;
15:11;25:8;35:2;
49:13;50:2;51:17,21
item (1)
25:22
items (1)
15:7

**J**

James (3)
3:23;14:8,14
January (2)
7:14;42:21
Jim (1)
6:19
job (2)
13:23;18:23
joint (5)
5:16;8:16;17:25;
22:7;25:6
Judge (4)
4:5;22:15;26:6,22
judgment (6)
20:7;27:17;42:2,7;
47:1;51:24
jury (2)
42:12;45:22
justice (2)
50:21;51:12

**K**

Karn (3)
13:25;25:1,1
keep (3)
9:8;15:12;46:13

kept (2)
15:7;37:7
key (2)
10:12;29:14
keyed (1)
28:13
kind (1)
26:7
kitchen (1)
46:22
knew (2)
15:9;45:19
knowledge (3)
18:13;22:7;25:2
known (1)
41:22

**L**

Lake (1)
12:9
language (1)
19:22
large (3)
9:13;41:22,22
larger (1)
23:19
last (8)
7:14;12:5,19;
18:16;24:22;42:13;
47:23;48:18
late (6)
15:20;19:21;
28:23;29:5;31:16;
34:18
later (3)
28:15,15,22
Lawson (2)
14:8,15
lead (20)
3:24;9:22;16:18,
20,21;17:3,7,20;
18:2,5,5;20:20;21:2;
26:17,17;30:8;31:1;
33:2,11;47:17
leads (3)
16:19;30:11,22
least (1)
6:7
leave (1)
28:14
legal (2)
6:4;11:10
legitimate (1)
26:11
Less (2)
8:19;18:19
letter (1)
12:24
letters (2)
44:23;46:24
lie (1)
43:19

limited (1)
23:14
limiting (3)
42:18;44:16,16
line (5)
10:11;15:7;28:2,
17;43:21
list (2)
9:25;47:25
listen (2)
17:5;30:10
litigants (2)
41:19,21
litigated (1)
41:16
litigating (1)
37:9
litigation (2)
11:7;50:19
litigations (1)
31:1
little (2)
4:17;46:22
Lloyd's (2)
3:11;12:9
local (1)
4:2,3;13:21,22;
18:22;25:22;27:20;
51:2,3,7
located (1)
22:25
log (18)
11:10,13;14:2;
15:12,23;22:10;
23:17,23,24;24:2,8,
10,17,18,25;34:21;
35:4,6
logs (10)
11:4,11,12;15:2,5,
19;34:19;35:7,14;
38:8
London (3)
10:8;16:16;21:8
long (1)
41:7
longer (5)
14:10;22:14;
24:11;35:13,13
look (7)
5:23;8:18;16:15;
35:25;40:7;43:23;
50:4
looked (3)
14:23;15:8;23:7
looking (5)
12:12;35:11;38:6,
21;46:8
looks (8)
9:5;11:5,11;12:9,
10;28:18;29:20;
44:21
loss (3)
8:3;9:4;48:4

**lot (4)**
15:17;40:6;44:19;
49:21
**Louisiana (1)**
12:9

**M**

**maintain (1)**
7:18
**makes (1)**
50:22
**making (1)**
40:13
**manner (2)**
42:20;52:6
**many (3)**
28:5;37:6;41:19
**Marine (3)**
9:3;10:25;12:2
**Mark (1)**
3:20
**Market (6)**
16:24;18:12;
20:21;30:8,13;31:3
**match (2)**
24:1,16
**materials (1)**
42:18
**matter (2)**
36:21;51:13
**matters (2)**
27:10;36:2
**may (14)**
7:18;8:9,9,10;
10:6;11:13;16:6;
34:6,6;37:9;38:23;
41:5;45:22;49:9
**Maybe (5)**
11:15;24:13;
30:24;45:20;46:21
**McGuire (3)**
3:18,19,20
**mean (24)**
9:10;20:10;21:19,
20;22:11,12,21;
23:18;26:12,23;29:5,
7;30:1,14,16;32:17;
39:23;40:13;41:7,
18;43:5,24;44:14;
45:8
**meant (1)**
13:8
**meet (4)**
24:4;44:22;50:2;
51:16
**meeting (2)**
11:20;29:18
**meetings (4)**
28:3,7;29:14,15
**members (5)**
46:3;50:16,16
**men (1)**

18:13
**mention (2)**
19:19;45:8
**mentioned (8)**
15:24;30:14;33:1;
37:16;39:20;42:10;
46:12;47:5
**merits (1)**
4:11
**mess (1)**
11:5
**message (3)**
44:5,7,10
**met (1)**
16:9
**metadata (1)**
9:10
**method (1)**
24:14
**might (6)**
16:7,14;29:16;
45:1;48:20;49:14
**million (1)**
21:13
**mind (1)**
46:14
**mine (1)**
40:13
**minor (1)**
12:19
**mirror (1)**
18:20
**misjudge (1)**
37:10
**misjudging (1)**
38:11
**misrepresentations (1)**
40:22
**missed (1)**
27:22
**Mitsui (6)**
13:5,6,7,8;22:6,7
**moisture (3)**
17:9,13,13
**mold (12)**
10:8,15,17;12:2,7,
10;14:24;23:4,8;
47:15,18;49:16
**moldy (2)**
23:6;48:2
**money (3)**
45:12;46:2;49:21
**month (1)**
28:23
**months (6)**
28:22;31:6;41:24;
43:8,9;47:3
**more (11)**
5:3;13:16;21:14;
35:19;36:7;37:11;
45:17,18,23;50:22;
51:9
**morning (1)**

4:1
**most (5)**
11:10;15:11;
32:24;40:18;46:11
**motion (17)**
4:6;6:20,21;20:6,
7;26:5,7;31:13,18,
22;34:22;35:3,24;
38:6,22;39:6;46:25
**motions (4)**
41:9;42:19;44:22;
50:8
**move (4)**
29:8;44:25;45:7;
52:1
**movement (1)**
35:22
**Moving (3)**
30:1;49:20;50:23
**MRI (1)**
15:16
**much (4)**
4:17;17:5;25:11;
28:6
**multiple (2)**
24:22;44:21

**N**

**name (1)**
22:6
**named (1)**
22:7
**names (2)**
11:1;32:4
**nauseam (1)**
49:4
**near (2)**
34:23;51:14
**necessarily (2)**
20:4;34:2
**necessary (2)**
4:23;40:25
**need (14)**
7:4;8:7;10:22;
24:4;26:10,24,25;
28:8;31:2;41:10;
49:9,21,24;50:10
**needed (4)**
12:25;28:19;
33:11;38:20
**needs (4)**
43:11;50:7;52:1,1
**New (6)**
3:24;14:1;20:5;
37:15,22;48:3
**Next (3)**
25:22;35:6,7
**nice (1)**
9:21
**ninety-five (1)**
42:8
**noncompliance (3)**

13:3,14;27:3
**normal (1)**
30:25
**normally (1)**
24:3
**North (3)**
3:3,9;36:16
**note (1)**
51:7
**notebook (1)**
25:12
**noted (4)**
5:8;6:10;25:23;
38:5
**notice (5)**
19:21,21;28:4,18;
47:5
**notion (2)**
20:23;21:15
**November (1)**
24:23
**number (8)**
3:12;19:9,13;
22:14,15;24:10;
27:22;46:12
**numbered (2)**
15:3;24:8
**numbering (1)**
15:7
**Numbers (4)**
3:4,12;15:22;16:2
**nutshell (1)**
13:17

**O**

**oath (4)**
12:25;14:19,20;
46:19
**objection (2)**
11:6;17:19
**objections (3)**
8:18,20;30:21
**obligation (1)**
30:18
**obligations (1)**
21:3
**Obviously (9)**
17:14;26:4;29:8;
34:19;35:16;40:8;
46:2;50:4;51:1
**occasion (1)**
37:9
**occasions (1)**
37:6
**occurred (3)**
4:9;12:11;48:4
**occurrence (2)**
37:10;38:3
**occurring (1)**
52:5
**October (1)**
26:22

**odds (1)**
6:12
**off (7)**
11:13;14:18;
23:23;24:9,17,25;
30:23
**offer (2)**
31:4;37:19
**office (1)**
3:21
**officer (1)**
39:25
**officers (1)**
52:3
**oftentimes (1)**
36:14
**omitted (1)**
49:8
**Once (3)**
8:15;17:7;46:6
**one (36)**
4:25;8:6;10:11,14;
12:8;13:5;14:8;17:1;
19:19;20:18;21:3,6,
17;22:7;30:1,3,7,21,
25;32:13,20;33:25;
35:2;36:3;39:2,22;
41:16;43:7;45:1,14;
47:7;48:21,22;49:7,
15,23
**one-for-one (1)**
16:5
**ones (1)**
51:17
**ongoing (2)**
28:2;29:15
**only (13)**
8:24;19:7;21:17;
30:3;31:11;33:10,
11;35:22;36:2;39:2;
41:8;44:3;48:18
**open (2)**
11:20;20:4
**opine (1)**
40:9
**opposed (1)**
29:16;34:22
**opposing (2)**
29:10;36:18
**opposition (2)**
38:6,21
**optional (1)**
44:2
**options (1)**
40:7
**order (37)**
3:5;4:7,14,16,21;
5:8,8;7:4,7,10;8:15;
9:9;10:4;11:17;
12:24,24;13:3;
14:14;15:12,15;
23:19,25;24:12;26:5,
6,12,22;27:17;30:12,

Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 59 of 64

16;31:13;38:5;39:3;
43:25;47:24;50:12;
51:14
**ordered (8)**
6:14;7:1,13;8:5;
9:17;10:7;11:25;
46:19
**orders (2)**
15:6;51:22
**origin (1)**
10:9
**others (2)**
32:9;49:1
**ought (1)**
12:15
**ours (1)**
48:6
**out (38)**
8:2;9:12;11:9,19;
14:18;15:3,10,15,24;
16:8,24;18:8,24;
19:17;20:2;24:19;
25:7;26:8;30:2,2,12;
32:9,14;35:5,14,17;
39:3,24;41:8,11,20;
47:3,11,20;48:8,12,
21,23
**outcome (1)**
42:13
**outlining (1)**
51:14
**out-of-state (2)**
51:2,9
**outstanding (2)**
50:2;51:17
**over (7)**
11:14;15:17;25:5;
32:19;37:8,8;43:4
**overall (2)**
16:15;40:23
**overruled (1)**
11:6
**overview (2)**
4:23;5:2

**P**

**pages (1)**
9:2
**paragraph (1)**
34:10
**part (6)**
31:20;35:6,22;
36:12;37:12;51:3
**participated (1)**
34:7
**participation (1)**
42:4
**particular (6)**
17:7;34:5;41:3;
43:14,16;49:15
**particularly (3)**
26:10;36:10;51:10

**parties (9)**
26:9;28:2;29:18;
36:13;40:9;50:2;
51:16,21,23
**party (5)**
16:20;18:6;26:18;
27:10;36:19
**party's (1)**
16:23
**pass (1)**
50:3
**pattern (1)**
37:13
**Paula (1)**
10:24
**pay (1)**
8:9
**PDF (1)**
23:25
**PDFs (1)**
9:13
**penalized (1)**
42:6
**penalizing (1)**
43:20
**penalty (5)**
12:25;42:24;
43:19;44:8;45:15
**pending (1)**
12:8
**people (7)**
5:1;11:1;18:12;
32:4,19;37:25;45:18
**per (2)**
27:24;29:12
**perceive (1)**
31:2
**percent (4)**
16:14,14;42:8;
51:19
**perfection (1)**
18:20
**perfectly (1)**
29:15
**perhaps (8)**
22:22;30:3,16;
31:13;35:8;37:12;
39:19;43:10
**period (1)**
28:24
**perjury (1)**
12:25
**person (2)**
34:2,3
**perspective (1)**
17:12
**pertained (1)**
28:9
**pertaining (1)**
13:4
**pertinent (1)**
24:13
**ph (1)**

15:16
**PII (1)**
14:17
**places (1)**
37:22
**plaintiff (1)**
29:24
**plaintiffs (4)**
3:16;12:21;19:14;
51:24
**plaintiff's (2)**
4:12;38:22
**plan (1)**
48:9
**plays (2)**
37:16;42:13
**pleadings (4)**
27:14;43:14;
44:12,16
**Please (1)**
3:5
**plenty (1)**
20:3
**point (18)**
6:9;19:17;21:20;
23:9;25:12,12;
31:19;42:15;43:19;
45:2,4,7,17;46:10;
47:3;49:8,19;50:5
**pointed (1)**
48:21
**pointing (1)**
36:11
**points (1)**
41:3
**polices (1)**
7:9
**policies (6)**
7:11,16,23;8:11;
12:3;32:4
**Policy (7)**
3:11;16:4;17:6;
19:22;47:14;48:5,22
**position (4)**
18:25;41:12;
44:14;46:14
**possibility (1)**
29:23
**possible (1)**
40:7
**post-removal (1)**
27:21
**practice (2)**
50:8,15
**practicing (1)**
37:25
**precedent (2)**
19:15;48:22
**prefix (1)**
8:25
**pre-judgment (1)**
45:12
**prejudice (6)**

19:20;26:9;44:16,
24;45:10,11
**prejudiced (4)**
19:20,23,25;40:19
**prepared (2)**
4:18;20:20
**present (2)**
22:22;42:19
**presiding (1)**
3:4
**pressed (1)**
44:3
**presumably (1)**
8:25
**pretty (1)**
15:23
**prevail (2)**
16:11;46:1
**prevents (1)**
50:22
**previously (1)**
26:6
**primary (1)**
19:9
**principals (1)**
28:3
**print (1)**
18:8
**prior (1)**
46:24
**privilege (22)**
11:4,11,14;14:2;
15:2,5,12,18,22;
22:10,15,15;23:17,
23;24:2,8,10;34:19,
21;35:4,14;38:7
**privileged (1)**
8:1
**privy (1)**
51:1
**probably (4)**
16:5;29:2;37:4;
49:23
**problem (7)**
5:5;10:23;24:14;
27:23,24;29:9,12
**problems (1)**
5:25
**proceedings (1)**
27:21
**process (7)**
20:6;24:4;35:20;
37:4;40:22;49:11;
50:22
**processing (1)**
35:12
**produce (6)**
7:21;9:10;10:7;
11:25;16:3;35:19
**produced (31)**
8:23,23;9:1,5,17,
21,23;11:17;12:21;
15:19;17:21;18:15,

17;19:5;23:21;
24:17;31:16;32:5,9,
12,15;34:5,21;36:9;
38:8,9,12,14,24;
43:18;48:4
**producing (2)**
23:25;34:22
**product (2)**
11:6,9
**production (6)**
8:14;9:3;10:4;
24:15;25:4;31:9
**products (1)**
10:16
**Professional (2)**
36:17;40:1
**professionals (1)**
52:3
**programs (1)**
7:18
**progress (1)**
30:25
**prohibit (1)**
27:10
**promises (2)**
36:14;37:6
**promptly (3)**
38:24;51:18;52:1
**prospective (1)**
49:24
**protective (1)**
30:16
**prove (2)**
19:23;48:9
**provide (3)**
5:4;8:5;39:15
**provided (5)**
5:14;16:4;21:18;
32:18;34:12
**provides (1)**
5:2
**public (1)**
41:22
**punish (1)**
27:3
**purely (1)**
13:21
**purpose (1)**
18:4
**push (1)**
36:2
**put (5)**
15:3;20:11;44:20,
23;49:22

**Q**

**quibble (1)**
45:9
**quick (1)**
13:19
**quickly (1)**
37:4

Case 5:19-cv-00430-BO   Document 90   Filed 05/11/21   Page 60 of 64

**quota (1)**
16:9

**R**

**raised (3)**
10:15;25:9;35:2
**Raleigh (2)**
3:10,20
**random (1)**
23:25
**ranges (1)**
9:16
**rather (1)**
23:25
**reach (4)**
10:14;47:22;50:3;
51:18
**read (4)**
26:7,15;35:21;
36:13
**readily (1)**
31:22
**real (3)**
21:1;35:22;44:24
**Realistically (1)**
45:25
**realities (1)**
37:9
**reality (2)**
39:1,2
**realize (1)**
15:20
**really (14)**
5:21;6:13;9:11,13;
11:16,18;12:23;
14:1;17:5;21:17;
24:23;42:13;45:2;
51:11
**reason (6)**
13:1;17:25;18:1;
30:7;43:7;49:2
**reasons (1)**
33:25
**rebuttal (2)**
10:21;49:19
**recall (4)**
30:21,23;31:16;
32:1
**receive (7)**
5:20;10:5,9,10;
12:22;21:12;33:13
**received (6)**
5:24;6:23;13:5,10;
46:23;49:14
**recently (6)**
24:13;30:4;31:13;
36:7;39:12,19
**recess (2)**
52:6,7
**recognize (1)**
21:5
**recollection (1)**

45:22
**reconcile (7)**
6:13;9:13;33:24;
38:17;39:1,13;47:11
**reconciled (2)**
47:7;48:10
**record (6)**
3:15;28:10;34:21;
35:21;38:3;50:6
**rectify (1)**
7:5
**red (1)**
5:15
**redo (1)**
48:7
**refer (2)**
25:11;40:21
**refers (1)**
26:17
**reflect (1)**
36:22
**regard (1)**
13:22
**regarding (1)**
14:23
**regular (2)**
37:10;38:3
**reimburse (1)**
7:19
**reinsurance (13)**
7:9,11,16,18;8:8,
11;16:4,6,7,7,8,9,16
**reinsurers (2)**
7:25;8:7
**relate (1)**
8:6
**related (5)**
4:6;7:22;12:2;
18:14;34:18
**relates (2)**
7:9;10:8
**relating (1)**
12:6
**relatively (1)**
50:5
**relevant (1)**
17:18
**remedies (1)**
43:13;45:14
**remedy (3)**
42:15,24;43:15
**remember (4)**
10:6;28:1;29:14;
45:21
**remembering (1)**
24:13
**reminded (1)**
29:6
**remote (2)**
37:15,17
**remotely (1)**
37:25
**removal (2)**

28:4,18
**removed (1)**
28:11
**repeated (3)**
29:5;35:24;39:23
**report (7)**
8:7;10:9,20,21;
30:16;47:21,22
**Reporting (3)**
9:3;10:25;21:3
**reports (8)**
7:24;8:1,7;21:8;
43:18;49:10,15,19
**repository (1)**
33:7
**representation (2)**
40:14,17
**representations (1)**
41:2
**representatives (1)**
17:1
**represented (1)**
38:10
**reproduce (1)**
23:24
**request (8)**
7:22;8:13;12:6;
20:19;23:14,14;
25:4;31:9
**requests (6)**
4:20;10:3;17:24;
25:13;41:6;44:20
**required (4)**
7:11;18:10;39:9;
40:5
**resolution (2)**
50:23;51:18
**resolved (1)**
49:12
**resolving (2)**
19:3;29:24
**respect (15)**
6:23;8:4,13;12:20;
13:4,7;14:15;15:14;
18:16;25:4;27:21;
30:12;31:17;48:19;
49:1
**respond (6)**
5:10,11;6:9;30:18;
35:24;41:25
**responded (5)**
12:18;30:11;39:3;
48:23,24
**response (10)**
6:6;7:17;8:17;
13:18;17:25;25:6;
31:9;35:3;39:6;
46:13
**responses (36)**
4:19;5:6,7,12,14,
16,18,23;6:1,15,23,
25:7;3:8;16,18;9:15,
18;15:6;19:17;

20:12,14;21:22;
25:6;30:5;31:6,15;
38:23;39:7,15;41:8,
10;43:10;44:19;
47:9;48:8,19
**responsibility (2)**
18:22;40:10
**responsive (5)**
9:20;31:23;33:5
**rest (2)**
9:2;38:25
**result (3)**
34:11;37:18;43:1
**retained (1)**
9:4
**reveal (1)**
9:19
**revealed (1)**
33:17
**reviewed (2)**
24:12;44:12
**revised (2)**
15:5,9
**right (21)**
4:4;15:8;16:11;
21:25;22:3,5,9,18;
24:5;25:8,21;26:4;
27:4,19;28:11;
33:21;36:11;43:2;
44:7;46:1,25
**rise (4)**
3:2;16:6,14;52:7
**Rivkins (1)**
3:24
**Robert (1)**
3:4
**role (6)**
25:22,23;37:16;
42:13;51:3,9
**round (2)**
49:19,22
**Rule (7)**
16:3;20:5;21:5;
26:2;30:16;33:12;
51:20
**ruled (1)**
35:16
**rules (9)**
26:24;27:20,21;
36:16,17;40:1;44:1;
50:21;51:25
**run (1)**
51:24
**runoff (1)**
14:9
**Rutherford (1)**
17:2

**S**

**same (7)**
5:24;10:2;15:7,16;
25:5;31:8;38:4

sanction (2)
45:1;51:8
**sanctions (11)**
4:8;26:11;27:2;
40:8,8,9;44:13,15;
51:14,20,23
**sat (1)**
29:21
**satisfy (1)**
14:21;19:5
**SAVILLE (76)**
3:23,24;4:5;12:22;
13:2,6,11,18,19;
16:12;21:25;22:2,4,
10,17,19;23:2,4;
24:6,24;25:1,7,16,
18,23;26:1,3,4,14,
25;27:5,8,12,15,18,
24;28:21;29:1,12;
30:7,20;31:7,10,15,
24;32:1,7,13;18,21,
25;34:16,25;35:10;
36:7,20;37:14,24;
38:13,16,18;39:4,11,
18,20;40:3,12,17,25;
41:13;42:4,23;
43:13;44:9;48:16,
18;50:9
**Saville's (2)**
19:4;20:10
**saw (3)**
8:2,6;27:1
**saying (4)**
8:1;9:8;32:19;
47:21
**scenario (1)**
34:12
**scenes (1)**
29:22
**schedule (1)**
49:25
**scheduling (1)**
50:10
**scope (5)**
15:18;16:10;
17:16,22;23:10
**scratches (1)**
13:15
**screen (1)**
21:10
**se (2)**
27:24;29:12
**search (2)**
33:23;34:4
**searched (6)**
31:23;32:1,17,17,
20;34:3
**searches (4)**
32:4;33:19;34:10,
11
**season (1)**
29:3
**seated (1)**

Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 61 of 64

3:5
**second (13)**
6:21;16:21,22;
26:5,17;30:12;31:13,
18,22;35:3;38:6;
39:3,6
**Secondly (1)**
5:16
**seeing (3)**
29:17;37:8;40:20
**seek (1)**
45:15
**seem (7)**
27:22;36:1,5;37:5;
38:25;39:9;44:7
**seemed (3)**
37:10;43:25;44:2
**seems (6)**
31:11;35:22;
36:13;37:5,11;43:24
**segregate (1)**
25:7
**send (3)**
44:5,7,22
**sent (4)**
10:24;17:20;
23:16;34:5
**separate (5)**
7:17,22;15:1;18:8;
21:21
**serial (1)**
13:13
**series (1)**
31:17
**seriously (1)**
48:7
**serve (1)**
31:6
**served (6)**
35:6,6,7;39:8,12;
41:6
**serving (2)**
31:12;35:4
**session (1)**
3:4
**set (4)**
4:8;5:25;29:18;
41:8
**Seth (1)**
4:2
**settlement (1)**
28:9
**seventeen (1)**
43:8
**several (3)**
30:15;31:5;37:21
**Shelby (2)**
3:17;25:18
**shifting (1)**
44:10
**ship (1)**
23:5
**shortcomings (2)**

40:10,12
**shorter (1)**
11:12
**shot (1)**
21:10
**shove (1)**
36:3
**show (1)**
24:20
**showing (1)**
28:19
**side (5)**
16:22;30:23;
36:15;45:19;52:4
**signature (1)**
20:23
**similar (8)**
5:23;12:1;14:23,
24;22:24,25;23:4,7
**similarly (1)**
13:4
**simple (1)**
16:1
**simplest (1)**
15:11
**simply (4)**
14:17;25:25;
50:21;51:9
**sink (1)**
46:22
**sit (2)**
11:22;24:24
**sit-down (2)**
28:12,14
**sit-downs (1)**
29:23
**site (1)**
45:19
**sitting (1)**
3:9
**situation (2)**
42:24;50:13
**six (1)**
49:3
**sixteen (2)**
41:24;43:8
**sixty (1)**
29:21
**skeptical (1)**
21:15
**slide (1)**
4:25
**slightly (1)**
5:22
**slow (1)**
38:1
**slows (2)**
50:19,21
**slow-walked (1)**
50:14
**snapshots (1)**
32:7
**someone (1)**

39:25
**soon (2)**
17:2;50:5
**sorry (2)**
23:2;25:18
**sort (2)**
41:23;51:22
**sound (1)**
22:12
**sounds (3)**
22:13,24;41:9
**sources (3)**
31:22;32:23,25
**special (1)**
50:17
**specific (8)**
6:22;9:19;12:5;
15:2;21:4;32:25;
33:3;46:12
**specifically (4)**
7:8;12:2;14:13;
33:12
**speculative (3)**
10:14,19;47:22
**speedy (1)**
50:20
**spent (1)**
49:21
**stand (4)**
5:2;34:6;40:20;
52:5
**standard (3)**
6:3;32:4;33:19
**standing (1)**
42:10
**start (3)**
4:11,22;14:5
**started (2)**
10:16;47:18
**state (3)**
28:19,20;46:16
**statement (2)**
39:1;40:13
**statements (2)**
29:5;39:23
**States (3)**
3:2,8;13:6
**stating (1)**
13:6
**status (1)**
4:13
**Stephanie (1)**
10:25
**sticks (1)**
30:2
**still (16)**
5:24;6:2,4;8:17,
21;9:6,25;10:23;
11:4,18;25:14;33:8;
37:14;43:9;46:14;
51:8
**stop (1)**
17:10

stored (1)
9:9
**story (1)**
7:2
**stricken (2)**
19:10;46:10
**strike (1)**
27:13
**striking (3)**
6:8;43:14,20
**stuff (2)**
20:8;32:5
**subject (2)**
36:16;51:8
**submit (3)**
5:11;21:8;34:10
**submitted (4)**
4:20;5:16;10:21;
49:10
**submitting (1)**
7:25
**Subscribing (1)**
3:11
**substance (1)**
25:25
**substantial (1)**
28:24
**suffer (1)**
43:11
**suffered (2)**
44:17;45:10
**suffice (1)**
4:20
**sufficient (1)**
14:21
**suggest (1)**
37:19
**suggested (1)**
12:24
**suggestion (1)**
33:9
**summary (2)**
20:7;46:25
**summer (1)**
42:13
**supervision (1)**
14:3
**supplement (2)**
49:10,14
**supplemental (3)**
4:19;10:4;38:7
**supposed (6)**
5:10,11,11;9:10,
17;36:2
**supposedly (1)**
24:17
**sure (6)**
16:18;20:14;
22:20;32:10;37:1;
46:25
**surface (1)**
13:15
**surprised (1)**

42:10
**suspect (2)**
20:23;21:12
**syndicate (3)**
14:10,12;16:13
**syndicates (1)**
14:8
**system (4)**
14:18;18:5;21:8,
11

---

**T**

**table (1)**
51:23
**talk (2)**
11:23;28:12
**talked (3)**
20:10;21:4;33:12
**talking (2)**
6:8;20:8
**telling (4)**
10:11;12:15;19:4;
32:20
**ten (2)**
12:5;21:13
**term (1)**
51:14
**terms (24)**
14:3;15:16,17;
16:15;18:20;25:24;
26:13,23;28:16;
30:22;36:22,24;
40:7;41:10,20,23;
43:1,20;44:21;
48:21;49:2;50:8,10;
51:20
**testified (2)**
17:2,5
**testimonies (1)**
32:19
**testimony (15)**
6:12;13:9;14:5,6,
7,11,14;31:21;32:24;
33:3,17,22;47:6,11;
48:11
**that'll (1)**
18:6
**theme (1)**
35:25
**therefore (4)**
15:25;17:23;18:7;
19:15
**thirteen (11)**
5:17;18:8;20:11,
24;21:6,21;30:2;
31:11;33:14;46:15,
18
**thirty (1)**
29:21
**though (2)**
8:8;51:8
**thought (6)**

Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 62 of 64

6:14;10:13;15:10;
38:19;47:9;48:5
**three (3)**
28:22;36:24;38:12
**threw (1)**
14:18
**throughout (3)**
5:20;26:16;36:8
**till (1)**
30:11
**timely (3)**
31:16;42:20;52:5
**times (2)**
24:22;30:15
**timing (8)**
19:20;29:13;
35:19;36:21,24;
37:16;38:11;41:4
**Tobacco (16)**
3:10;4:7;10:18;
14:24;17:14;19:2;
23:5,5,8,15;25:5;
32:16;47:15,19;48:1,
13
**Tobacco's (2)**
43:3;44:12
**today (5)**
20:9;22:21,22;
51:18;52:6
**together (4)**
20:11;44:20,23;
49:22
**told (7)**
5:20;12:8;29:10;
33:15,18;39:7,14
**tomorrow (1)**
36:23
**took (5)**
15:24;30:7,10;
32:24;35:12
**tool (1)**
42:1
**top (1)**
30:24
**topic (1)**
15:24
**topics (2)**
14:15;34:18
**totally (2)**
17:16;44:2
**track (1)**
15:12
**treble (1)**
45:15
**trial (7)**
42:12,19;45:3,3,7,
20;46:1
**tribunal (1)**
38:4
**tried (1)**
24:22
**trouble (1)**
37:8

**true (4)**
14:20;27:7;36:7;
39:24
**truth (1)**
32:21
**try (3)**
44:22;45:23;51:18
**trying (8)**
5:6;26:21;37:17,
18;39:24;41:20;
44:19;49:22
**turned (1)**
39:24
**turning (1)**
15:17
**turns (1)**
35:5
**twelve (5)**
8:20;30:5;46:14,
15,18
**two (15)**
6:13;15:25;16:13,
14,19;21:10;28:15,
24;33:24,25;34:10;
41:8;47:23,24;49:23
**type (6)**
32:4,14;34:12;
36:23;45:14;47:25
**types (3)**
12:15;19:25;48:6
**typically (1)**
8:11

## U

**unacceptable (2)**
50:18,25
**unchanged (1)**
7:13
**under (11)**
12:2,25,25;14:19,
19,20;17:2,7;42:16;
46:19;51:13
**underestimated (1)**
35:11;40:4
**undergoing (1)**
39:8
**understandable (1)**
38:2
**understood (5)**
26:12,14;27:16;
30:20;37:24
**underwriter (6)**
14:11;16:20,22;
17:17;18:9,9
**Underwriters (3)**
3:11;14:9;16:23
**underwriters' (1)**
17:1
**underwriting (2)**
14:15;33:4
**unfortunately (2)**
35:12;41:16

**uninvolved (1)**
25:24
**UNISON (1)**
3:7
**United (2)**
3:2,8
**unitize (1)**
9:10
**unless (1)**
16:9
**up (14)**
6:17;13:10;14:6;
17:20;20:4;24:1,16;
29:18;30:9,15;
31:20;37:15;40:20;
41:3
**updated (1)**
35:4
**upon (3)**
7:18;8:9;9:8
**USC (1)**
14:19
**use (2)**
21:7;25:19
**used (1)**
42:21
**useful (1)**
22:21
**USTC (2)**
23:1;46:2
**USTC's (1)**
44:14
**usually (1)**
30:21

## V

**value (1)**
45:11
**various (1)**
46:3
**vein (1)**
38:4
**verification (1)**
21:22
**verified (3)**
5:11,15;12:25
**vice (3)**
48:1,2,5
**view (4)**
17:13,15;23:6;
26:16
**viewpoint (2)**
31:25;51:1
**views (1)**
4:23
**virtually (1)**
6:11
**volume (1)**
37:3
**voluntarily (1)**
19:11

## W

**wait (4)**
43:3;45:16,16,16
**waived (1)**
22:15
**walk (4)**
4:18;5:1;24:19,25
**wants (1)**
48:13
**warehouse (5)**
14:24;23:5,8;
47:16,19
**warehouses (2)**
8:3;10:17
**warranted (1)**
42:16
**wave (1)**
23:6
**way (20)**
9:7;11:16;12:16;
14:6;15:11;17:19;
18:20;19:3;21:6;
28:13;29:10;30:17;
35:5,25;36:2;40:23;
41:15;50:18,19;52:5
**week (2)**
35:7,8
**weeks (1)**
47:24
**weren't (3)**
37:7;38:20;39:11
**wet (1)**
23:6
**what's (13)**
5:21;8:20;18:3,10;
19:3;21:7;24:13,16,
25;25:24;31:14;
35:8;41:11
**whole (7)**
18:4;20:4;30:8;
31:17;35:21;36:8;
44:6
**who's (2)**
21:17;39:25
**willing (1)**
20:10
**window (1)**
18:20
**withdrawn (1)**
19:10
**withheld (3)**
8:21;11:18;34:23
**within (3)**
15:18;17:16,21
**without (3)**
26:9;28:6;52:2
**witness (5)**
10:22;14:7;34:2,6,
7
**witnesses (5)**
22:5;33:3;45:18;

49:4,4
**women (1)**
18:13
**wondering (1)**
39:1
**Woods (3)**
3:18,19,20
**word (1)**
13:12
**words (1)**
11:10
**work (6)**
9:24;11:6,9;14:5;
23:18;24:4
**worked (3)**
14:12;25:2;26:8
**working (1)**
11:2
**worms (1)**
20:5
**worth (1)**
21:13
**written (2)**
8:15;9:15

## X

**Xchanging (2)**
21:7,11

## Y

**year (4)**
5:7;7:14;16:8;43:4
**years (3)**
12:5;45:20;47:23
**York (1)**
3:24;37:15,22

## 1

**1 (4)**
15:3,8,9;18:9
**10 (1)**
15:9
**11 (1)**
20:5
**13 (1)**
6:5
**1746 (1)**
14:19

## 2

**2 (1)**
18:9
**2018 (2)**
10:10,13
**2019 (2)**
7:6;41:7
**2020 (2)**
26:22;42:21
**2021 (1)**

41:5
**26 (2)**
  16:3;30:16
**26f (2)**
  21:5;33:12
**28 (1)**
  14:19

### 3

**3 (2)**
  6:5;19:13
**300 (1)**
  15:3
**30b6 (3)**
  14:6;34:13;47:20

### 4

**4 (1)**
  6:5

### 5

**5:19-cv-430 (1)**
  3:13

### 6

**600 (1)**
  9:2

### 7

**7 (1)**
  15:9

### 8

**8 (3)**
  15:9;22:15;24:10
**8's (1)**
  22:14

### 9

**9th (2)**
  5:9;10:4

Case 5:19-cv-00430-BO    Document 90    Filed 05/11/21    Page 64 of 64