# EXHIBIT A

1      UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF NORTH CAROLINA

3                                    )
       U.S. TOBACCO COOPERATIVE,     )
4      INC.,                         )      DOCKET NO. 5:19-cv-00430-BO
                                     )
5                      Plaintiff,    )
                                     )
6      vs.                           )
                                     )
7      CERTAIN UNDERWRITERS AT       )
       LLOYD'S, SUBSCRIBING TO       )
8      POLICY NUMBERS                )
       B1353DC1703690000 AND         )
9      B1353DC1602041000

10                     Defendants.

11            TRANSCRIPT OF SETTLEMENT CONFERENCE
         BEFORE MAGISTRATE JUDGE ROBERT T. NUMBERS, II
12              MONDAY, MAY 3, 2021; 1:36 PM
                   RALEIGH, NORTH CAROLINA
13
       FOR THE PLAINTIFF:
14          McGuire Woods LLP
            By:  Mark E. Anderson, Esq.
15               Amy E. Dehnel, Esq.
                 Shelby S. Guilbert, Jr.
16          501 Fayetteville Street
            Suite 500
17          Raleigh, NC 27601

18
       FOR THE DEFENDANTS:
19          Hill Rivkins LLP
            By:  James A. Saville, Esq.
20          45 Broadway
            Suite 1500
21          New York, NY 10006

22          Clark, Newton & Evans, PA
            By:  Seth P. Buskirk, Esq.
23               Don T. Evans, Jr., Esq.
            509 Princess Street
24          Wilmington, NC 27401

25     Audio Operator:              CLERK'S OFFICE PERSONNEL

1          MR. EVANS:  Good morning, Your Honor.  Don Evans, I'm

2    local counsel for the defendants, along with Seth Boskirk here

3    who is also local counsel.

4          THE COURT:  All right.  Good afternoon, everyone.

5          MR. SAVILLE:  Good afternoon, Judge.

6          So we're here on a -- related to a motion to compel

7    that was filed by U.S. Tobacco in which I granted the order

8    and set a hearing to discuss what sanctions, if any, are

9    appropriate in this case given what occurred in the course of

10   discovery.

11         Before we dig into the merits, I want to start by

12   asking -- I'll hear from plaintiff's counsel first on this --

13   what is the current status of discovery and the compliance

14   with the order I entered?

15         MR. GUILBERT:  Your Honor, we don't think that the

16   defendants have complied with the court order, and I'd be

17   happy to go into as much or as little detail as the Court

18   would like this afternoon.  We're prepared to walk through the

19   responses.  We've brought copies of the supplemental discovery

20   requests that were submitted that, suffice it to say, we don't

21   think that the defendants have complied with the order.

22         THE COURT:  Well, let's start with -- just give me an

23   overview of what your views of it since -- and, if necessary,

24   we'll dig into it.

25         MR. GUILBERT:  Okay.  And we've got one slide that I

 1  think people can help us walk through where we think things

 2  currently stand that, I think, provides a good overview.  And

 3  if you'd like more detail as we get into this, I'm happy to

 4  provide it.

 5           So I think that the first problem that we had with

 6  the responses is that we've been trying to get interrogatory

 7  responses from the defendants for a year and a half as Your

 8  Honor noted in the order.  And the order that Your Honor

 9  entered on April 9th said that all of the defendants were

10  supposed to actually respond to interrogatories.  They were

11  supposed to respond.  They're supposed to submit verified

12  interrogatory responses.  So we don't think that the insurers

13  have complied.

14           The responses that we were provided, and first of

15  all, not verified.  There's a red flag there.

16           Secondly, their joint responses submitted on behalf

17  of all thirteen defendants in the case, we don't have

18  individual interrogatory responses from all the defendants

19  which is something that we've been asking for, and we've been

20  told we were going to receive throughout the case, and don't

21  really understand what's at issue there.

22           We do have, what appears to be, some slightly amended

23  interrogatory responses.  They look very similar to what we

24  had received before, but they still have some of the same

25  problems that we had with the first set of interrogatory

 1   responses.

 2          For example, there's still no explanation, we have an

 3   interrogatory -- standard interrogatory to explain the factual

 4   or legal basis for the defenses in the case.  There is still

 5   no answer for, I think, affirmative defenses 3, 4, or 13.

 6   There's just no response.

 7          So we think that certain of those defenses, at least

 8   now, we should be talking about striking defenses at this

 9   point if the insurers don't want to respond.  And I think

10   another issue that we noted when we were here in December is

11   that -- I guess we were doing it virtually -- is that we have

12   deposition testimony that is at odds with the answers in the

13   interrogatories.  You can't really reconcile the two.  We

14   thought that they were ordered to go back and amend the

15   responses that that was going to be addressed.  It has not

16   been.

17          And what we've done -- and if I can hand this up to

18   Your Honor.

19          I don't know -- do you have a copy first, Jim?

20          With our motion to compel that we filed -- I guess

21   the second motion to compel, there is an exhibit C, Your

22   Honor, that identified all the specific deficiencies with

23   respect to each of the responses we had received.  And I think

24   what was done is we've taken what was exhibit C, we just added

25   another column that explains why for each of the responses we

1    don't think that they've complied with what Your Honor ordered

2    the insurers to do.  So that's the story on interrogatory

3    responses.

4         The order also addressed the need for the insurers to

5    rectify certain issues that we have identified in December of

6    2019 with the initial disclosure.  So the insurers did not

7    comply with the order which directed them to do so.

8         I think that the disclosure specifically that we've

9    been focused on since December relates to reinsurance polices.

10   We think that -- and as your order found, the insurers were

11   required to disclose the reinsurance policies with their

12   initial disclosure.  They didn't do that.  They've been

13   ordered to do so, and they're disclosure now is just unchanged

14   from what we had back in January of last year.

15        Now, we do know that they have some insurance or

16   reinsurance policies.  We'd like to see them, because there's

17   a separate interrogatory response that says that insurers all

18   maintain reinsurance programs that may be called upon to

19   reimburse insurers.  So we know they got them.  They haven't

20   given them to us.

21        And beyond that, they did not produce -- and we have

22   a separate request for this.  It was just related to the

23   initial disclosures because we want the policies.  We also

24   want to see the reports that the claim adjusters have been

25   submitting to the reinsurers.  And those communications are

1  not privileged.  We expect that there would be reports saying

2  well, this is what we saw when we went out to the

3  Cooperative's warehouses.  This is what we think the loss is.

4  These are the challenges with respect to the claim.  They've

5  been ordered to provide that information.

6        We saw one document that appeared to relate to the

7  need to report to reinsurers.  We don't have the reports,

8  though.  There should be if all the insurers have reinsurance

9  that may be called upon to pay for damages that may be entered

10 in this case, that may be awarded for bad faith and it's

11 reinsurance for bad faith typically in these policies.  We

12 want to see what communications exist and we don't have them.

13       I think with respect to the document request and the

14 production issues, I think there the insurers did not comply

15 with the order there.  Once again, instead of getting written

16 discovery responses from each of the insurers, we had a joint

17 amended response, and it's still -- it's filled with

18 boilerplate objections.  So if you look at the responses,

19 they're almost identical to what we had before.  Less than

20 twelve general boilerplate objections.  We have no idea what's

21 still being withheld.

22       There were some additional documents that were

23 produced.  Some documents were produced, we don't know on

24 behalf of which insurer.  We think it's only from Aegis, but

25 there's a Bates prefix, DEF.  So presumably, those have been

1  produced on behalf of all defendant insurers.  And there are

2  about 600 additional pages as far as we can tell.  The rest of

3  the production, there are documents from Marine Reporting

4  International which was a loss adjuster the insurers retained.

5  They produced some additional documents.  But what it looks

6  like is that we do not, and we still do not have documents

7  from all of the insurers.  So there's no way to tell.

8         In fact, they keep saying there is an agreed upon

9  electronically stored information order that says we're

10  supposed to unitize documents, produce metadata.  I mean, we

11  don't have any of that either.  So it's really hard for us to

12  figure out where the documents did come from.  We just have a

13  few large PDFs.  So it's really hard to reconcile where the

14  documents came from.

15         The written responses that were amended do not

16  identify Bates ranges of documents that have now been

17  produced.  I think the Court ordered that that was supposed to

18  be included in the amended responses.  It has not been.

19         I think the depositions that reveal very specific

20  categories of responsive documents that have not been

21  produced, and these are not just documents that would be nice

22  to have.  We've deposed the lead claim handler for AEGIS who

23  said I got claim diary.  Claim diary has not been produced to

24  us.  That's a core document that contained his work on claims

25  investigation.  Still don't have it.  And the list goes on and

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO   Document 92-1   Filed 05/24/21   Page 8 of 31

1  on, and that's detailed at exhibit E to this binder that, I

2  think, did the same thing and went through each of the

3  document requests and identifies why we think even at the

4  April 9th order and supplemental production that we did

5  receive that the insurers have not complied.

6          Now, Your Honor may remember that there was another

7  category of documents the insurers were ordered to produce

8  that relates to their mold expert, Dr. Heard, from London.

9  And we did receive a copy of a draft cause and origin report

10  that was drafted in 2018.  So we did receive that.  It was

11  telling because the bottom line conclusion is that one -- a

12  couple of the key defenses that the insurers have been

13  asserting in this case that she thought back in 2018 that it

14  would be speculative to reach the conclusion.  It's one of the

15  defenses that they've raised is that the mold that we found on

16  our products started growing before it came into the

17  warehouses and that mold is an inherent characteristic in

18  tobacco.  She said that she couldn't conclude that, and that

19  would be speculative.

20          Now, that's not in her expert report that was

21  submitted as an exhibit as a rebuttal expert report, but she's

22  now a fact witness in this case, and we need to depose her.

23  But the problem is we still don't have her documents.  We've

24  got a handful of emails that were sent from Paula Cook at

25  Marine Reporting International back to Stephanie Heard, and a

1  couple of invoices.  They identify a bunch of names of people
2  that we had no idea were even working on this file.  But we
3  don't have those documents either.

4          I think that the privilege logs, those are still a
5  mess.  I think that what it looks like the insurers have done
6  is I think the Court has overruled the work product objection
7  based on the anticipation of litigation date.  And what it
8  appears that the insurers have done is that they've deleted
9  work product claims, so that's out, but they just added the
10 words "legal advice" to most of the entries on the log, and we
11 got the privilege logs are also in the binder.  It looks like
12 the logs are shorter than they were before.  So then it's a
13 guess that some documents may have fallen off the log or
14 they're not claiming privilege over them, but it doesn't
15 appear that we have all those documents.  Maybe, but there's
16 really no way to tell because they did not do what was also in
17 the order which was to say what documents are being produced,
18 what documents are still being withheld.  We can't really
19 figure that out.

20         We are open to meeting and conferring with the
21 insurers on that issue, but we'd like some direction from the
22 Court to fix this in the first instance before we sit down and
23 talk with them.

24         A couple other issues that we've identified.  The
25 Court ordered the insurers to produce information about

1   similar claims that these insurers have dealt with before,

2   specifically related to mold issues under marine cargo

3   policies, and also bad faith cases.

4           We asked for -- had interrogatory asking for all the

5   bad faith claims in the last ten years.  We have a specific

6   document request for documents relating to interest coverage

7   for mold damage claims.

8           They told us about one case that's pending now

9   against Lloyd's in Lake Charles, Louisiana.  It looks like it

10  has nothing to do with mold.  It looks like it has to do with

11  an explosion that occurred.  They're bad faith claims.  So

12  we're looking into that, but we expected that if they had any

13  other claims like this that either tell us what they were, or

14  they tell us they don't have them, that they don't have these

15  types of claims, they ought to just be telling us that and

16  that would be the way to address that issue.  But we don't

17  have documents for that case, and we don't think that they've

18  responded.

19          Last couple issues, minor issues, but there was a

20  direction from the Court with respect to some documents that

21  plaintiffs inadvertently produced to the insurers.  We did

22  receive confirmation from Mr. Saville that his clients had

23  complied with the Court's directive, but didn't really comply

24  with the letter of the order.  The order suggested that this

25  needed to be verified under oath or under penalty of perjury

1   we got an affirmation of. I got no reason to doubt what Mr.
2   Saville said in his affirmation, but just another example of
3   noncompliance with the Court's order.

4          And similarly, with respect to the issue pertaining
5   to Mitsui which is one of the defendants. We received an
6   email from Mr. Saville stating that Mitsui states we agree to
7   be bound with respect to Mitsui about emails they -- we assume
8   he meant to say that Mitsui agrees to be bound by the
9   testimony of MS Amlin in this case. That's not what the email
10  said that we received, and we're happy to clear that up if
11  that's what Mr. Saville intended to say that they intend to be
12  bound by MS Amlin, we'll take him at his word. But this is
13  another example of what we think is serial examples of
14  noncompliance with the Court's directive.

15         So I think that just scratches the surface, and be
16  happy to go into more detail, but I think that's it in a
17  nutshell, Your Honor.

18         THE COURT: Mr. Saville, what do you say in response?

19         MR. SAVILLE: Your Honor, a couple quick things.

20         Everything that has to do with this case is me.
21  Local counsel has nothing to do with it. They've been purely
22  local in that regard. Gave me some guidance early on as to
23  what to do. And if I had questions, they did a great job in
24  complying with that.

25         Brody Karn is behind me. He's also with our firm.

1    separate issue, but there's been nothing there.

2            The privilege logs, we were very specific, Your

3    Honor.  We put them all out.  We numbered them from 1 to 300,

4    let's say, for entry.  So we had some correlation to that.

5            On the revised privilege logs, we amended the

6    responses, as we should, and based on the Court's orders we

7    deleted line items.  However, we kept the same numbering.

8            So when you looked at them, you could go all right, 1

9    through 10 on the revised is 1, 7, and 8, so you knew exactly

10   what documents were coming out of it.  That's what we thought

11   was the simplest and most direct way to address the issues

12   with the privilege log in order that we can keep track of

13   them.

14           With respect to the Heard documents, in accordance

15   with the order, we have just given everything that's out there

16   in terms of the Heard file.  The same with the MRI (ph.)

17   documents in terms of turning them over.  A lot of those

18   documents were within, I think, the scope of the privilege

19   logs, so those have all been produced.

20           I'm having -- I realize that this is late in the day,

21   Your Honor, but I'm happy to go through and designate by Bates

22   numbers which documents came from which entry on the privilege

23   log.  It's -- they were pretty well described by to, from, cc,

24   date, and topic.  And as I mentioned, we took it out.  And so

25   therefore, you'd be able to just correlate the two.  But if we

1          As one of the underwriters' representatives

2    testified, this I under a Rutherford facility.  So as soon as

3    the lead agrees, it's automatic.  There's nothing else that's

4    done.

5          She testified that listen, I don't really know much

6    about it.  Here's the policy.  I know who these guys are, but

7    once the lead committed us to this under this particular

8    facility, there is no choice.

9          This case has always been about whether moisture

10   would be considered an external cause.  That's it.  Full stop,

11   Your Honor.  There's no debate as to any other issue from our

12   perspective.

13         We've taken the view that moisture, ambient moisture

14   is not an external cause.  Obviously, U.S. Tobacco has taken a

15   different view.  All of this other information while clearly

16   within a broad scope of discovery is totally irrelevant to

17   that issue.  Whether there's some underwriter down the chain

18   has any information is not relevant to anything.  They don't

19   have a choice.  And if they had an objection to the way the

20   case was being handled, that would be sent up to the lead and

21   that would have been produced, because that was within the

22   scope of it.  There had been no such documentation of that at

23   all.  And therefore, we believe we've complied with all the

24   discovery requests.

25         The reason why we did a joint interrogatory response,

1          I'm happy to answer any questions you have.

2          THE COURT:  Well, what U.S. Tobacco heard and what

3     your -- what's the best way to go about resolving the concerns

4     you have?  Mr. Saville's telling me everything's been

5     produced, so how do we satisfy you that that's correct?

6          MR. GUILBERT:  Well, I think first of all, I

7     understand now that there's no debate that this case is only

8     about whether there was an external cause.  If that's the case

9     then the number of the insurer's primary defenses that it had

10    not been explained or it should be stricken or withdrawn

11    voluntarily by the insurers, for they just haven't answered or

12    explained the basis for these defenses.

13         So for example, the affirmative defense number 3, in

14    this case, says that the plaintiffs have not complied with

15    conditions precedent to coverage and, therefore, there's no

16    coverage in this case.  No explanation for that in the

17    interrogatory responses.  It should be out at this point.

18         There was another contingent interrogatory, they

19    didn't mention this one, that said if you contend that there

20    was prejudice, that you're prejudiced by the timing of the

21    notice in this case.  Now, there's a late notice defense in

22    this case, but very forgiving language in the policy that says

23    that the insurers have to prove that they were prejudiced.

24    They haven't answered that or explained the basis for how they

25    were prejudiced.  Those are the types of defenses that, I

1  would think if you're not going to answer them, they should be

2  out.

3          THE COURT:  I've got plenty to deal with with what

4  I've got here.  I don't necessarily want to open up a whole

5  new can of worms, and if you feel like filing a Rule 11

6  motion, go through the process to do that.  If you feel like

7  filing a motion for summary judgment, do ahead and do that.

8  And that's all stuff that you can deal with.  I'm talking

9  about what we got here today.

10         I mean, Mr. Saville's talked about he's willing to

11  put together thirteen different copies of interrogatory

12  responses.  Do you want that?

13         MR. GUILBERT:  Well, I think that we should have

14  responses from everyone, and not sure that those will be

15  identical.  I heard him to say that all of the insurers are

16  bound.  Well, we've deposed some of the insurers, not all of

17  them.

18         We have, for example, one insurer who said that he

19  disagreed with denials of request for admission that we

20  understand have been prepared by AEGIS, the lead.  So here,

21  you've got a Following Market insurer who has a different

22  understanding of the facts in this case.  And that's why I'm

23  suspect of the notion that we can just have a signature from

24  each of the thirteen insurers and that's going to take care of

25  the issue.

1  documents that are hard to decipher and match up with the

2  privilege log.

3          Now, that's something that normally you would be able

4  to work through in a meet and confer process, but they need to

5  do it right the first time.

6          THE COURT:  So what I've heard from Mr. Saville, or

7  what I understand him to have said, was that they've now

8  numbered everything that was on the privilege log and the

9  things they've taken off, there should be a gap on the

10  privilege log for whatever -- like I said, I think number 8 is

11  no longer there.  And what is your concern with that?  I

12  admittedly, have not reviewed that electronic discovery order

13  recently, so maybe I'm just not remembering what's pertinent

14  about it, but what is your problem with that method of

15  production?

16          MR. GUILBERT:  Because we can't match up what's come

17  off the log and what supposedly has been produced to us with

18  what the log had on it before.  We just haven't been able to

19  figure it out.  Now, if they want to walk us through it and

20  show that they've done it, then that's fine.  But we've gone

21  through that exercise with the defendants in this case

22  multiple times.  I think the last time we tried it was in

23  November or December, and we didn't really get anywhere.

24          THE COURT:  Mr. Saville, can you sit down with them

25  and walk them through what's come off the log?

1          MR. SAVILLE:  Mr. Karn and I will.  Mr. Karn has the
2    detailed knowledge of that.  I don't -- I know how it worked,
3    I don't know anything after that, Your Honor.

4          THE COURT:  With respect to request for production,
5    and what I've heard from U.S. Tobacco is the same concern over
6    a joint response.  Was individualized responses going to be --

7          MR. SAVILLE:  We'll segregate them out, Your Honor.

8          THE COURT:  All right.  Have I covered all the issues
9    that you've raised here?

10         MR. GUILBERT:  Yes, Your Honor.  And I think we went
11   into much greater detail than -- if you could refer to exhibit
12   E which is in your notebook.  I think it goes point by point
13   through each of the document requests on why we don't think
14   that they're in compliance.  So we'd still like them to
15   comply --

16         MR. SAVILLE:  Your Honor --

17         MR. GUILBERT:  -- as they were directed to.

18         MR. SAVILLE:  I'm sorry, Shelby.

19         Your Honor, I'll use that as a guide.  I'll go
20   through it.

21         THE COURT:  Okay.  All right.

22         Next item I had on my agenda was the role of local
23   counsel here.  Mr. Saville has noted that their role here is
24   generally as uninvolved with what's going on here in terms of
25   substance and simply --

1  on what he saw, Your Honor.

2        THE COURT:  And you understand the sanctions that are

3  available to the Court to punish noncompliance with discovery,

4  right?

5        MR. SAVILLE:  Fully do, Your Honor, yes.

6        THE COURT:  And you understand among those are

7  designating certain facts in the case as true?

8        MR. SAVILLE:  Correct, Your Honor.

9        THE COURT:  And you understand that the Court could

10  prohibit a party from introducing certain matters into

11  evidence?

12        MR. SAVILLE:  Correct, Your Honor.

13        THE COURT:  And you understand the Court could strike

14  pleadings?

15        MR. SAVILLE:  Yes, Your Honor.

16        THE COURT:  And you understood that the Court could

17  order entry of a default judgment?

18        MR. SAVILLE:  Correct, Your Honor.

19        THE COURT:  All right.  Explain to me why there was

20  such an issue with complying with the Court's local rules and

21  the federal rules with respect to post-removal proceedings.

22  There seem to be a number of missed deadlines and other things

23  like that.  What was the problem?

24        MR. SAVILLE:  There was no problem per se, Your

25  Honor.  I think it was a day or so on corporate -- if I

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
Case 5:19-cv-00430-BO    Document 92-1    Filed 05/24/21    Page 19 of 31

1       MR. SAVILLE:  I have no excuse for that, Your Honor.

2    I couldn't tell you other than it was probably a holiday

3    season, gathering information.

4       THE COURT:  Well, what about filing the answer?  I

5    mean, the answer was late and there was repeated statements

6    about we'll file it, we'll file it, and they reminded it, and

7    you said we'll file it, and it never got filed.  I mean,

8    obviously, they didn't move for default there, and eventually

9    you did get around to filing it, but what was the problem with

10   getting it filed either on time or the way you told opposing

11   counsel you'd do it?

12      MR. SAVILLE:  There was no problem per se, Your

13   Honor, other than the timing of it.  And again, that is on me.

14   That key to the meetings that were had, I don't remember those

15   dates perfectly.  But there were meetings ongoing.  So as

16   opposed to incurring the cost that might be incurred going

17   forward, we dedicated the time and effort into seeing if we

18   could set this up to have a meeting among the parties which,

19   in fact, went forward.

20       So on its face, Your Honor, it clearly looks like I

21   sat on my hands and did nothing for thirty days or sixty days

22   or whatever that time frame is.  Behind the scenes, however,

23   there were sit-downs and discussions about the possibility of

24   resolving the case with the plaintiff, and that's what was

25   going on in the background at that time.

Case 5:19-cv-00430-BO    Document 92-1    Filed 05/24/21    Page 20 of 31

 1  bound by the professional rules of this court, how do I -- how

 2  do I deal with that?

 3          MR. SAVILLE:  Your Honor, I have no explanation other

 4  than it's a time issue, and grossly underestimated what was

 5  required to take time on it and it just --

 6          THE COURT:  So you've taken a lot of this on

 7  yourself.  In terms of -- as I look at the possible options of

 8  sanctions, there's, obviously, sanctions against attorneys and

 9  there's sanctions against parties.  Do you care to opine on

10  the division of the responsibility for the shortcomings that

11  the Court has identified?

12          MR. SAVILLE:  Your Honor, the shortcomings are all

13  mine.  I mean, I'm not making any statement -- any other

14  representation other than that.  There's -- that's on me.

15          THE COURT:  Well, if that's the case, then why should

16  we continue to allow you appear in this case?

17          MR. SAVILLE:  Other than my representation that going

18  forward I'm the attorney that's most familiar with it, I think

19  the client would be prejudiced and then we'll -- you won't be

20  seeing me stand up here again like this.

21          THE COURT:  Why should I not refer this to the

22  court's disciplinary process given the misrepresentations that

23  have been made to the Court and the overall way discovery's

24  been conducted here?

25          MR. SAVILLE:  I don't believe that's necessary, Your

1   Honor.  Discovery's been conducted in good faith.  The

2   representations were made in good faith.  I understand the

3   particular points that you brought up and it's just a question

4   of -- it's always been a question of timing to get it done.

5           THE COURT:  Well, we're here in May of 2021, and my

6   understanding is these discovery requests were served in

7   December of 2019.  I mean, that's a long time for it to take

8   to get a set of responses out.  And it only -- it's taken two

9   motions to compel to get things done, and it sounds like we're

10  not even where we need to be in terms of getting responses

11  out.  So what would you -- how would you -- what's your

12  position on why that's okay?

13          MR. SAVILLE:  It's certainly not okay, Your Honor,

14  and I -- other than my explanations to you, I don't believe

15  it's okay.  I don't believe that's the way the cases should be

16  litigated.  Unfortunately, this is one that went that

17  direction.

18          THE COURT:  Well, because, I mean, I've got -- we are

19  an incredibly busy court.  We have many litigants in front of

20  us, and I'm trying to figure out in terms of dissuading other

21  litigants from taking this course of action here, how do I

22  make it known to the public at large, the bar at large, that

23  this sort of conduct is not acceptable in this court in terms

24  of discovery and taking four -- what, fourteen, sixteen months

25  to respond to discovery.

 1   believe -- it couldn't be a just result in terms of where we
 2   are right now.
 3            THE COURT:  Well, since U.S. Tobacco's had to wait
 4   well over a year to get discovery, why wouldn't it be fair?  I
 5   mean, whether it's -- you are -- you claim it's your fault,
 6   but the client hired you and they have to bear with the
 7   decisions you make.  And here, it appears that for one reason
 8   or another, we're now sixteen months into this, seventeen
 9   months into this, and they still don't have the discovery
10   responses that they are entitled to.  And so perhaps your
11   client needs to suffer the consequences of their attorney's
12   actions in this case.
13            MR. SAVILLE:  I don't believe the remedies of default
14   or striking particular pleadings or affirmative defenses or
15   discovery after a certain date would be an appropriate remedy
16   in this particular case.
17            The depositions have been done.  The documents have
18   been produced.  Experts have done reports.  And we're at that
19   point, Your Honor.  If there's any penalty, it should lie at
20   my feet, not in terms of penalizing the client in striking an
21   answer or a default or anything along that line.  That
22   wouldn't be fair or equitable in this circumstance at all.
23            THE COURT:  Well, it guess it depends on how you look
24   at it.  I mean, it seems -- from what I've seen -- and I
25   expressed this in my order -- it seemed that you or your

 1    clients didn't think you had to comply with the rules of

 2    discovery at all.  It seemed like it was totally optional on

 3    whether you wanted to do it or not, and only when pressed did

 4    you do anything.  So if that -- if that's the case, how do

 5    I -- what message to I send to the bar if I just say, oh,

 6    here's some attorneys' fees.  On the whole, it's -- it doesn't

 7    seem to send the right message if there's not an extreme

 8    penalty here.

 9              MR. SAVILLE:  I believe the attorneys' fees or

10    shifting the costs is an extreme message in this circumstance,

11    Your Honor.

12              THE COURT:  As I reviewed U.S. Tobacco's pleadings,

13    they always ask for whatever other sanctions the Court

14    imposed.  I mean, what is USTC's position on appropriate

15    sanctions here, and if you think it's something like default

16    or limiting evidence or limiting pleadings, what prejudice has

17    your client suffered?

18              MR. GUILBERT:  Your Honor, our client has incurred a

19    lot of fees just chasing the insurers' trying to responses to

20    discovery requests.  And I'd be happy to put together what

21    that looks like in terms of time and costs to file multiple

22    motions to compel, try to meet and confers, send deficiency

23    letters.  So that's something that we could put together, and

24    I think that is real prejudice.  But I think beyond that, our

25    clients are eager to move the case forward.

 1           So I think that one sanction that the Court might

 2     consider is, I think at this point, this really should be the

 3     trial around damages and a trial about bad faith at this

 4     point.

 5           I think that we're not getting discovery about the

 6     affirmative defenses in this case that have been asserted, and

 7     at some point, we should just move forward to a damages trial.

 8           THE COURT:  Well, I mean, you mention the fees and

 9     all that, I certainly don't quibble with that, but is there

10     any other prejudice that your client has suffered?

11           MR. GUILBERT:  I think prejudice is the time value of

12     money and -- we do have a claim for pre-judgment interest in

13     this case.  We do have a bad faith claim in this case.  It's

14     one of the remedies you get for this type of conduct, and as

15     to the treble damages penalty, we intend to seek that.  But I

16     think just to -- having to wait and wait and wait, I think, at

17     some point it's more than just fees.  And I think that it does

18     get harder as more time goes by with witnesses and people who

19     knew on the insurer's side haven't been to the site in five

20     years.  Maybe we can cross-examine them and do that at trial

21     to establish that they don't remember or don't have a

22     recollection and the jury can do with that what it may, but I

23     think the more time that goes by it gets harder to try this

24     case.

25           THE COURT:  Realistically, who is -- who does the

 1  damages award go to if you were to prevail at trial, right?
 2  Obviously, USTC, but then what happens to that money?  Does it
 3  go to the various cooperative -- members of the cooperative or
 4  what happens to that?

 5          MR. GUILBERT:  And Your Honor, I don't know where the
 6  funds would go once it goes to the cooperative, or what they
 7  do with the funds.  I know they've got a board of directors
 8  now and they would be looking at that.

 9          THE COURT:  And which affirmative defenses do you
10  contend should be stricken at this point?

11          MR. GUILBERT:  Oh, I think most of them, Your Honor.
12  I think I mentioned some by specific number earlier where
13  there was just no response from any of the insurers.  And keep
14  in mind here that twelve -- and it's still our position that
15  twelve of the thirteen never answered interrogatories
16  including interrogatories didn't even state the basis for the
17  claims or defenses in this case.

18          So twelve of thirteen haven't answered.  We got
19  answers that aren't under oath as they were ordered to do.
20  We've got some where they just chosen not to answer at all
21  whether these affirmative defenses.  Maybe they're just to --
22  there was a little bit of kitchen sink approach with the
23  answer that we received.  Some defenses that hadn't been
24  articulated in prior coverage letters, but they're in the
25  answer, right.  And sure, we could file a motion for summary

eScribers, LLC │ (973) 406-2250
operations@escribers.net │ www.escribers.net
Case 5:19-cv-00430-BO    Document 92-1    Filed 05/24/21    Page 26 of 31

1  judgment, but if they're not going to answer and explain the

2  basis for the defense after being asked to do so for fifteen

3  months, at some point those defenses should be out of the

4  case.

5          I think that there is a -- I mentioned a notice

6  defense.  I think that there's now deposition testimony that

7  can't be reconciled with the defense.  So that's one that I

8  think should be gone.

9          We thought that when we got the amended responses

10  that they would explain -- either explain the basis for that

11  defense or how to reconcile the testimony or it would be out,

12  but that's not what happened.

13          There's a duration of cover exclusion in the

14  insurance policy that they have to clearly establish.  And

15  that the mold was growing on the tobacco before it came into

16  the warehouse.

17          We got the lead claim adjuster in his deposition said

18  that he could not clearly establish that the mold started

19  growing on the tobacco before it entered the warehouse.

20  That's 30(b)(6) are out.

21          We also now have the Heard report saying it could be

22  speculative to reach that conclusion, and that was her report

23  that was hidden from us for the last two years that we didn't

24  get until we got your order two weeks ago.  So that's another

25  type of defense and the list goes on.

1          There's an inherent vice argument that tobacco is
2     just inherently moldy and there's an inherent vice.  Well, we
3     now know that from a handful of the new documents that were
4     produced to us that insurers, after this loss occurred,
5     thought about adding an inherent vice exclusion to the policy.
6     It's not in ours.  But those are the types of defenses, that
7     if they're going to go back and seriously redo the
8     interrogatory responses, some of those defenses should be out
9     of the case now, or they should explain how they plan to prove
10    them, but they haven't done either.  They haven't reconciled
11    them with the testimony, the documents, and I don't think that
12    they can.  So those should be out.

13          THE COURT:  Anything else U.S. Tobacco wants to add
14    to that?

15          MR. GUILBERT:  No, Your Honor.  Anyone else?

16          THE COURT:  Mr. Saville, anything else on your behalf
17    or on behalf of the clients?

18          MR. SAVILLE:  Your Honor, the only last thing is the
19    interrogatory responses, we believe, with respect to the
20    affirmative defenses, I think, as Mr. Guilbert might have
21    pointed out, there's one that says we incorporate the terms
22    and conditions of the policy.  One is a condition precedent
23    which is out because we haven't responded -- not that we
24    haven't responded to, but we don't believe there was any issue
25    with that.

Case 5:19-cv-00430-BO     Document 92-1     Filed 05/24/21     Page 28 of 31

1         But with respect to the others, they've all been

2    identified in here in terms of the reason and the factual

3    basis for why they've asserted them.  And there's been six

4    witnesses or five witnesses that have explained ad nauseum the

5    basis for all those assertions.  So with that, Your Honor,

6    there's nothing further.  Thank you.

7         MR. GUILBERT:  I think, you know, one thing that I've

8    omitted is that I think at some point we -- and depending on

9    which defenses are in the case, there may be some need for us

10   to supplement our expert reports that we had submitted.  We

11   were in the process of expert discovery when Your Honor

12   decided to hold the case in abeyance while we resolved these

13   issues.  I think that amendment with some of the documents we

14   received, I think that we might want to supplement some of our

15   reports.  In particular, our bad faith expert.  And also one

16   of our experts on some of the mold information we have from

17   Dr. Heard.

18        We don't think that that should entitle the insurers

19   at this point or another round of rebuttal expert reports.  We

20   want to get this case moving, but that's something else that

21   we will need to do.  We spent a lot of money in the first

22   round trying to put all that together.  And there are,

23   probably, one or two other depositions that we're going to

24   need just from a fact deposition prospective.  So we'll have

25   to build that into the schedule.

1   the Court's viewpoint.  And I'm obviously not privy to

2   conversations between local counsel and out-of-state counsel,

3   but certainly part of the role of local counsel is conveying

4   the court's expectations of foreign counsel to them, and

5   certainly this does not appear to -- this conduct does not

6   comply with this Court's expectations, and it would be my hope

7   that local counsel would note that for foreign counsel.  And

8   even though they're not subject to sanction, still it's your

9   role to do more than simply be a drop box for out-of-state

10  counsel, particularly when things like this are going on that

11  indicate conduct that is really detrimental to the

12  administration of justice.

13          I'm going to take this matter under advisement and

14  issue an order in the near term outlining what the sanctions

15  here will be.

16          Since the parties are here, they should meet and

17  confer on any outstanding issues, the ones we discussed here

18  today, and try to reach a resolution promptly.

19          While I'm not a hundred percent certain how I'm going

20  to rule here in terms of sanctions, if there are any further

21  discovery disputes, both parties -- or discovery issues,

22  failure to comply with my orders, and that sort of thing, the

23  parties should be aware that all sanctions are on the table.

24          It's a default judgment if the plaintiffs were to run

25  afoul of the rules, and a dismissal of the complaint.  This

Case 5:19-cv-00430-BO    Document 92-1    Filed 05/24/21    Page 30 of 31

1  case needs to move forward promptly.  It needs to do so

2  without further difficulty.  And it's my expectation that all

3  the attorneys as officers of the court and as professionals

4  will get it done, and that clients on either side will not

5  stand in the way of further discovery occurring in a timely

6  manner.  So that will be all for today.  We'll be in recess.

7          THE CLERK:  All rise.  This court is now in recess.

8                      (Court is adjourned)

9                      * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25