IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:19-CV-00430-BO

| | |
|---|---|
| **U.S. Tobacco Cooperative, Inc.,** | |
| Plaintiff, | |
| v. | **Order &** |
| **Certain Underwriters at Lloyd's Subscribing to Policy Numbers B1353DC1703690000 and B1353DC1602041000,** | **Memorandum & Recommendation** |
| Defendants. | |

This case was supposed to be about whether Plaintiff U.S. Tobacco Cooperative had a right to recover from the Defendant Underwriters, who issued insurance policies to USTC, for damage to tobacco stored at one of its warehouses. But instead of addressing that issue, this case has devolved into a series of disputes over the Underwriters' failure to respond to discovery and comply with this court's orders.

The Underwriters try to place the blame on their attorney, James A. Saville, who they claim had mental health issues. But they have not shown that the circumstances of this case justify relieving them from the consequences of his actions. So in connection with USTC's Second Motion to Compel, the court will require the Underwriters to pay the fees USTC incurred because of their failure to respond to discovery. The court will also prohibit them from relying on documents and information that were not produced promptly after the Second Motion's filing. And because of their failure to comply with the court's April 9, 2021 Order, the undersigned recommends that the court enter a default against the Underwriters and then, after holding a hearing on damages, enter a default judgment against them.

## I.    Background

The court's April 9, 2021 Order discusses many of the events that brought the parties to this point. D.E. 86. But in short, USTC served discovery requests on the Underwriters in December 2019 and they largely failed to respond. Twelve of the thirteen Underwriters did not respond at all to USTC's interrogatories. *Id.* at 6. Four of the thirteen Underwriters also failed to respond to USTC's request for production of documents. *Id.* at 8. And the responses USTC received were incomplete and inadequate. *Id. passim*. So the court ordered the Underwriters to provide complete responses within 14 days from the date of the order. *Id.* at 36. It also scheduled a hearing to discuss whether to sanction the Underwriters, their counsel, or both. D.E. 88.

During this hearing, which took place in early May 2020, the court asked Saville to explain his repeated failure to comply with deadlines throughout this litigation. Sanctions Hr. Tr. 27:19–27:23, 28:18–28:25. But he couldn't. *Id.* 29:1–29:3. The court also asked him to explain why his clients had been unable to comply with their discovery obligations. But for most questions, the best response he could muster was, "I don't know" or that he had "no excuse" for their conduct. *See, e.g.*, *id.* 34:8, 34:25; 31:5–31:7, 31:18.

At the end of the hearing, the court warned the Underwriters' counsel that failure to comply with the discovery order could lead to entry of default or default judgment against his clients. *Id.* 51:19–51:25. And Saville assured the court that USTC was "not going to have an issue from us in terms of scheduling and things need to be done." *See id.* 50:9–50:11.

But despite the court's warning, the Underwriters didn't comply with the order, and, in late May 2021, USTC asked the court to sanction them as a result. Mot. for Sanctions, D.E. 91 at 1. When it filed its Motion for Sanctions, USTC still had not received a single set of verified interrogatory responses due about a year and a half ago. Mem. in Support of Mot. for Sanctions,

D.E. 92 at 2. USTC had also received no interrogatory responses from twelve of the thirteen Underwriters, any documents from eight of them, or any documents from the "Heard" investigation of the insurance claim. *See id.* at 4. And USTC had no idea what documents the Underwriters have searched or withheld. *Id.* at 4–5. So the Cooperative asks for the court to enter a series of sanctions against the Underwriters, including entry of a default judgment.

The deadline for the Underwriters to respond to the motion came and went without anything being filed. Then, in late June 2021, new attorneys appeared for the Underwriters. D.E. 93, 94. Despite the response passing several weeks before, the Underwriters asked for an opportunity to respond since, they claimed, they had been "victimized by their own former counsel" who did not report the discovery issues to them. Mem. in Support of Mot. for Extension of Time, D.E. 96 at 4. The court ultimately granted the motion, not because the Underwriters had established excusable neglect, but because of the severity of the sanction sought by the Cooperative. D.E. 101

In their response, the Underwriters argued that the court should not hold them responsible for the discovery violations since Saville had not kept them informed about recent developments in the case. *See* Resp. in Opp. Mot. for Sanctions, D.E. 102 at 5. According to the Underwriters, since some unspecified time they "had been having a difficult time getting in touch with and receiving reports from" Saville. Foulger Dec. ¶ 4, D.E. 102–3. But they got in touch with him on May 24, 2021, when Saville told them "that he was backlogged with work and that whilst there were ongoing minor issues concerning privilege and disclosure there was nothing to report of any concern." *Id.* When Saville failed to respond to further correspondence or provide requested updates, the Underwriters asked another firm to assist him with the case. *Id.* ¶ 5. The Underwriters notified Saville of the new firm's involvement on June 15, 2021. *Id.* Saville told the Underwriters he would work with the new firm going forward. *Id.* But Saville never contacted the new firm. *Id.*

3

On June 18, 2021, the Underwriters new counsel located and reviewed the docket for this case. Tricarico Dec. ¶ 4, D.E. 96–1. It was around that time that he and the Underwriters learned for the first time about the April 9, 2021 Order, the early May 2021 hearing, and the late May 2021 sanctions motion. *See, e.g.*, Foulger Dec. ¶¶ 9–10, D.E. 102–3; Hill Dec. ¶¶ 5, 8, D.E. 102–4. The Underwriters fired Saville and his firm a few days later.[1] Foulger Dec. ¶ 5.

The Underwriters eventually learned from Anthony J. Pruzinsky, a colleague of Saville's, that Saville was suffering from unspecified mental health issues. Foulger Dec. ¶ 6, D.E. 102–3. Saville's partners had learned in mid-June 2021 "that there were a number of problems with some of the ongoing cases he was handling, including this one." Pruzinsky Dec. ¶ 3, D.E. 102–2. Eight days later, Saville's partners asked Pruzinsky to "delve into the matter." *Id.* ¶ 3. Pruzinsky discovered that there were "several matters" in which Saville had failed "to comply with discovery obligations or otherwise" follow court rules. *Id.*

Despite these issues, according to Pruzinsky, Saville "gave every appearance that he was performing his job in the usual diligent fashion expected of an attorney in his position." *Id.* ¶ 4. And since Saville was his firm's managing partner, no one was monitoring his work. *Id.* The firm has since relieved Saville of his professional responsibilities. *Id.* ¶ 7.

Pruzinsky claims that neither he nor the Underwriters' other attorneys have spoken with Saville about his "personal issues." *Id.* ¶ 9. And they do not intend to do so until they "receive more information from his attending physician." *Id.* Yet despite not speaking with Saville, Pruzinsky has concluded that Saville "experienced a mental breakdown . . . that affected his performance[.]" *Id.* ¶ 7.

---

[1] Yet Saville remains one of the Underwriters' counsel of record in this case.

4

The Underwriters claim that now that they know of these issues, they are trying to comply with the April 9, 2021 Order. Resp. in Opp. at 22. The Cooperative, however, maintains its request for sanctions.

## II.    Discussion

Resolution of the pending motions requires the court to answer several questions. Chief among them is whether the Underwriters can absolve themselves of their failure to meet deadline after deadline by laying the blame at Saville's feet. The court finds that they cannot. The Supreme Court requires courts to hold clients responsible for their attorney's actions. While there are some limited exceptions to this rule, none of them are present here.

With that question out of the way, the court is left with the question of what the repercussions are for the conduct by the Underwriters and their counsel. Since the Underwriters have engaged in several kinds of improper conduct, they will be subject to several kinds of sanctions. The court will require the Underwriters to pay the reasonable expenses, including attorney's fees, that USTC incurred in connection with these discovery disputes. It will also prohibit them from using documents or information that they did not produce promptly after the filing of the Second Motion to Compel. And for their failure to comply with the April 9, 2021 Order, the district court should enter a default against the Underwriters and then, after a hearing on damages, enter a default judgment against them.

### A.    The Underwriters cannot avoid the consequences of their attorney's failure to comply with the Federal Rules or this court's orders.

The Underwriters argue that if someone is to be sanctioned for the discovery issues here it should be Saville, not them. They say he did not keep them up to speed about the case or the court's orders so they should not be held liable for their lack of compliance.

This argument is unpersuasive. An attorney is a client's agent. As a result, a client must live with the consequences of their attorney's actions. While agency law recognizes an exception to this general rule when an attorney engages in self-dealing, serves the interests of a third-party, or abandons his client, those circumstances are not present here. Though Saville may have been negligent or grossly negligent in his representation of the Underwriters, that is not a basis to excuse them from the consequences of his actions.

The relationship between Saville, an attorney, and the Underwriter, his clients, is governed by agency law. *Dunkley* v. *Shoemate*, 350 N.C. 573, 577, 515 S.E.2d 442, 444 (1999) (internal quotations omitted) ("North Carolina law has long recognized that an attorney-client relationship is based upon principles of agency[.]"); *Poucher* v. *Blanchard*, 86 N.Y. 256, 260 (1881) ("The law which regulates the relation between attorney and client is that of agency[.]"). And that fact has two implications here. First, the knowledge of the attorney is imputed to the client, no matter if the client has actual notice. *See Link* v. *Wabash R.R. Co.*, 370 U.S. 626, 634 (1962) (explaining that a client "is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'"). So whatever the Underwriters' attorneys knew about this case, the law presumes they knew.

And second, courts can hold clients liable for the consequences of their attorney's acts. For example, in *Link*, the Supreme Court affirmed a district court's decision to dismiss a case when the plaintiff's attorney failed to show up at a pretrial conference. The Court found that there was "no merit" to the client's argument "that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client." *Id.* at 633. The court explained that since the client "voluntarily chose this attorney as his representative in the action . . . he cannot now avoid the consequences of the acts or omissions of this freely selected agent." *Id.* at 633–34.

6

A contrary rule, "would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney." *Id.* at 634 (internal quotations omitted).

Courts across the country have echoed this conclusion in various contexts. *See Cadet* v. *Fla. Dep't of Corr.*, 853 F.3d 1216, 1229 (11th Cir. 2017) (counsel's negligent failure to file a habeas petition on time did not qualify as a breach of loyalty that severed the attorney-client relationship); *Irwin* v. *Dep't of Veterans Affs.*, 498 U.S. 89, 91–93 (1990) (holding a complaint untimely when filed too long after the attorney's office, not the client, received notice); *Hinterberger* v. *City of Indianapolis*, 966 F.3d 523, 529 (7th Cir. 2020) (internal quotations omitted) ("[I]t is well established that attorneys' actions are imputed to their clients, even when those actions cause substantial harm . . . [and a] litigant bears the risk of errors made by his chosen agent."); *Bolus* v. *Fleetwood RV, Inc.*, 308 F.R.D. 152, 158 (M.D.N.C. 2015), *aff'd,* 646 F. App'x 316 (4th Cir. 2016) (internal citation omitted) (It is "appropriate to hold a client accountable for the mistakes of counsel[.]"); *Wesby* v. *District of Columbia*, 502 F. Supp. 3d 136, 142 (D.D.C. 2020) (internal quotations and citations omitted) ("[A]lthough Plaintiffs (perhaps rightfully) point the finger at [counsel] . . . each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts[.]"); *Galloway* v. *Watt*, 185 F. Supp. 3d 130, 134 (D.D.C. 2016) (citing cases) (internal quotations omitted) (noting "clients generally must bear the risk of attorney error" when counsel misleads a client about the timing of filing); *Lin* v. *Joedy*, 214 F. Supp. 3d 207, 216 (W.D.N.Y. 2016) (A party is responsible for his counsel not naming a defendant in an action because "an attorney's inadvertence, neglect, mistake or misplaced reliance does not suffice[.]").

7

The requirement that courts hold clients responsible for their attorney's mistakes and misdeeds is a strong one. *See Pioneer Inv. Servs., Co.* v. *Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396 (1993) ("[C]lients must be held accountable for the acts and omissions of their attorneys."). And agency law provides clients with only a narrow path to escape the consequences of their attorney's conduct.[2] Courts have found that "the client is not constructively charged with his attorney's knowledge or actions when, for example, the attorney actually abandons his client or purposely acts adversely to his client's interests or commits another serious breach of loyalty to his client." *Cadet*, 853 F.3d at 1229. The Underwriters invoke both exceptions here, but neither applies to these facts. And in the end, the Underwriters have not shown that they exercised the necessary level of diligence in monitoring the litigation and their attorney's conduct to escape the rule imputing an attorney's knowledge and actions to his client.

### 1. Saville remained actively involved in the case, so he did not abandon the Underwriters.

The Underwriters say that the court should not impute Saville's conduct to them because he abandoned them. Abandonment is one of the reasons a court will excuse a client from the consequences of an attorney's conduct since "[h]aving severed the principal-agent relationship, an attorney no longer acts, or fails to act, as the client's representative." *Maples* v. *Thomas*, 565 U.S. 266, 281 (2012).

But to invoke this exception, an attorney must truly abandon his client. The Supreme Court's decision in *Maples* provides a useful example. In that case, a criminal defendant claimed that his attorneys abandoned him, causing him to miss the deadline to appeal an order denying his request for post-conviction relief. *Id.* at 271. Without telling him, the defendant's two main

---

[2] The Fourth Circuit has questioned whether there are any exceptions to the rule that a client is liable for their attorney's actions in the civil context. *See Raplee* v. *United States*, 842 F.3d 328, 334 (4th Cir. 2016). The court need not delve into that issue here since the outcome would be the same either way.

attorneys left their law firm and took positions that prohibited them from further representing him. *Id.* They had been gone from their firm (and thus their representation of the defendant) for over ten months when the appeal deadline passed. *Id.* at 281. And a third attorney, who served as local counsel, never had any substantive involvement in the case beyond allowing the other attorneys to appear pro hac vice. *Id.* at 287–88. Given those facts, the court found that counsel had abandoned the defendant. *Id.*

The Fourth Circuit's decision in *Farabee* v. *Clarke*, 967 F.3d 380 (4th Cir. 2020), is also instructive. There, an attorney failed to inform his client about the nature of the probation violation he was facing and had not prepared a defense to the charge. *Id.* at 392. Additionally, the attorney "had not returned any of his calls, visited him in person, or sent him any legal mail in the weeks leading up to the revocation proceeding." *Id.* While the Fourth Circuit described the attorney's conduct as "near-abandonment[,]" it did not say that the attorney had abandoned his client. *Id.*

What *Maples* and *Farabee* show is that the bar for client abandonment is a high one.[3] And courts have imposed this high bar despite the stakes of a post-conviction proceedings and the limited resources incarcerated parties have to hire and monitor their attorney's conduct. *See Raplee* v. *United States*, 842 F.3d 328, 334 (4th Cir. 2016) ("There is no redemption for habeas petitioners whose attorneys abandon them in this way. A malpractice suit cannot compensate them for the loss of freedom—or life itself."); *Choice Hotels Intern. Inc.,* v. *Grover*, 792 F.3d 753, 755–56 (7th Cir. 2015) ("All prisoners face difficulties in obtaining and monitoring the performance of counsel,

---

[3] The Underwriters also point this court to the Supreme Court's decision in *Holland* v. *Florida*, 560 U.S. 631, 634, 652 (2010). But the question in *Holland* (whether AEDPA's statute of limitations is subject to equitable tolling) has no relevance here. While the *Holland* opinion discusses an attorney's shortcomings in representing his client, the Court did not find that the attorney had abandoned his client. Instead, it left that issue for the lower courts to address. So it provides no guidance on whether Saville's conduct constitutes abandonment of his client.

and damages for malpractice are a poor substitute for time in prison, just as they are no substitute for one's life.").

Perhaps, then, it should not be surprising that claims that a civil litigant has been abandoned by their attorney have been even more coldly received by courts than those by criminal defendants. *See, e.g.*, *In re Bloomer*, 552 B.R. 897 (S.D. Fla. 2016) (rejecting claim of abandonment and declining to set aside a default judgment when attorney misled and deceived client about status of the case, stopped communicating with the client, and took no action on the client's case); *Choice Hotels*, 792 F.3d at 753–56 (rejecting claim of abandonment when an attorney failed to answer a complaint, deceived client about status of the case, and stopped returning client phone calls).

To try to show that Saville abandoned them, the Underwriters submitted declarations outlining how Saville failed to keep them abreast of recent developments in the case, did not tell them of the court's order on the Second Motion to Compel, misled them about the status of discovery, and eventually stopped communicating with them.

But despite these issues, which are serious, Saville did not abandon the Underwriters. He continued to actively represent their interests throughout the case. He responded to several motions filed by USTC, sought a protective order, asked to have various documents sealed, and sought an extension of deadlines. D.E. 32, 33, 34, 47, 48, 62, 69, 70. He also participated, either in person or by video, in three hearings with the court. D.E. 57, 77, 89.

The discovery process also shows that, while his performance was lacking, Saville remained involved in the case. He served some responses to written discovery, produced over 2,000 pages of documents, and created a privilege log and supplemented it. And from June to October 2020, several Underwriters representatives and at least one Rule 30(b)(6) deposition occurred. *See* D.E. 68–1, 68–2, 68–3, 68–4, 68–10, 68–11, 68–13, 68–14, 74. The Underwriters

have not claimed that they went without representation at their depositions. All of this is added to the many exchanges in the record that took place between Saville and opposing counsel.

Considering the totality of the circumstances, Saville's conduct falls well short of the Supreme Court's standard for client abandonment. Saville was actively involved in the case when the sanctionable conduct took place. So the Underwriters cannot avoid the consequences of his actions on this basis.

>    2.    **Saville did not engage in self-dealing or conduct to the benefit of third parties that would justify relieving the Underwriters of the consequences of his actions.**

The Underwriters also argue that the court should find that Saville severed the attorney-client relationship since he was "acting with his own self-preservation in mind" when he "made materially incorrect statements" about discovery issues. Resp. in Opp. at 13. According to the Underwriters, since he was "putting his interest ahead of those of his clients" they cannot be held liable for his conduct. *Id.* at 14.

But the adverse interest exception does not extend as far as the Underwriters would like it to. It does not apply to every circumstance where an attorney "blundered and made an unwise, negligent, or grossly negligent mistake that harmed" the client's interests. *Cadet*, 853 F.3d at 1229. Instead, "[t]o come within the exception, the agent must have *totally abandoned* his principal's interests and be acting *entirely* for his own or another's purposes." *Kirschner* v. *KPMG LLP*, 15 N.Y.3d 446, 466 (2010) (emphasis in original). *Accord Brite* v. *Penny*, 157 N.C. 110, 72 S.E. 964, 965 (1911) (explaining the exception applies when the "agent is acting in his own behalf, and does not act in any official or representative capacity for the" principal).

A less exacting standard would cause the exception to swallow the rule. Anytime an attorney misses a deadline or fails to comply with a court's order, that attorney will have

determined that something else was more important to him than safeguarding his client's interests. That "something" may be a more lucrative or interesting case, an outside activity, a vice, concerns about personal or professional matters, or not wanting to devote the time and energy to improve their organizational or time-management skills. So allowing a party to invoke the adverse interest exception based on a generalized notion that an attorney put their interests ahead of their client's would hollow out the general rule of imputing an attorney's knowledge or conduct to their client since it would apply in almost every case.

Thus, the Underwriters must show that Saville was acting entirely for his own interest or that of a third party. They cannot do that because Saville acted, at least in part, to try to serve the Underwriters' interests. Throughout this process he made a limited attempt to provide updated privilege logs and other materials. And when the court raised the potential for imposing sanctions on the Underwriters, he argued against it. Sanctions Hr. Tr. 42:4–42:17. While his conduct fell well short of what was required, there is nothing in the record, other than the Underwriters' speculation, that would show that Saville was motivated by the necessary type of self-interest to invoke the adverse inference exception.

> **3.  The assertion that Saville's mental health issues justify departing from the general rule imputing an attorney's conduct and knowledge to his client is unpersuasive.**

The Underwriters attempt to avoid liability due to Saville's alleged mental health problems is similarly unpersuasive. To begin with, there is no competent evidence in the record about the nature and severity of Saville's mental health issue. The Underwriters submitted a declaration from Anthony Pruzinsky, one of Saville's colleagues that said, "it appears probable to me that Jim had experienced a mental breakdown of some sort that affected his performance across the board." Pruzinsky Dec. ¶ 7. But Pruzinsky, as he notes, is "only a lay person," *id.*, and, as far as the record

shows, lacks any formal training that would qualify him to opine on these mental-health-related issues. The record also lacks statements from any medical or mental health professionals who may have diagnosed or treated Saville. So the Underwriters have failed to show that Saville was suffering from some sort of severe or debilitating mental health issue that would justify considering whether to relieve them from the consequences of his conduct.

And while mental health issues can provide a basis to excuse an attorney's error, courts impose a demanding standard before a party is entitled to relief on that basis. Take the case of *Knott* v. *Wedgewood*, No. DKC 13–2486, 2014 WL 4660811 (D. Md. Sept. 11, 2014). In that case, a court agreed to reconsider its ruling on a motion to dismiss even though the defense counsel had missed the response deadline. *Id.* at *3. The court found that reconsideration was necessary because the attorney was receiving in-patent psychiatric treatment at a hospital and "was without email access or cell phone service" when the motion was served. *Id.* at *3.

In cases presenting less exceptional circumstances, courts have not found that mental health is an excuse for attorney misconduct. *See In re: FM Forrest, Inc.*, 587 B.R. 891, 927 (S.D. Tex. 2018) (finding an attorney's claim that her misconduct was because of "severe depression" insufficient due to lack of evidence and being active in the case during the time of alleged incapacity); *Abad* v. *United States*, Nos. 09 Civ. 8985 & 01 Crim. 831, 2018 WL 2021698, at *2 (S.D.N.Y. Apr. 12, 2018) (finding a pro se party's mental disability did not qualify as exceptional circumstances since he filed multiple documents with the court); *Prince of Peace Enters., Inc.* v. *Top Quality Food Mkt., LLC*, No. 07-CV-0349, 2012 WL 4471267, at *6 (S.D.N.Y. Sept. 21, 2012) (rejecting a Rule 60(b)(6) motion premised on an attorney suffering for "psychological difficulties for several years" and worsened at the time of the misconduct since the attorney had not shown the impairment and "was capable of filing numerous motions as well as supporting

13

declarations and memoranda"); *Tango Music, LLC* v. *DadQuickMusic, Inc.*, 348 F.3d 244, 247 (7th Cir. 2003) (explaining that even if attorney misconduct resulted from severe depression, the client "should not be permitted to shift the burden of its agent's neglect to the district court and the" opposing party); *D'Anglelo* v. *State Farm Fire & Cas. Co.*, 32 F. App'x 604, 605 (2d Cir. 2002) (affirming decision to deny relief under Rule 60(b)(6) based on an attorney "suffering from Adult Attention Deficit Hyperactivity Disorder ('ADHD') at the time of trial.").

Nothing in the record hints that Saville's mental condition may have risen to the necessary level to use it as an excuse for his conduct. So the Underwriters may not rely on Saville's mental health issues to avoid sanctions.

### 4. The Underwriters are sophisticated parties who knew of the importance of monitoring an attorney and should have been aware of Saville's poor performance.

The idea that a client can escape the consequences of their attorney's actions assumes that it can be difficult, if not impossible, for the principal to detect misconduct by their agent. When a client is indigent and incarcerated, it is understandable that he cannot closely monitor the attorney's actions or evaluate the competency of his attorneys conduct. The same may be true for a lay person who has no experience with or education in the law. But a sophisticated client who understands how litigation works has a much easier time keeping tabs on their hired counsel.

The Underwriters no doubt fall into this latter category. Their participation in a world-wide network of insurance providers qualifies them as sophisticated commercial entities. *See ACA Fin. Guar. Corp.* v. *City of Buena Vista, Virginia*, 917 F.3d 206, 216 (4th Cir. 2019) (calling an insurance company a "sophisticated commercial entit[y]"). And any entity involved in the insurance industry will have almost limitless opportunities to learn about the legal process. *N.*

14

*Assur. Co.* v. *Ware*, 145 F.R.D. 281, 283 (D. Me. 1993) ("Insurance companies are no strangers to litigation[.]").

So the Underwriters cannot claim—at least not credibly—that they did not know the importance of monitoring the progress of this litigation and their attorney's work on their behalf. In fact, the lead underwriter's[4] internal policies require the claims handler to manage outside counsel "on a day-to-day basis[.]" *See* D.E. 98–3 at 56. That they may not have done so does not excuse them from the consequences of Saville's actions. Neither of the issues they complain about, failure to respond to communication and failure to provide updates about the case, change this fact.

The Underwriters complain that Saville did not update them about the case and that they were unaware there were any discovery issues. But the record contains evidence that the Underwriters knew—or in the exercise of reasonable diligence should have known—that Saville was missing important deadlines and not keeping them properly informed about the case.

The Underwriters began missing deadlines right after the case arrived in this court. They did not file the post-removal notice required by the court's local rules[5] until almost three months after it was due. Apr. 9, 2021 Order at 3. They did not file their financial disclosure forms when they were supposed to. *Id.* They also repeatedly missed the deadline to file their answer. *Id.* It is hard to believe that they would not know of the deadline for responding to the Complaint and would not be highly invested in seeing that it be done on time. Yet they have not explained why they were unaware of these issues and why they did not cause concern about Saville's performance.

---

[4] The various underwriters involved here are separated into two groups. One group, known as lead underwriters "are responsible for the handling of a claim, including corresponding with the insured and instructing experts, adjusters and attorneys" Hill Dec. ¶ 7, D.E. 102-4. It appears that AEGIS, Riverstone/Mitsui and MS Amlin are the lead underwriters. Foulger Dec. ¶ 2, D.E. 102-3. The other underwriters are considered "following underwriters" and have limited involvement with the litigation or the claims handling process. Hill Dec. ¶¶ 6–7.
[5] The Underwriters' new counsel also appear to be unfamiliar with the court's local rules. Despite the 10-page limit on discovery-related motions, Local Civil Rule 7.1(f)(2), their response in opposition spanned 23 pages. In the interest of bringing this aspect of the case to a close, the court has decided not to strike their response.

But even if they were unaware of these initial issues with Saville's performance, later issues were brought directly to their attention by USTC's attorneys. During his June 2020 deposition, Richard Foulger, the Head of Claims for one of the lead underwriters, testified that he was unaware that USTC had filed a motion for summary judgment even though Saville should have notified him about that filing. Foulger Dep. Tr. at 161:22–163:2, D.E. 97–2. Foulger also learned that USTC had not received responses to interrogatories that it served in December 2019 until just before his deposition. *Id.* 139:5–140:24. And Foulger testified that this case was the subject of regular internal discussions. *Id.* at 152:1–12; 208:1–12; AEGIS Claims Review Committee Notes, D.E. 98–2. In fact, AEGIS's notes show that discovery issues were among the topics discussed at those meetings. *Id.* at 4, 11, 43. Foulger, who has worked for AEGIS for two decades and has been involved "in the London insurance market for 40 years" has not explained why he could not or did not monitor Saville's conduct more closely after these disclosures. Foulger Dec. ¶ 1, D.E 102–3.

Other claims handlers also learned of missed deadlines during their depositions. *See* Smith Dep. Tr. at 79:14–80:14, D.E. 97–4 (discussing Underwriters' delay in responding to written discovery); Holmes Dep. Tr. at 94:3–6 (same). The Underwriters have not explained why learning about these deadlines did not cause them to pay closer attention to Saville's conduct.

The Underwriters also complain that they had issues communicating with Saville. But the record does not bear this assertion out—at least not in any way relevant to the motion for sanctions.

Pruzinsky asserts that Saville may have stopped regularly communicating with clients in January 2020. But the record contains no evidence of specific instances of communication difficulties between Saville and the Underwriters until late May 2021 when he did not respond to a request for more regular updates on the case. Foulger's declaration reinforces this fact when, in a declaration filed in late June 2021, it says, "*recently* I became increasingly concerned about the

16

level of reporting from" Saville. Foulger Dec. ¶ 4, D.E. 96–2 (emphasis added). The lack of information about any communication issues from the period between January 2020 and May 2021, undercuts the Underwriters' argument that they could not adequately communicate with their attorney.

And whatever Saville's shortcomings as a communicator may be, there were two North-Carolina-based attorneys representing the Underwriters. *See* Notice of Appearance by Don T. Evans, D.E. 3; Notice of Appearance by Seth Buskirk, D.E. 6. The Underwriters have not explained why they did not or could not seek updates from those attorneys.

What is more, as the declaration from the Underwriters' new counsel shows, information about this case was readily available online. Tricarico Dec. ¶ 4. The Underwriters have not explained why they could not learn about what was occurring through that avenue.

So all in all, the Underwriters cannot show that they were diligent in monitoring the progress of this lawsuit. Thus, the court will not relieve them from the consequences of their chosen attorney's conduct.

### B.    Award of Attorney's Fees and Costs for USTC's Second Motion to Compel

Since the court granted the Second Motion to Compel, it "must" require the Underwriters, their attorneys, or both to pay USTC's, "reasonable expenses incurred in making the motion, including attorney's fees[.]" Fed. R. Civ. P. 37(a)(5)(A). The Federal Rules set out only a few exceptions to this rule. Among them is whether the non-moving party's actions were "substantially justified" or "other circumstances make an award of expenses unjust." *Id.*

The court held a hearing to discuss fees and sanctions associated with the Second Motion to Compel. The Underwriters did not show that their conduct was substantially justified or establish that requiring them to pay USTC's expenses and fees for the motion would be otherwise

unjust. So the Underwriters must pay the reasonable expenses, including attorney's fees, USTC incurred in bringing the Second Motion to Compel.

### C. As a sanction for the conduct that led to the Second Motion to Compel, the court will prohibit the Underwriters from relying on documents or information that were not produced shortly after the motion's filing.

As noted in the court's earlier order, the Underwriters failed to meet their discovery obligations. Many Underwriters failed to respond to USTC's written discovery requests, and those who did served responses that fell well short of what the Rules required of them. The Federal Rules allow courts to address this type of conduct by imposing sanctions under 37(d). After considering the Underwriters' conduct, the court has determined that it is appropriate to sanction them. So the Underwriters may not support their defenses or oppose USTC's claims with any documents or information requested by USTC in its written discovery that they had not produced or properly included on a privilege log by October 26, 2020.

Rule 37(d) provides a mechanism for sanctioning a party who fails to respond to properly served interrogatories or requests for production. *Id.* 37(d)(1)(A)(ii). The sanctions the court has at its disposal include directing that facts be established, prohibiting the party from supporting or opposing certain matters, striking pleadings, staying the case, dismissal, default judgment, or finding the party in contempt of court. *Id.* 37(d)(3) & (b)(2)(A)(i)-(vi). And either as part of those sanctions or instead of them, the court must require the offending party, their attorney, or both to "pay the reasonable expenses, including attorney's fees, caused by" their conduct. *Id.* 37(d)(3).

Even though some Underwriters responded to USTC's discovery requests, the court will find that they all failed to respond to the requests for Rule 37 purposes. When, as here, a party provides "an evasive or incomplete disclosure, answer, or response[,]" the court "must" treat the conduct "as a failure to disclose, answer, or respond." *Id.* 37(a)(4). Given the inadequacy of the

Underwriters' responses, the court will treat those responses as if they failed to respond at all. So the court may sanction all the Underwriters under Rule 37(d).

Before the court can sanction a party, it must consider four things. *Wilson* v. *Volkswagen of Am., Inc.*, 561 F.2d 494, 503–04 (4th Cir. 1977). To begin with, the court must first consider whether the offending party acted in bad faith. *Id.* Next, the court must determine the amount of prejudice that the failure to respond caused to the party who served the discovery. *Id.* Then, the court must determine the need to deter similar conduct. *Id.* Finally, the court must evaluate whether less drastic sanctions would be effective. *Id.*

Each of these factors supports imposing severe sanctions on the Underwriters.

The first factor requires considering if the Underwriters acted in bad faith. A party acts in bad faith when they show a "callous disregard for the authority of the district court and the Rules." *Mut. Fed. Sav. & Loan Ass'n* v. *Richards & Assocs., Inc.*, 872 F.2d 88, 92 (4th Cir. 1989). A primary example of bad-faith conduct is when a party ignores the opposing party's requests and the court's calls for cooperation. *Id.* at 93 (affirming a determination of bad faith because of a party's "haphazard compliance" with discovery requests and court orders); *Anderson* v. *Found. for Advancement, Educ. & Emp. of Am. Indians*, 155 F.3d 500, 504 (4th Cir. 1998) (finding bad faith when the responding party "stonewalled on discovery from the inception of the lawsuit.").

As the court noted in its order on the Second Motion to Compel, the Underwriters' conduct meets the bad-faith standard. Apr. 9, 2021 Order at 16, 18, 25. They failed to respond to the vast majority of USTC's discovery requests and the responses they provided were grossly inadequate. Plus, they disregarded the Court's explicit instruction in October 2020 to comply with the discovery rules or face sanctions.

The second factor focuses on whether USTC suffered prejudice from the Underwriters' noncompliance. Among the types of prejudice a party can suffer from discovery violations is the inability to effectively prepare and litigate its case. *See Mut. Fed. Sav. & Loan Ass'n*, 872 F.2d at 93 (affirming the district court's determination that the requesting party "suffered great prejudice" because the requested documents were necessary for the party to prove its case.); *Porter* v. *Guarino*, 223 F.R.D. 282, 284 (M.D.N.C. 2004) (the requesting party "suffered great prejudice" when he could not prepare his case and wasted considerable resources moving to obtain discovery material).

The Underwriters' actions have caused this case to grind to a halt. Because they have not complied with their discovery obligations, USTC has been unable to gather the information it needs to build its case.[6] So the court finds that the Underwriters' actions have unnecessarily extended litigation, caused USTC and the court to waste considerable resources, and prejudiced USTC.

And the Underwriters cannot say that they were not on notice of the potential for their conduct to prejudice USTC. The Cooperative first brought up prejudice in an August 2020 hearing before the district judge on the First Motion to Compel. *See* Aug. 7, 2020 Hr., 2:22:21–2:23:59 PM. And then it reiterated those concerns at the sanctions hearing. Sanctions Hr. Tr. 44:21–44:25.

The third factor, deterrence of similar conduct, carries substantial weight in this case. As the court noted in its order on the Second Motion to Compel, "If someone unfamiliar with federal litigation were to review the [Underwriters'] conduct here, they would be left with the distinct impression that compliance with the Federal Rules was optional. Or, at best, they would conclude that there was no penalty for disregarding them." Apr. 9, 2021 Order at 1. This type of conduct

---

[6] The court also notes that while this discovery dispute has been pending USTC has filed for bankruptcy. *See In re: U.S. Tobacco Cooperative, Inc.*, Case No. 5:21-BK-01511 (E.D.N.C. July 7, 2021).

requires a sanction that provides an unambiguous message that such conduct is intolerable. *See Mut. Fed. Sav. & Loan Ass'n*, 872 F.2d at 93 (explaining that there is an obvious need to deter parties from "stalling and ignoring the direct orders of the court."). So the deterrence factor supports a severe sanction.

That leaves the questions of what level of sanctions would effectively address the Underwriters' conduct. Here, the Underwriters were on notice that they needed to comply with their discovery obligations, or they would be sanctioned. Oct. 8, 2020 Order, D.E. 66 at 4. But they did not comply, necessitating the filing of the Second Motion to Compel. At the very latest, the Underwriters should have brought their responses into compliance by the time they responded to that motion on October 26, 2020. *See* Resp. in Opp. Second Mot. to Compel, D.E. 69. But they didn't.

So the court will prohibit the Underwriters from supporting their defenses or opposing USTC's claims with any documents or information that were requested by USTC in its written discovery but were not produced or included on a privilege log by October 26, 2020. No lesser sanction would effectively address their misconduct.

As noted above, when the court sanctions a party under Rule 37(d), it must pay "the reasonable expenses, including attorney's fees, caused by the failure" to respond. The Underwriters failure to respond began on January 20, 2020. So to the extent not covered by the award of costs discussed above, USTC may recover the reasonable expenses, including attorney's fees, that it incurred on issues related to the Underwriters' responses to its interrogatories and requests for production of documents from January 20, 2020, through April 9, 2021, the date the court ruled on the Second Motion to Compel.

**D. Entry of a default judgment is the only sanction that can effectively address the Underwriters' failure to comply with the April 9, 2021 Order**

When the court ordered the Underwriters to comply with their discovery obligations, that should have been the end of things. But it wasn't. USTC was still unable to obtain the discovery it requested because the Underwriters ignored the court's April 9, 2021 Order. USTC now requests that the court sanction the Underwriters for their non-compliance by entering a default judgment against them. The district court should grant USTC's request.

Under Rule 37, if a party "fails to obey an order to provide or permit discovery," the court may "render[] a default judgment against the disobedient party[.]" Fed. R. Civ. P. 37(b)(2)(A)(vi). The court must once again consider the four *Wilson* factors before imposing such a sanction. And the court must ensure that a party had explicit notice about the potential for a default judgment. *See Hathcock* v. *Navistar Int'l Transp. Corp.*, 53 F.3d 36, 40 (4th Cir. 1995) ("[T]his court has emphasized the significance of warning a defendant about the possibility of default before entering such a harsh sanction.").

Largely for the same reasons described above, the *Wilson* factors favor entering default against the Underwriters. The Underwriters' flagrant disregard of both of the court's orders on discovery matters shows that they were acting in bad faith. The prejudice to USTC in being unable to proceed with its case only worsened due to the Underwriters' noncompliance. The need to strongly deter parties from ignoring not one but two orders of this court goes without saying. And because of their unwillingness to participate in good faith in this case for nearly 18 months, there is no lesser sanction that will effectively address their conduct.

Plus, the court repeatedly warned the Underwriters at the sanctions hearing about the potential for entry of a default judgment if they did not comply with the April 9, 2021 Order. *See* Sanctions Hr. Tr. 27:17; 42:1;44:15; 51:24. And just to make sure that the court's message was

clear, it asked Saville (with local counsel sitting next to him) if he "understood that the Court could order an entry of a default judgment" and allowed him to be heard. *Id.* 27:16–17. He responded, "Correct[.]" *Id.* 27:18.

Sanctioning the Underwriters through entry of a default and default judgment is appropriate even if they have made recent attempts to comply with the April 9, 2021 Order. *See Mut. Fed. Sav. & Loan Ass'n*, 872 F.2d at 94 (affirming entry of a default judgment "[e]ven though the defendants may have made efforts to comply" since "the attempts were lastditch and only offered when it became crystal clear that they were going to lose the case unless they did something."). Imposing this sanction on the Underwriters will send "an unmistakable message to them and others that the judicial system will not tolerate repeated misconduct never wholly remedied in the future." *Id.* Any other outcome would "send the opposite message that the court may be pushed, ignored and defied to the outermost limits so long as the noncomplying party has even an inadequate fallback act ready in the wings should the final curtain be falling." *Id.*

So the undersigned recommends that, as a sanction for their failure to comply with the April 9, 2021 Order, the district court enter a default against the Underwriters and then, after holding a hearing on damages, enter a default judgment against them.

### III.  Conclusion

For all these reasons, the court orders as follows:

1.     The Underwriters must pay the reasonable expenses, including attorney's fees, that USTC incurred on issues related to the Underwriters' responses to its interrogatories and requests for production of documents from January 20, 2020, through April 9, 2021, the date the court ruled on the Second Motion to Compel. The fees must be paid within 28 days from the date of entry of this order. If a dispute arises over the amount of fees to be paid, USTC's counsel must contact the

undersigned's case manager and the court will issue additional orders as necessary to resolve the dispute.

2.     The Underwriters may not support their defenses or oppose USTC's claims with any documents or information that were requested by USTC in its written discovery but were not produced or included on a privilege log by October 26, 2020.

3.     The Clerk of Court must send a copy of this document as well as D.E. 86, 90, 95, 96, and 102 to the Attorney Grievance Committee of the First Judicial Department of the Supreme Court of the State of New York so that body can determine what action, if any, should be taken against Saville for his conduct.

The Undersigned also recommends that, as a sanction for their failure to comply with the April 9, 2021 Order, the district court enter a default against the Underwriters and then, after holding a hearing on damages, enter a default judgment against them.

The Clerk of Court must serve a copy of this Order and Memorandum and Recommendation ("O&M&R") on each party who has appeared in this action. Any party may file a written objection to the M&R within 14 days from the date the Clerk serves it on them. The objection must specifically note the portion of the M&R that the party objects to and the reasons for their objection. Any other party may respond to the objection within 14 days from the date the objecting party serves it on them. The district judge will review the objection and make their own determination about the matter that is the subject of the objection. If a party does not file a timely written objection, the party will have forfeited their ability to have the M&R (or a later decision based on the M&R) reviewed by the Court of Appeals.

Dated: August 18, 2021

ROBERT T. NUMBERS, II
UNITED STATES MAGISTRATE JUDGE

24