IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:19-cv-00430-BO

U.S. Tobacco Cooperative Inc.,     )
     )
     Plaintiff,     )
     )
     v.     )
     )
Certain Underwriters at Lloyd's subscribing to )
Policy Numbers B1353DC1703690000 and )
B1353DC1602041000,     )
     )
     Defendants.     )

**U.S. TOBACCO COOPERATIVE INC.'S RESPONSE IN OPPOSITION TO INSURERS' LOCAL CIVIL RULE 72.4(B) OBJECTIONS TO THE AUGUST 18, 2021 ORDER & MEMORANDUM & RECOMMENDATION OF MAGISTRATE JUDGE ROBERT T. NUMBERS, II**

Mark E. Anderson (NC Bar No. 15764)
MCGUIREWOODS LLP
501 Fayetteville Street, Suite 500
Raleigh, North Carolina 27601
Phone: (919) 755-6600
Fax: (919) 755-6699
manderson@mcguirewoods.com

Shelby S. Guilbert (GA Bar No. 315101)
Amy E. Dehnel (GA Bar No. 707836)
MCGUIREWOODS LLP
1230 Peachtree Street N.E., Suite 2100
Atlanta, GA 30309-3534
Phone: (404) 443-5500
Fax: (404) 443-5599
sguilbert@mcguirewoods.com
adehnel@mcguirewoods.com

*Attorneys for Plaintiff U.S. Tobacco Cooperative Inc.*

# I.     INTRODUCTION AND NATURE OF CASE

Insurers ask the Court to excuse two years of litigation misconduct, which ultimately led to a series of well-reasoned orders by Magistrate Judge Numbers, including an order granting Plaintiff U.S. Tobacco Cooperative Inc.'s ("USTC") Second Motion to Compel (D.E. 86, "April 9 Order"), an order rejecting Insurers' argument that their failure to respond to a sanctions motion was the product of excusable neglect (D.E. 101), and an Order & Memorandum & Recommendation that this Court enter a default judgment against the Insurers after a final hearing on damages. D.E. 112 ("O&M&R"). Insurers do not and cannot dispute that the misconduct summarized in these orders occurred, so they try to blame an unidentified mental health condition of their lawyer Jim Saville for all that has transpired and urge that a "manifest injustice would result if they were to be deprived of the opportunity to litigate the merits of this dispute." D.E. 117 ("Obj.") at 2.

Judge Numbers already considered and rejected the Insurers' blame-the-lawyer defense. In a lengthy O&M&R, supported by case law from this Circuit and around the country, Judge Numbers considered declarations purporting to describe Mr. Saville's current condition and correctly determined that Insurers "have not shown that the circumstances of this case justify relieving them from the consequences of [their chosen counsel's] actions." O&M&R at 1. In objecting to this holding, the Insurers rely on inapplicable case law and virtually no record evidence, pointing to unspecified mental health issues of their counsel, which they utterly fail to corroborate, and for which they concede "evidence . . . may not even exist." Obj. at 13. These conclusory, general arguments—which Judge Numbers previously considered and rejected—do not warrant *de novo* review and certainly do not warrant disturbing Judge Numbers' findings and recommendation.

In reality, the opposite of Insurers' unsupported arguments is true: manifest injustice would result if the Insurers were allowed to escape the consequences of the way they have litigated (ignored) this dispute. Though completely absent from Insurers' retelling of this litigation's history, the Insurers' bad faith has permeated this controversy from day one. USTC is now in bankruptcy and has been deprived of valuable insurance coverage that was owed over three years ago. At the beginning of all of this, more than three

1

years ago, USTC submitted an insurance claim for its mold- and wet-damaged tobacco product. Shortly after receiving notice of USTC's claim, Insurers sent multiple surveyors to USTC's warehouses to inspect the damaged product. Each of them confirmed that USTC's tobacco had suffered "wet damage" caused by an external cause and recommended a $9 million reserve. D.E. 68 at 3. It remains unclear why that recommendation was never accepted, but we do know that shortly after it was made, in 2018, instead of paying the Claim, Insurers hired attorney James Saville of Hill Rivkins to investigate coverage defenses and draft reservation of rights letters to USTC. *Id*. Around the same time, Insurers also hired a cause and origin expert, Dr. Stephanie Heard, to investigate whether any of Mr. Saville's coverage defenses might stick. *Id*. In October 2018, Dr. Heard inspected USTC's warehouses, took product samples, interviewed USTC employees, and asked for USTC documents—all without any attorneys present. D.E. 75 at 6.

Insurers' reservations of rights letters admitted that USTC's product was damaged by an external cause. Nevertheless, for nearly eighteen months, Insurers refused to reimburse USTC, delaying and cancelling several conferences with USTC, and refusing to provide any information to USTC in support of the coverage defenses that Mr. Saville had asserted in the letters he drafted. D.E. 1, 86; Ex. A, Deposition of Edward Kacsuta, at 157:12-160:12. Yet Insurers also refused to deny USTC's claim. In fact, Richard Foulger (the Head of Claims and the corporate representative for lead insurer AEGIS) has since testified that AEGIS *still* has not denied coverage for USTC's claim, is *still* reserving its rights, but is no longer "investigating the claim for coverage" "because as Jim [Saville] says we're in litigation." D.E. 98 at 2.

Stonewalled and out of other options, USTC filed suit against its Insurers in August 2019. But Insurers' bad faith conduct only got worse. For instance, after USTC served interrogatories on Insurers in December 2019, twelve of the thirteen Insurers refused to respond *at all*, and the one set of responses USTC did receive in June 2020 (five months late) were unverified, inadequate, incomplete, and contradicted deposition testimony and documentary evidence. D.E. 86 at 6; D.E. 68 at 4-5; O&M&R at 2. USTC never received *any verified responses* until months after Judge Numbers issued an Order granting USTC's Second Motion to Compel on April 9, 2021. These interrogatories included standard requests—asking, for instance, that Insurers provide the factual and legal bases for the defenses that Mr. Saville had concocted. As Judge

Numbers has detailed in two lengthy orders, Insurers also failed to produce a host of relevant and responsive documents to USTC for nearly two years, (including damning documents from their cause and origin expert confirming that the Insurers knew their coverage defenses were "speculative"), they refused to provide adequate privilege logs, and they refused to serve written responses to USTC's documents requests from any Insurer other than the lead Insurer, among other things. D.E. 86; O&M&R.

As Judge Numbers aptly summarized in his April 9 Order overruling all the Insurers' discovery objections, "If someone unfamiliar with federal litigation were to review the Defendant Insurers' conduct here, they would be left with the distinct impression that compliance with the Federal Rules was optional." D.E. 86 at 1. This Court and Judge Numbers issued multiple warnings that compliance was not optional, including (1) during the August 7, 2020 hearing on USTC's First Motion to Compel, (2) in the Court's October 8, 2020 Order (D.E. 66), (3) during the December 8, 2020 hearing on USTC's Second Motion to Compel, (4) in the Court's April 13, 2021 Order concerning the sanctions hearing (D.E. 88); and (5) during the May 3, 2021 hearing ("May 3 Hearing") in which the Court expressly warned "*all sanctions are on the table.*" D.E. 92 at 9. Remarkably, *all* of these warnings went unheeded, prompting USTC to file its Motion for Sanctions asking for, among other things, a finding of default. D.E. 92; O&M&R at 1-2.[1] Insurers failed to respond, adding yet another missed deadline to the already-long list. O&M&R at 3.

USTC then reached out to a third-party insurance broker and asked that it pass along the Court's recent orders to the lead Insurer. D.E. 97-7 at ¶ 3. It appears only this move prompted Insurers to check the docket to see what might be happening. Thereafter, Insurers hired a new law firm,[2] and Kennedys filed a Motion for Extension of Time to respond to USTC's Motion for Sanctions, arguing they had been "victimized" by Mr. Saville and that their failure to respond to the sanctions motion was a product of "excusable neglect." D.E. 96 at 4. Judge Numbers granted the request for an extension but expressly found Insurers failed to demonstrate "excusable neglect."[3] D.E. 101. The Insurers do not challenge that finding.

---

[1] USTC incorporates herein the arguments in its Motion for Sanctions briefing. D.E. 92.

[2] Notably, Mr. Saville is still inexplicably counsel of record.

[3] USTC incorporates herein the arguments in its Opposition to Insurers' Motion for Extension of Time briefing. D.E. 97.

In his Order granting the extension, Judge Numbers also made clear what standard Insurers needed to meet to avoid a default judgment. D.E. 101. Specifically, under well-established agency principles, to escape the consequences of Mr. Saville's actions, Insurers were required to establish with specificity that: (1) they exercised reasonable diligence, *and* (2) extraordinary circumstances caused any delinquency or their inability to prevent it. *See Cadet v. Fla. Dep't of Corr.*, 853 F.3d 1216 (11th Cir. 2017). After considering both the record and case law from around the country, Judge Numbers held that Insurers failed to establish either of those elements in their opposition to USTC's Motion for Sanctions. That conclusion was correct. While Insurers continue to claim they did not know about Judge Numbers' April 9 Order or USTC's subsequent Motion for Sanctions, this professed ignorance is no excuse, particularly in light of the way the Insurers handled this litigation from the outset. As Judge Numbers observed, had Insurers appropriately managed their own litigation or even remotely supervised outside counsel, they would have been aware of the issues long before a default judgment was on the table. Whether they knew or not, in other words, they plainly "*should have known*." O&M&R at 15.

Insurers' suggestion they were blindsided by their lawyer's missed deadlines rings hollow. To begin with, the lead insurer's corporate representative, Richard Foulger, testified that the principal responsibility for managing and handling this insurance claim during litigation rests with him. D.E. 98 at 6. He and other lead Insurers consider what arguments to advance in litigation and how to respond to counter-arguments. *Id.* And the Insurers' internal policies, as Judge Numbers pointed out, require claims handlers "to manage outside counsel 'on a day-to-day basis.'" O&M&R at 15. USTC's counsel informed these very representatives (who were responsible for managing litigation) during their depositions that Insurers' interrogatory responses were more than five months late and were missing key information. D.E. 112 at 16; D.E. 68-17. USTC's counsel also identified responsive, non-privileged documents in these representatives' custody that had not been provided. D.E. 68-19. And in multiple of these depositions, USTC discussed a pending motion to compel and motion for summary judgment—about which, Mr. Foulger testified he knew nothing. D.E. 97-2 at 162:10-163:2. Insurers, who are repeat players in the U.S. court system, failed to heed *any* of these warning signs.

4

Insurers' deficient conduct does not stop there. Things have not materially changed since Insurers hired new counsel. Judge Numbers' April 9 Order granted USTC's Second Motion to Compel and required Insurers to produce all the information they had been improperly withholding for nearly two years, within two weeks. That was more than five months ago. And although Kennedys was retained nearly three months ago, the Insurers are *still* not in compliance with the April 9 Order—as Insurers themselves admit. Obj. at 18 (noting that Insurers are "attempting to come into compliance"); D.E. 117-1 at ¶¶ 20, 27 (explaining that it has been "difficult for Underwriters to more promptly comply with the Court's most recent April 9, 2021 discovery order"). Insurers have not sought an extension from the Court or USTC to comply with the April 9 Order, nor have they proffered any plan for bringing their discovery into compliance.

Insurers do not deny any of this. Instead, they ask the Court to simply ignore what has happened because a colleague of Mr. Saville—a self-described "lay person"—asserts that "it appears probable to me that [Mr. Saville] had experienced a mental breakdown of some sort." D.E. 102-2 at 3. But under well-established law, these unsupported assertions do not demonstrate the "exceptional circumstances" required to avoid imputation under agency law. O&M&R at 13. Further, Insurers cannot shift all responsibility to their outside counsel, even one willing to fall on the sword. Insurers were still responsible for monitoring and participating in this litigation, including ensuring the actions of all the outside law firms they retained to protect their interests are appropriate. O&M&R at 14-15. They do not even attempt to claim they did so and offer no explanation why they did not. Insurers' cry that they may "be deprived of the opportunity to litigate the merits of this dispute" is absurd. Obj. at 2. They have only their own willful blindness to blame.

This tortured procedural history is more than academic. Insurers' actions have cost USTC dearly. Three years after first filing its claim for its multi-million dollar product loss, USTC still lacks the coverage it paid for and has been forced to expend significant resources litigating this case—not on the merits (trial has been delayed several times) but instead, in an effort to secure what should be routine discovery. USTC has since filed for bankruptcy. USTC should not be further punished for problems of Insurers' own making.

Judge Numbers weighed this history and considered Insurers' arguments in the O&M&R. He concluded that Insurers were responsible for their counsel's conduct under the law of agency and that

sanctions were warranted. Consistent with his authority to decide non-dispositive matters, he ordered Insurers to pay USTC's expenses and imposed evidentiary sanctions on the Insurers going forward. He then recommended that this Court impose the additional sanction of entering default judgment against Insurers for their repeated intransigence. For the reasons set forth herein, Insurers have failed to adequately lodge any Objections to the O&M&R that would warrant *de novo* review, and there is no clear error. However, to the extent this Court considers the merits of Insurers' Objections, they still fail. Judge Numbers' thorough O&M&R should be adopted in its entirety.

## II.  INSURERS' ATTEMPT TO REWRITE HISTORY IS UNSUPPORTED[4]

Throughout their "Factual Background" section, Insurers mischaracterize much of this litigation. Obj. at 2-8. Judge Numbers already considered these same factual assertions in the O&M&R and found they support sanctioning Insurers with entry of default. Insurers proffer no new material evidence in support of their factual allegations or explain with particularly which of Judge Numbers' factual findings they object to and why. Thus, the factual findings laid out in the O&M&R should be adopted on this basis alone. However, a review of some of Insurers' allegations and the record only further demonstrate Insurers' bad faith and lack of candor with this Court, and that Insurers' so-called facts are wholly unsupported.

### A.  Insurers Mischaracterize the Over Two-Year History of this Litigation, Which Has Always Been Plagued by a Disregard for the Court's Orders and Deadlines.

In their attempt to rewrite history, Insurers summarize some of the activity Mr. Saville undertook on their behalf but suggest that "unbeknownst to Defendants . . . Mr. Saville inexplicably missed several discovery deadlines." Obj. at 1. "Several deadlines" vastly understates what actually happened. Judge Numbers' April 9 Order lists the wide array of deadlines and Court rules Insurers have ignored during this litigation, which include not only the blown deadline for responding to the sanctions motion, but also deadlines associated with their removal of this action and filing their answer at the outset of this litigation.

---

[4] Insurers repeatedly assert Mr. Saville was a respected and competent lawyer. *See, e.g.* Obj. at 1, 3. These allegations are not germane. To the extent Insurers suggest they purportedly demonstrate that Mr. Saville's had "some sort" of "mental break down," they proffer no legal authority to support this argument.

6

D.E. 86, at 3-4.[5]  Similarly, although Insurers refer to the Court's granting of Mr. Saville's protective order with respect to depositions of the Following Markets, they ignore the fact that, in this same Order, the Court expressly stated its "relief is limited to protecting the Following Market syndicates from participating in depositions" and "legitimate discovery requests are to be complied with if sanctions are to be avoided." D.E. 66 at 4, 6.  At the time of Judge Numbers' April 9 Order, USTC had never received any interrogatory responses from twelve of the Insurers (or verified responses from *any* Insurer) or any documents from the Following Markets. D.E. 86 at 7-8, 16. Some of this history is again recounted in the O&M&R. Insurers have never disputed the findings in either order.

**B.**   **Insurers Do Not Demonstrate Any Diligence and Their Claims That They Were Unaware of the Status of Discovery Are Unavailing.**

While Insurers now claim in conclusory fashion that they were not "advised by Mr. Saville of virtually any of the outstanding discovery issues, the prior discovery orders, or the pending motions for sanctions," they offer no evidence that they ever inquired about the status of the litigation, despite their guidelines' requirements to do so—even after USTC put them on notice of the deficiencies. Obj. at 4-7. Nor do Insurers dispute Judge Numbers' finding that they were "unwilling[] to participate in good faith in this case for nearly 18 months." O&M&R at 22.

**1.**   **Insurers Are Sophisticated Litigants Who Chose Their Counsel and Were Required to Monitor This Litigation By Their Own Standards and Policies.**

Insurers do not dispute they are sophisticated litigants, familiar with litigation, and cognizant of the importance of monitoring litigation. O&M&R at 14-15. Indeed, as a sophisticated litigant and head of claims for the lead Insurer, AEGIS, Mr. Foulger hand-selected Mr. Saville as lead counsel for this matter, even though Hill Rivkins was not on Insurers' list of pre-approved counsel, and all Insurers agreed. D.E. 98-5 at 3 & 98-6 at 3. And Mr. Foulger admits that he, not Mr. Saville, maintained principal responsibility for managing and handling USTC's insurance claim *during litigation*. D.E. 97-2 at 98:16-99:2.

---

[5] Insurers' reference to Mr. Saville's assertion of twenty affirmative defenses ignores Mr. Saville's concession at the May 3, 2021 hearing that "[t]his case has always been about whether moisture would be considered an external cause. That's it. Full stop." D.E. 92 at 7.

Insurers' claims handling guidelines prohibit Insurers from passing all responsibility to outside counsel. As a starting point, the "Lloyd's Minimum Standards" which are "the minimum level of performance required of any organization to operate in the Lloyd's market," govern this claim, and specifically provide that an Insurer's delegation of "the handling of a claim to another entity must have no adverse effect on [the Insurers'] customer" and that the insurer "must ensure that the entity is properly managed and monitored." D.E. 97-5 at 3.

Insurers' own internal guidelines go even further. For example, AEGIS's "claims handling philosophy," which Mr. Foulger authored, sets forth "the procedures that we expect and ask the various AEGIS claim handlers to follow," which is "to provide a professional and efficient claims handling service to clients and their brokers, addressing all claim circumstances fairly and in a prompt and open matter." D.E. 98-1 at 3. Those guidelines explain that outside counsel "is often the interface between the client and AEGIS [and it is] imperative that the [lawyer] acts in a manner that is acceptable to AEGIS and in accordance with local legislative requirements." *Id.* at 17. To that end, AEGIS's claims manual requires: "A claims handler should ensure the following approach is followed: *At all times full consideration should be given to any time limits and other requirements imposed by overseas regulators or applicable insurance statutes upon the handling of a claims*." *Id.* at 11 In addition, "all steps should be taken to ensure the professional and efficient resolution of the claim, including the monitoring of the broker and experts' performance." *Id*. at 13. And the "content of summary judgment motions, answers to complaints, responses to requests for production. . . , responses to requests for admissions, and responses to interrogatories that are prepared or issued on behalf of AEGIS" must be referred to Mr. Foulger. *See id.* § 3.1(iv).

Likewise, Defendant MS Amlin has a "Claims Legal" group of London lawyers whose job it is to "manag[e] the performance of external law firms." D.E. 98-3 § 22.2. The MS Amlin claims manual also provides that "[w]herever an external law firm has been instructed . . . *it remains the primary responsibility of the Claims Handler to manage the adviser on a day-to-day basis . . . while ensuring they comply* with the appropriate guidelines (as determined by Claims Legal)." D.E. 98-3 § 22.5 (emphasis added)). And Riverstone's claims manual requires that, in litigation matters, there should always be "appropriate

experience, skill and expertise **with emphasis on rules of the court."** D.E. 98-4 § C.4 (emphasis added)). Insurers do not deny any of this or explain how they met a single one of their own standards.

### 2. There Is No Evidence Insurers Monitored this Litigation

Despite these clear policies, Insurers' approach to this litigation was one of willful blindness. They have never claimed they monitored this litigation. In fact, Insurers do not point to a single telephone call or email they sent Mr. Saville about this litigation before May 24, 2021, a single time they performed an internet search or checked the docket for this case, or anything else they did at any time to ensure the litigation was being handled appropriately and the "rules of the court" were being followed. Judge Numbers found that "in the end, the Underwriters have not shown that they exercised the necessary level of diligence in monitoring the litigation" (O&M&R at 8), and Insurers do not refute this.

### 3. Even if Mr. Saville Did Not Update Insurers, Insurers Knew or Should Have Known About Discovery Deficiencies Long Before May 2021.

Insurers' attempts to blame their missed deadlines and compliance failures on Mr. Saville were roundly rejected by Judge Numbers, who expressly found that Insurers failed to establish excusable neglect—a finding Insurers do not challenge here. D.E. 101; D.E. 112 at 5-17. As an initial matter, Insurers' claims that they "*now* understand" or "*only recently* learned" things about their discovery failures are disingenuous. Obj. at 4-6. The only evidence Insurers rely on are non-specific, conclusory statements in their affidavits. *See, e.g.*, D.E. 102-3 ¶ 9 ("AEGIS was unaware of any discovery requests (with the exception of the request for my claims diary, which I knew to be outstanding) that had not been responded to, the Court's discovery orders, or the currently pending motions for sanctions."). Mr. Holmes and Mr. Foulger likewise vaguely claim that on May 24, 2021, Mr. Saville told them "there were ongoing minor issues concerning privilege and disclosure" but "nothing to report of any concern." *Id.* ¶ 4; D.E. 102-10 ¶ 4. Insurers also do not point to a single deadline Mr. Saville "obscured" or a single "assurance" Mr. Saville made but failed to live up to. Obj. at 2, 4, 18. Judge Numbers considered these affidavits and allegations in his O&M&R and found they do not preclude imputation of Mr. Saville's conduct to each of the Insurers.

Beyond that, Insurers' conclusory statements contradict the record in this case. In June 2020, during depositions, USTC's counsel showed Insurers' representatives—those principally responsible for overseeing the litigation per the Insurers' claims manuals—USTC's interrogatory requests. USTC specifically pointed out that the interrogatories were served on December 13, 2019 and were due within 33 days of service. D.E. 97-2 at 139:5-140:3; D.E. 97-4 at 79:14-80:11. At least one of Insurers' representatives confirmed they had seen USTC's interrogatories in late 2019 or early 2020, and yet, none of them knew why the unverified responses (served on behalf of AEGIS in June 2020) were five months late. D.E. 97-2; D.E. 97-4; Ex. B, Holmes Dep., at 93:11-94:6. Likewise, during the 30(b)(6) depositions of Insurers' representatives, both USTC and Insurers' counsel discussed a pending motion to compel multiple times. For example, during the deposition of Riverstone's claims handler, USTC's counsel explained: "Given the document issues that have come up and the ongoing motion to compel and interrogatory issues that we've identified, we'd like to keep this deposition open, as we've done with the other ones." Ex. C Smith Dep., at 185:14-19; *see also* Ex. B, Holmes 86:23-87:15, 159:20-21 (references to motion), Ex. D, Foulger Dep., at 219:2-10 (same). Insurers do not credibly deny they were not on notice of the ongoing discovery issues.

C.     **Insurers Continue to Disregard This Court's Rules and Have *Still* Not Complied with Almost Every Aspect of the April 9, 2021 Order**[6]

In a transparent attempt to divert the Court's attention from their bad faith, Insurers point to their purported recent discovery efforts. Their "look over here" tactics should be rejected. As a starting point, the April 9 Order required Insurers, among other things, to each produce written discovery responses and documents to USTC, as outlined in detail therein, within two weeks. D.E. 86 at 15-16, 33-36. As evidenced by the lengthy and detailed April 9 Order, when Judge Numbers entered this two-week deadline, he was familiar with the content of USTC's requests, Insurers' widespread discovery deficiencies, and the size of

---

[6] Aside from the ongoing discovery deficiencies set forth herein, Insurers' new counsel continues to disregard other local rules in this Court. For example, Insurers' response in opposition to USTC's motion for sanctions was supposed to be 10 pages, but Insurers ignored these rules and filed a 23-page response without seeking leave to do so. L.R. 7.1(c)(1) and 7.2(f)(2)(B); D.E. 102. Mr. Tricarico also claims that he filed a Notice of Special Appearance on June 23, 2021, even though he actually filed a Notice of Special Appearance on June 21, 2021 that the Court rejected. D.E. 117-1, at ¶ 11; D.E. 93; 06.21.2021 D.E.).

Mr. Saville's firm. D.E. 86. Insurers never filed objections to the April 9 Order or its deadlines. Nonetheless, they missed the compliance deadline without requesting an extension. D.E. 86 at 36; O&M&R at 6.

While Insurers claim Mr. Saville alone is to blame for these failures, Insurers' new counsel is faring no better. Kennedys—which touts itself as a "global law firm" with "2300+ people" in 43 offices around the world with "particular expertise in litigation"[7]—was retained three months ago. D.E. 117-1 ¶ 10. Despite this expertise and vast resources, though, Insurers admit they have still not complied the April 9 Order. Obj. at 18 (Defendants are "attempting to come into compliance with the relevant orders."); D.E. 117-1 at ¶¶ 20, 27 (explaining that it has been "difficult for Underwriters to more promptly comply with the Court's most recent April 9, 2021 discovery order"). Insurers have not sought an extension or offered a specific plan or timeline to bring their discovery into compliance.

Apparently aware of these gross deficiencies, Insurers proffer a series of excuses and point to some additional minimal discovery tasks they have performed. Judge Numbers already considered these explanations and correctly rejected them in his O&M&R. O&M&R at 18. Insurers do not object to these findings and they should be adopted for that reason alone.

Even if the Court were to consider Insurers' insufficient explanations, though, the result would be the same. To begin with, Insurers' claims that they have "in good faith attempted to rectify the deficiencies," but that the "process has not proceeded as quickly as . . . anticipated," (Obj. at 7; D.E. 117-1 at ¶ 27), are strikingly similar to Mr. Saville's claims during the May 3 Hearing: "I have no explanation other than it's a time issue, and grossly underestimated what was required . . . ." and "Discovery's been conducted in good faith. The representations were made in good faith. . . .[I]t's just a question of—it's always been a question of timing to get it done.". D.E. 92.1 at 40:3-5, 41:1-4. Judge Numbers rightly found these explanations insufficient to preclude a recommendation of default. O&M&R at 22-23. And Insurers have not objected to that finding. Rather, they concede "deadlines were missed and directives were ignored" "inexplicably." Obj. at 1, 2. Insurers' current identical excuses should similarly have no effect on the entry of default.

---

[7] Ex. E, About Us, KENNEDYS, https://kennedyslaw.com/who-we-are/about-us/ (last visited Sept. 15, 2021).

Insurers then pivot to blaming USTC's counsel for USTC's failure to prioritize outstanding discovery. D.E. 117-1 ¶ 13. But Insurers remain in contempt of the April 9 Order and cite no law establishing that USTC must pick and choose which Court-ordered discovery Insurers should produce. Moreover, USTC *did* prioritize discovery when it filed two motions to compel and provided lengthy exhibits detailing exactly what it needs. *See, e.g.*, D.E. 29, 43-1, 68, 68-15 to 68-20, 75, 109-8, 109-9. Insurers were ordered to produce the information set out in the April 9 Order within two weeks, and USTC is entitled to compliance with the Order.

Insurers also try to blame Hill Rivkins associate Brody Karn's alleged limited involvement and knowledge of the case for their continued flaunting of the April 9 Order. D.E. 117-1 at ¶ 19. But Mr. Karn has been involved in this case since at least February 10, 2020, and has participated in numerous meet and confer conferences regarding this matter, as well as the May 3, 2021 hearing. *See, e.g.*, D.E. 29-17, 68-6, 79-2, 79-3, 79-4, 92-4. Insurers do not explain why Mr. Saville's partners (some of whom defended depositions in this case) or their North Carolina law firm could not help with their compliance efforts either.

Insurers also reference some documents they produced in April 2021 ("April Production") as if this production is a newly unearthed discovery that changes the calculus. D.E. 117-1 ¶ 2; D.E.118-1. But this April Production was grossly deficient, as discussed in detail and acknowledged by Mr. Saville at the May 3 Hearing. *See, e.g.*, D.E. 92.1 at 8-10. Thus, the Court ordered the parties to meet and confer about the April Production and other outstanding issues immediately after the May 3 Hearing. D.E. 92 at 2. USTC attempted to meet and confer outside of the courthouse with Mr. Saville and Mr. Karn, but Mr. Saville had to leave within a matter of minutes, and Mr. Karn left with him. *Id.*; D.E. 92-2. Although USTC attempted to further meet and confer about the April Production, including in two letters sent on May 7 and May 14, 2021, Insurers never substantively responded. D.E. 92 at 2. Judge Numbers was aware of Insurers' April production when he issued his O&M&R and found default was still appropriate even if Insurers had produced a few documents after the April 9 Order issued. O&M&R at 23. Insurers do not object to this finding and it should be adopted.

In short, even if the Court were to set aside the lengthy history of non-compliance, Insurers' current conduct is inexcusable: there is no universe in which an unexplained failure to abide by a Court's Order for five months is appropriate or normal course. Indeed, even if this was a new case with new counsel, Insurers would not be excused for not responding to discovery requests for five months merely because gathering documents was time-consuming. Considering the totality of the circumstances, the egregiousness of Insurers' conduct becomes even clearer: Insurers' pattern and practice throughout this entire case has been to offer half-hearted, apologetic excuses, random non-compliant productions, and general statements that they are continuing to bring discovery into compliance with the Court's Order when backed against the wall, all as part of a calculated effort to delay payment of a valid insurance claim. D.E. 86, 97-1, O&M&R. Judge Numbers carefully considered this case's procedural history, saw these lukewarm demonstrations and empty apologies for what they were, and recommended a finding of default. O&M&R at 1.

### III.     STANDARD OF REVIEW

In reviewing a magistrate's Memorandum and Recommendation (M&R), the "district court is only required to make a *de novo* determination of those specific findings to which [a litigant] has actually objected." *Jones v. Campbell Univ.*, No. 20-0029, 2021 WL 3053314, at *2 (E.D.N.C. July 20, 2021) (citing *Camby v. Davis*, 718 F.2d 198, 200 (4th Cir. 1983)). Portions of the M&R not objected to "may be affirmed . . . unless clearly erroneous or contrary to law." *United States v. Andrews*, No. 07-0249, 2008 WL 11449208, at *2 (E.D.N.C. Jan. 30, 2008), *aff'd*, 577 F.3d 231 (4th Cir. 2009). *De novo* review is also not required "when an objecting party makes only general or conclusory objections." *McNair v. City of Rocky Mt.*, No. 13-0058, 2013 WL 1963483, at *1 (E.D.N.C. May 10, 2013). And "when objections to strictly legal issues are raised and no factual issues are challenged," this Court has made clear, *de novo* review "may be dispensed with." *Slep-Tone Ent. Corp. v. Powers*, No. 12-0053-BO, 2014 WL 2040121, at *1 (E.D.N.C. May 16, 2014) (citing *Orpiano v. Johnson,* 687 F.2d 44, 47 (4th Cir. 1982)).

Insurers must be "specific and particularized" as to the claimed error. *Hill v. Sch. Bd. of Robeson County*, No. 18-0149, 2018 WL 5019387, at *1 (E.D.N.C. Oct. 16, 2018). A generalized complaint that the magistrate judge got it wrong will not suffice. *See id.* And as this Court has warned, "merely reiterating

the same arguments made in the pleading submitted to the magistrate judge does not warrant *de novo* review." *Id.*  Otherwise, the "initial reference to the magistrate" would be "useless."  *Id.*

Once designated, a magistrate judge's authority over a motion is broad.  *See Reddick v. White*, 456 F. App'x 191, 192–93 (4th Cir. 2011) ("[A] district court may 'designate a magistrate judge to conduct hearings, including evidentiary hearings,'" before submitting "'proposed findings of fact and recommendations.'" (quoting 28 U.S.C. § 636(b)(1)(B))).  And the district court need not hold an additional hearing or permit those involved to be heard again.  *See United States v. Melvin*, No. 17-0357, 2019 WL 1761544, at *1 (E.D.N.C. Apr. 22, 2019).   "A reviewing district court," moreover, "must accord great deference to the magistrate's assessment of the facts presented to him." *United States v. Rodgers*, No. 11-0087, 2012 WL 381705, at *4 (E.D.N.C. Feb. 6, 2012).

Under this standard, large portions of the O&M&R do not require *de novo* review.  To begin with, Insurers' Objections are largely devoid of any citations to record evidence and contain exactly the type of conclusory allegations this Court has rejected.  *See Cochran v. Lindzau*, No. 15-03138, 2015 WL 9049810, at *1 (E.D.N.C. Dec. 16, 2015) (Boyle, J.), *aff'd*, 694 F. App'x 150 (4th Cir. 2017) ("[A] party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.").  Moreover, Insurers essentially rehash arguments Judge Numbers has already considered and rejected.  *See Whisnant v. Hill*, No. 17-3047, 2020 WL 917253, at *1 (E.D.N.C. Feb. 26, 2020) (Boyle, J.) (no *de novo* review where objecting party "simply restates the testimony she provided at the evidentiary hearing, and expresses general disagreement with the magistrate judge's finding of liability").  On this basis, the O&M&R may be adopted—virtually in its entirety—on clear error review alone. A *de novo* review, however, will yield the same outcome.  For the reasons that follow, Judge Numbers' O&M&R was correctly decided, and Insurers' objections are without merit.

## IV.      ARGUMENT AND CITATIONS OF AUTHORITY

### A.      Judge Numbers Properly Imputed Saville's Conduct to the Insurers.

Insurers first take aim at Judge Numbers' conclusion that they "must live with the consequences of their attorney's actions."  Obj. at 9 (citing O&M&R at 6).  According to Insurers, this "key point" in Judge

Numbers' ruling is "incorrect" "in the context of a dispositive sanction." *Id.* Insurers' arguments fall flat. As an attorney, Mr. Saville was Insurers' agent. O&M&R at 6. Insurers do not dispute this. And under "well-settled principles of agency law," Insurers bore "the risk of negligent conduct on the part of [their] agent." *Cadet*, 853 F.3d at 1222. To avoid such consequences, litigants must show: (1) they "pursu[ed] [their] rights diligently" ***and*** (2) "that some extraordinary circumstances stood in [their] way." *Holland v. Fla.*, 560 U.S. 631, 649 (2010); *see also Cadet*, 853 F.3d at 1225 (the two elements "are not blended factors," but rather "separate elements, both of which must be met"). Insurers do not object to application of this standard. But rather than try to meet it (which they cannot), Insurers eschew this framework altogether and instead rely on inapposite case law, labor to portray themselves as victims of a wayward lawyer, and attempt to explain away their inexcusable conduct. None of this meets the standard articulated consistently in the case law, and none of it justifies disturbing Judge Numbers' well-reasoned holding.

      1.      **It is Well-Established that Case Dispositive Sanctions Can Result from Attorney Misconduct.**

Insurers first insist that dispositive sanctions are categorically unavailable as a remedy for attorney misconduct. *See* Obj. at 16. Remarkably, Insurers make this argument even in the face of Judge Numbers' citation of numerous cases—including from the U.S. Supreme Court—approving dispositive sanctions against clients who later claimed they were victimized by attorney misconduct. *See* O&M&R at 6-8. In *Link v. Wabash R. Co.*, for instance, the Supreme Court held that "our system of representative litigation" dictates that "each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'" 370 U.S. 626, 634 (1962) (quoting *Smith v. Ayer*, 101 U.S. 320, 326 (1879)). And so, the Court assigned "no merit to the contention that dismissal" of a litigant's claims due to "his counsel's unexcused conduct imposes an unjust penalty on the client." *Id.* at 633. Where the litigant "voluntarily chose [the] attorney as his representative in the action," he cannot "avoid the consequences of the acts or omissions of this freely selected agent"—even where that consequence is dismissal. *Id.* at 633-34. The Fourth Circuit has "consistently" applied *Link*'s holding, *Robinson v. Wix Filtration Corp. LLC*, 599 F.3d 403, 409 (4th Cir. 2010), and as Judge Numbers noted,

"[c]ourts across the country have echoed [its] conclusion in various contexts." O&M&R at 7 (citing cases).

Insurers do not argue these cases are bad law, nor do they try to distinguish them. Instead, they merely cite to other cases, considering far different facts than those present here, in which courts have determined that dispositive sanctions were not warranted against a particular litigant. Each case cited by Insurers is easily distinguishable. Insurers rely principally, for instance, on the Fourth Circuit's decision in *Hillig v. Comm'r*, 916 F.2d 171, 174 (4th Cir. 1990), which they claim is analogous because, "very much like here, there was an express acknowledgement at a sanctions hearing that the attorneys were at fault." *See* Obj. at 10. But the "noncompliance" (*id.*) at issue in *Hillig* was far less serious than that involved here. It "spanned a period of three months" only, during which the truly "blameless client" (individual taxpayers who had formed a partnership) was never made aware of certain requirements under complex Tax Court rules. *Id.* at 174. As the Fourth Circuit explained, the noncompliance was more a product of "sloppiness and a lack of communication" than anything else and did "not approach the history of delay present in *Link*." *Id.* Under those circumstances, the court found "less drastic sanctions" appropriate. *Id*. But those are not the circumstances presented here, as Judge Numbers noted. *See* O&M&R at 8 (finding Insurers are sophisticated litigants who failed to "exercise[] the necessary level of diligence in monitoring the litigation and their attorney's conduct to escape the rule imputing an attorney's knowledge and actions to his client"). In the plainest of terms, this case is far more *Link* than it is *Hillig*. *Compare Link*, 370 U.S. at 634 (considering, among other delays, the failure to answer interrogatories for 19 months).

Insurers next unleash a string cite of cases they claim have "echoed" *Hillig*'s holding. *See* Obj. at 10-11. But again, this is unpersuasive in view of the vastly different facts involved. Like *Hillig*, several courts found dispositive sanctions would be disproportionate in context. In *NOA, LLC v. Khoury*, No. 14-0114, 2016 WL 4444770, at *5 (E.D.N.C. Aug. 23, 2016), for instance, the court saw no evidence that plaintiffs were themselves responsible for the delay, but noted that even if they were, that delay was "a drop in the bucket when considered in the larger context of this case." And in *Rice v. City of Chicago*, 333 F.3d 780, 786 (7th Cir. 2003), the court reversed the dismissal of a case brought by an individual civil rights plaintiff, finding this an unjust result where attorneys for *both sides* "were guilty of flagrantly disregarding

discovery time-lines and refusing to pay heed to court orders." Here, by contrast, Insurers are solely responsible for the remarkable, years-long disregard of Court orders brought about by their intransigence.

Likewise, the language Insurers quote from *Community Dental Services v. Tani*, 282 F.3d 1164 (9th Cir. 2002), does not apply here. In that case, the Court found that gross negligence constituted an extraordinary circumstance. *Id.* at 1170. But that case was decided fifteen years before *Cadet v. Fla. Dep't. of Corr.*, 853 F.3d 1216, 1229-34 (11th Cir. 2017)—the case Judge Numbers cited in his July 15 Order and his O&M&R—which considered recent precedent from the United States Supreme Court and held that, to avoid imputation of an attorney's misconduct, the reason for the deficiency "must be because of abandonment or some other extraordinary circumstance, *not negligence alone, even gross negligence*." *Id.* at 1234 (emphasis added).

Other cases cited by Insurers involved clients who could not fairly have been expected to know about the deadlines that were missed. In *Access 4 All, Inc. v. OM Mgt., LLC*, No. 06-0374, 2008 WL 183307, at *3 (S.D. Ohio Jan. 18, 2008), for instance, the litigant was "hospitalized ten days before the beginning of the trial and operated on eight days before." The court laid blame for the nonappearance solely on his attorney. *Id. Morrison v. Int'l. Programs Consortium, Inc.*, 240 F. Supp. 2d 53, 59 (D.D.C. 2003), also involved the singular failure of defendants and their attorneys to appear for trial, and the court found that sanctioning counsel only was sufficient where there was no evidence to establish that the client had been told a date had been set. The record in *M.E.N. Co. v. Control Fluidics, Inc.*, 834 F.2d 869, 873 (10th Cir. 1987), was even less clear. There, the court expressly noted that "[a]ttorney incompetence may be a sufficient basis for default judgment," but remanded because it was "unable to judge the extent to which defendants are personally at fault." *Id.* Again, the facts here are wholly different than any of those cases. As Judge Numbers found, sophisticated commercial entities like the Insurers "should have known" they were failing to meet their obligations. O&M&R at 15. These failures were varied, widespread, and spanned nearly two years. *Id.* at 2-5. That Insurers stuck their heads in the sand is no excuse.

Finally, Insurers cite a decision of this Court in which lesser sanctions were imposed because "[a]t bottom, the conduct about which defendant primarily complains is that of plaintiff's attorneys." *Eng. v.*

*Wilmington Plastic Surgery, P.A.*, No. 18-0179, 2020 WL 4926297, at *2 (E.D.N.C. Aug. 21, 2020). But that is simply not true here. In *England* the bad faith alleged against the individual plaintiff was her vague and non-responsive responses in her deposition. *Id.* at *1. By contrast, USTC has long made clear that Insurers' *own* failure to manage this case, and their refusal to appropriately supervise outside counsel, goes far beyond their vague deposition responses (which also occurred) and has brought about the significant delays and prejudice that now merits sanctions. Judge Numbers expressly agreed. O&M&R at 15.

Ultimately, not one of the cases Insurers cite announces the categorical rule advertised in their Objections. To be sure, they involve courts stopping short of dispositive sanctions in certain circumstances. But all those circumstances are inapposite. Here, it was not until after nearly eighteen months of willful blindness, delays, and serial disregards of multiple Court orders and express warnings that Judge Numbers recommended default. Ironically, a case cited by Insurers makes this point most effectively:

> Our reluctance to penalize an innocent client only applies, of course, where the client is in fact innocent, *i.e., he is unaware of his attorney's dereliction and not negligent in his own right in not reasonably keeping in contact with the attorney in his case.* When the client is aware, *or should be aware*, of his attorney's misconduct, *it is not unjust to penalize him*.

*Shea v. Donohoe Const. Co., Inc.*, 795 F.2d 1071, 1078 (D.C. Cir. 1986) (emphasis added). Judged against this standard, Insurers should have been aware of the missed deadlines, delays, and disregarded Court orders that have plagued this case from the outset. *See* O&M&R at 15. Judge Numbers' determination that default judgment was an available sanction as a result is consistent not only with the cases he cites, but with other well-reasoned cases from around the country.[8] As Insurers even admit, another court in Iowa has found default judgment appropriate against another London insurer who also retained Mr. Saville. Obj. at 7. Judge Numbers' recommendation should be upheld.

---

[8] *See also Krivak v. Home Depot U.S.A., Inc.*, 2 F.4th 601, 607 (7th Cir. 2021) ("[A]ttorney inattentiveness . . . is not excusable, no matter what the resulting consequences the attorney's somnolent behavior may have on a litigant."); *D.S. v. E. Porter Cty. Sch. Corp.*, No. 2:11-CV-431-PRC, 2013 WL 12409854, at *3 (N.D. Ind. Oct. 17, 2013) ("[A]ttorneys' actions are imputed to their clients, even when those actions cause substantial harm"; "A litigant bears the risk of errors made by his chosen agent."). *Jones v. Dyer Nursing & Rehab. Ctr.*, No. 2:04-CV-508-PRC, 2006 WL 1722361, at *2 (N.D. Ind. June 21, 2006) ("Litigants whose lawyers fall asleep at critical moments may seek relief from the somnolent agents; inexcusable inattention. . . does not justify putting the adversary to the continued expense and uncertainty of litigation.").

**2.** **Judge Numbers Correctly Found Evidence of Mr. Saville's Mental Health was Insufficient to Excuse Insurers from the Consequences of his Conduct.**

Insurers next argue that Judge Numbers was wrong to require competent evidence of their outside counsel's "mental health issues." Obj. at 12. Insurers "have provided all they can on this point," they insist, and they argue that should be enough to relieve them of responsibility for Mr. Saville's conduct. *Id.* Once again, Insurers are mistaken. This Court need not disturb Judge Numbers' considered judgment that "[n]othing in the record hints that Saville's mental condition may have risen to the necessary level to use it as an excuse for his conduct." O&M&R at 14.

In attempting to lay blame for all that has transpired at the feet of Mr. Saville, Insurers essentially claim that the veracity of Mr. Saville's mental illness should be immaterial. Obj. at 12. In support of these arguments, the Insurers ask the Court to accept as true their views on the "plague" of mental health problems in the legal profession, including the stigma associated therewith and treatment options available. *Id.* at 1. None of these theories is supported by cognizable evidence and they should all be rejected. They also fail to meet the standard required under the law. All of Insurers' arguments about the Mr. Saville's mental condition should, therefore, be rejected.

*First*, Insurers claim Judge Numbers "ignored the Declaration of Mr. Saville's former law partner." Obj. at 13. That is not true. Judge Numbers considered the affidavit but found it unpersuasive because Mr. Pruzinsky is self-admittedly a "lay person" and "lacks any formal training that would qualify him to opine on these mental-health-related issues." O&M&R at 12-13.[9] Judge Numbers also noted that neither Mr. Pruzinksy nor other of Insurers' attorneys have spoken with Mr. Saville, even though they have purportedly concluded he "experienced a mental breakdown." *Id.* at 4. Insurers do not dispute these conclusions. Judge Numbers' holding that this evidence is not enough is consistent with well-established law requiring particularized evidence supporting claims of mental illness. *See, e.g.*, *Gager v. Nicholson*, No. 04 CIV. 3410 DAB, 2006 WL 3616965, at *2 (S.D.N.Y. Dec. 12, 2006), *aff'd sub nom. Gager v. Principi*, 300 F.

---

[9] Moreover, Mr. Pruzinsky only inconclusively stated "it appears probable to be that Jim had experienced a mental break down of some sort." D.E. 103-2, at ¶ 7. This speculation does not hold water.

App'x 30 (2d Cir. 2008) (rejecting conclusory allegations of mental impairment); *see also Anderson v. Nooth*, No. 2:14-CV-01916-SB, 2016 WL 6496454, at *3 (D. Or. Aug. 12, 2016), *report and recommendation adopted*, No. 2:14-CV-1916-SI, 2016 WL 6496437 (D. Or. Nov. 1, 2016) (same).

Insurers proffer no case law to the contrary. Instead, they theorize that Mr. Saville's medical information is protected by HIPAA and "may not even exist" given "the sensitivity of mental health issues." Both of these unsupported arguments fail. *See Allendorf v. Sully Transport, Inc.*, No. 98-50243, 2001 WL 864265, at *1 (N.D. Ill. July 30, 2001) (noting the strong public interest in preserving the confidentiality privilege of a patient but recognizing "that when a party places at issue the question of his mental health, any privilege that might attach to such medical information is waived" because "[a]llowing a Plaintiff to use a confidentiality privilege as both a sword and a shield would simply be contrary to the most basic sense of fairness and justice"); *see Gager*, 2006 WL 3616965, at *2 (rejecting conclusory allegations of mental impairment); *see also Anderson v. Nooth*, No. 2:14-CV-01916-SB, 2016 WL 6496454, at *3 (D. Or. Aug. 12, 2016) (same).

*Second*, Insurers object to Judge Numbers' finding that "[n]othing in the record hints that Saville's mental condition may have risen to the necessary level to use it as an excuse for his conduct" based on their argument that "this is not the only case in which this happened." Obj. at 13. But this is not the standard. As Judge Numbers explained, and supported with several case citations, "courts impose a demanding standard before a party is entitled to relief on th[e] basis" of mental health issues. O&M&R at 13-14. Mental impairment is not an "extraordinary circumstance" when the attorney filed pleadings during the alleged period of impairment and there is no evidence the attorney "constructively disappeared" by being out of reach despite repeated attempts to establish contact. *See Prince of Peace Enters., Inc. v. Top Quality Food Mkt., LLC*, No. 07-CV-0349 LAP FM, 2012 WL 4471267, at *8 (S.D.N.Y. Sept. 21, 2012); *see also Clark v. Gastelo*, No. CV 20-7084 AB (RAO), 2021 WL 2691009, at *4-6 (C.D. Cal. Apr. 16, 2021), *report and recommendation adopted*, No. CV 20-07084 AB (RAO), 2021 WL 2685625 (C.D. Cal. June 30, 2021) (when an individual attends hearings, participates in litigation, and demonstrates he is "generally oriented, able to communicate, and able to understand communication by others," there is no extraordinary

circumstance); *Robison v. Hinkle*, 610 F. Supp. 2d 533, 539–40 (E.D. Va. 2009) (when an individual files pleadings "during the alleged period of incompetency, courts are often unwilling to find" extraordinary circumstances). Insurers proffer no legal authority or support to the contrary. In fact, their Objections support Judge Numbers' finding that Mr. Saville was filing pleadings, attending hearings, participating in depositions, and engaging in the discovery process—even if doing so negligently. Obj. at 10.

*Third,* Insurers claim that Judge Numbers could have ordered an *in camera* hearing to consider more evidence. Obj. at 14. Notably, Insurers do not claim that Judge Numbers should have ordered such a hearing or that it was improper to not hold a hearing. His decision not to do so was proper, as courts have held there is no need for an evidentiary hearing when a petitioner sets forth a bare allegation of mental impairment without any evidence of the nature or severity of such impairment or any evidence that such mental impairment rendered him unable to understand the need to timely file or unable to personally prepare court papers. *Anderson*, 2016 WL 6496454, at *3.

For these reasons, this Court should not disturb Judge Numbers' conclusion that the record lacked sufficient evidence of Mr. Saville's mental condition to allow Insurers to avoid imputation.

### 3. Judge Numbers Correctly Found Insurers Themselves at Fault for Failing to Monitor this Litigation.

Finally, Insurers object to Judge Numbers' conclusion that they share blame with their attorney for their noncompliance in this case. *See* Obj. at 14. Such a finding, Insurers claim, is unsupported by the record and therefore "incorrect." *Id.* But Insurers' argument ignores critical record evidence that Judge Numbers rightly found persuasive. This Court should adopt Judge Numbers' findings accordingly.

Insurers find fault with two crucial aspects of Judge Numbers' O&M&R. First, Judge Numbers concluded that Underwriters were sophisticated commercial entities with a duty, *and the ability*, to monitor the litigation. O&M&R at 14-15. Insurers do not dispute these specific findings but try to evade the requirement nonetheless by twisting it into something it is not. It "is simply not realistic," they assert, "to expect all insurers . . . to be intimately familiar with rules and procedures of the United States," or to require that they "constantly look over the shoulder of or second-guess their attorney"—particularly as "largely

foreign companies." Obj. at 15-16. But this is not the standard Judge Numbers held them to, nor do Insurers proffer any legal or factual support for their assertions. The insurance industry is highly regulated, and insurance companies have statutory obligations in North Carolina to ensure the prompt handling of insurance claims. N.C. Gen. Stat. § 58-63-15(11). The Insurers offer no authority for the notion that this duty somehow ends once they hire outside counsel to handle a coverage dispute. Moreover, as set forth above, Insurers' own claims handling standards require their "day-to-day" monitoring of, and their management and participation in, litigation. Insurers ignore all this and merely complain that some theoretical level of micromanaging—which was never suggested to be employed here—would have a chilling effect on the attorney-client relationship. These arguments are red herrings and should be rejected.

Second, Judge Numbers found that "the record contains evidence that [Insurers] knew—or in the exercise of reasonable diligence should have known—that Saville was missing important deadlines and not keeping them properly informed about the case." O&M&R at 15. Insurers claim that the so-called "red flags" alluded to by Judge Numbers were overstated and, in any event, balanced out by Mr. Saville's successful performance of other duties such that Insurers did not have actual notice of "the serious level of misconduct." Obj. at 15-16. But Insurers misconstrue the deposition testimony (as set forth above) and do not actually deny that USTC's counsel's questions regarding the pending summary judgment motion and grossly belated interrogatory responses in the depositions did or should have put Insurers on notice that there were issues. Insurers only claim that "[b]rief and vague questioning from an adversary, without follow up, *would* not put a client on notice that his attorney was committing the serious level of misconduct identified here." And at bottom, they do not dispute Judge Numbers' finding that "in the exercise of reasonable diligence [they] should have known…that Saville was missing important deadlines and not keeping them properly informed about the case." (*Id.* at 15).

Contrary to Insurers' unsupported arguments, the record Judge Numbers considered is and has been clear: Insurers have exhibited an "unwillingness to participate in good faith in this case for [over] 18 months." O&M&R at 22. Insurers do not deny this. Insurers also do not include a single allegation they monitored or were otherwise diligent in this litigation. Specifically, Insurers do not point to one

communication between August 2019 (when this case was filed) and May 2021, in which they contacted Mr. Saville, his partners, their North Carolina lawyers, the Court, or the Bar association about this case. D.E. 115, at 16-17.[10] There is no assertion they conducted any independent analysis or research relating to the case to ensure it was running smoothly. "As the declaration from the Underwriters' new counsel shows, information about this case was readily available online . . .The Underwriters have not explained why they could not learn about what was occurring through that avenue." O&M&R at 17. This lack of diligence and monitoring is particularly startling given Insurers' undisputed familiarity with litigation and their own internal policies that require monitoring an external lawyer "on a day-to-day basis" to, among other things, "ensur[e] they comply with the appropriate guidelines." Obj. at 16. Insurers do not object to Judge Numbers' findings that they are sophisticated litigants and have "a much easier time keeping tabs on their hired counsel" (O&M&R at 14-15) than a litigant with little to no experience in the federal court system.

The law is also clear: Insurers' "failure to allege that [they] took any steps to attempt to advance or monitor [this] case is fatal." *Myers v. Allen*, 420 F. App'x 924, 927 (11th Cir. 2011). Because Insurers "cannot show that [they have] exercise[d] reasonable diligence in pursuing [their] rights," the Court need not consider whether Mr. Saville's conduct constituted an "extraordinary circumstance." *Id.*; *see also Jones v. Peters*, No. CV 18-00526-JB-B, 2021 WL 1845977, at *6–7 (S.D. Ala. Apr. 15, 2021), *report and recommendation adopted*, No. CV 18-00526-JB-B, 2021 WL 1840757 (S.D. Ala. May 7, 2021) (if petitioner had "exercised *any* diligence or curiosity," he could have learned of the status and deadlines).

Several courts have upheld dispositive sanctions in similar circumstances involving sophisticated litigants. *See Lucero as Next Friend to Lucero v. City of Clovis Police Dept.*, No. 19-0445, 2021 WL 1326937, at *6 (D.N.M. Apr. 9, 2021) (refusing to set aside default where "Defendants . . . fail to substantiate their claim that their former counsel was to blame," noting that "Defendants are sophisticated and experienced litigants and neither they nor their insurer explain why they did not monitor the case docket or require periodic updates from their former counsel"); *see also Sloss Industries Corp. v. Eurisol*, 488 F.3d

---

[10] There is also still no explanation for why Insurers did not or could not seek updates from their North-Carolina-based attorneys. O&M&R at 17.

922, 936 (11th Cir. 2007) (foreign corporation could not "shift the blame" for failing to respond to U.S. lawsuit where it "failed to check with [its French counsel] to ensure that someone had been retained to respond to [the] lawsuit, and did not have any procedures in place to make sure that its interests were being protected"); *Pretzel & Stouffer, Chartered v. Imperial Adjusters, Inc.*, 28 F.3d 42, 45 (7th Cir. 1994) ("Maintaining communication during the course of litigation is the responsibility of both attorneys and their clients. Mere lack of communication does not excuse compliance with the rules, or from the penalties for failing to do so."). Insurers proffer no case law to the contrary.

The Northern District of Iowa also entered default judgment under strikingly similar circumstances. Cataloguing "the inaction or negligence of counsel . . . at work here," the court found the client had repeated warnings about counsel's omissions and yet had never:

> 1) discussed what actions [counsel] should undertake to defend the lawsuit; (2) what information [counsel] would need from [client] to defend this lawsuit; (3) how [counsel] would obtain the information needed; (4) when [counsel] would obtain that information; (5) what deadlines were imposed under the Federal Rules of Civil Procedure for defending the litigation; (6) how [counsel] intended to meet the deadlines; and (7) whether [counsel] was admitted to practice in the Northern District of Iowa, and if not, what steps would need to be taken to obtain counsel admitted in this district or local counsel. *In short, there is nothing in the record indicating that [client] did what a reasonable client could be expected to do in the initial contact with an attorney regarding representation or shortly thereafter. . . .*

> [E]ngaged in reasonable follow-up with [counsel], pressing her to explain, for example, (1) the import of the various filings in the case; (2) why such actions had been taken by the opposing party, the Clerk of Court, or the court; (3) what action [counsel] intended to take to rectify the Default Entry and, ultimately, the default judgment; or (4) what information [counsel] needed from [client] to complete responses to filings in the case. *Under the circumstances, even a purportedly "unsophisticated" litigant, as [client] claims to be here, could reasonably be expected to press counsel for adequate explanations, a plan for responding to the default or default judgment, assurances that appropriate steps would be taken, and confirmation that such steps had indeed been taken. Instead, [client] accepted without question the same brush-off answers it had received repeatedly.* The record contains only references to a few isolated telephone calls and other contacts between [client] and [counsel] in which [counsel] purportedly indicated that she would take care of things. The record contains no copies of any correspondence between representatives of [client] and [counsel] concerning this lawsuit. . . .

> Under the circumstances, the court finds that . . . *[client's] own conduct amounts to willful blindness.* Thus, . . . the court finds that there is simply no "negligent act" that was "itself in some sense excusable," nor was there any "surprise," to open the door to setting aside default judgment under Rule 60(b)(1) in this case.

*Murray v. Solidarity of Lab. Org. Int'l Union Benefit Fund*, 172 F. Supp. 2d 1134, 1144–47 (N.D. Iowa 2001) (emphasis added).[11]

Like the client in *Murray*, several Insurers, including the lead, Mr. Foulger, were warned Mr. Saville was missing deadlines and not apprising them of substantive developments, such as dispositive motions, in June 2020. O&M&R at 16. Even if Mr. Foulger was not paying attention to these warnings in his deposition, like the client in *Murray*, Insurers have not presented any evidence they took any reasonable steps "to prevent the occurrence of . . . default judgment." *Murray*, 172 F. Supp. 2d. at 1146. There is, for example, no evidence or testimony in their declarations that Insurers pressed Mr. Saville to ensure he was handling the lawsuit properly or otherwise monitored the litigation at all until, at the earliest, May 2021.[12]

**B.      Judge Numbers' Recommendation to Enter Default Against the Insurers Should Be Adopted.**

Insurers' Objections with respect to the sanction of default judgment are based on Insurers' arguments that Mr. Saville's conduct should not be imputed to them. They offer no independent arguments that Mr. Saville did not act in bad faith or that Mr. Saville's conduct should not be deterred. As set forth above, Judge Numbers correctly found that Mr. Saville's conduct should be imputed to Insurers, and therefore the Court need not consider Insurers' Objections on these points. However, even if the Court does consider Insurers' Objections, Judge Numbers' recommendation of default should still be upheld.

**1.      Insurers Have Acted and Continue to Act in Bad Faith.**

As Judge Numbers set forth in his O&M&R, "A party acts in bad faith when they show a 'callous disregard for the authority of the district court and the Rules.'" O&M&R at 19 (citing *Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs., Inc.*, 872 F.2d 88, 92 (4th Cir. 1989)).  Insurers do not dispute this standard or that sanctionable conduct occurred. *See, e.g.*, Obj. at 8 (Mr. Saville's conduct was "plainly

---

[11] The Court also found: (1) the client did not act reasonably by "accept[ing] without question the same brush-off answers," instead of pressing the lawyer, and (2) that there were "only references to a few isolated" contacts between the client and counsel, with "no copies of any correspondence." *Id.*

[12] In the O&M&R, Judge Numbers also rejected Insurers' arguments that Mr. Saville's conduct should not be imputed to them because he abandoned them as clients, and because he was pursuing his own independent interests rather than representing them.  *See* O&M&R at 8-12.  The Insurers take no issue with either holding.  These arguments are therefore waived. Judge Numbers' conclusions were not clear error.

improper"). Rather, the only objection they raise is that "there has plainly been no bad faith on the part of the Defendants, and significantly, the only conduct identified by the Magistrate as reaching the level of 'bad faith' was conduct undertaken by Mr. Saville." Obj. at 18. Judge Numbers, on numerous occasions has found that Insurers acted in bad faith and that they have failed to establish excusable neglect. *See, e.g.*, D.E. 86, D.E. 101, D.E. 112. As set forth above, Mr. Saville's conduct, as Insurers' agent, is imputed to Insurers, and therefore, any of Mr. Saville's bad faith is also imputed to Insurers.

Beyond that, Judge Numbers also held Insurers acted in bad faith because "[t]hey failed to respond to the vast majority of USTC's discovery requests and the responses they provided were grossly inadequate. Plus, they disregarded the Court's explicit instruction in October 2020 to comply with the discovery rules or face sanctions." O&M&R at 19. He also found that Insurers demonstrated an "unwillingness to participate in good faith in this case for nearly 18 months." *Id.* at 22. Insurers do not claim they participated in good faith in discovery and do not deny that they *still* have not complied with the April 9 Order (beyond only "haphazard compliance" at best). Thus, to this day, Insurers continue to ignore the Court's explicit instructions and warnings. The Fourth Circuit has expressly held this pattern of disregard and half-hearted compliance is sanctionable with a default:

> Even though the defendants may have made efforts to comply, the attempts were last ditch and only offered when it became crystal clear that they were going to lose the case unless they did something. In the context here, the things done did not add up to an adequate "something."

*Mut. Fed. Sav. & Loan Ass'n*, 872 F.2d at 93-94 (citations omitted). Judge Numbers correctly held that Insurers have acted in bad faith for this additional reason.

## 2.  USTC Has Been Prejudiced

Judge Numbers found that USTC was prejudiced by Insurers' noncompliance because this case has "grind[ed] to a halt" and "USTC has been unable to gather. . . information" it is owed or proceed with the case. O&M&R at 20, 22. Insurers do not object to this finding but instead claim USTC has not suffered prejudice because the discovery it sought in its Second Motion to Compel "largely related to the *bad faith claims*, or otherwise has nothing to do with Plaintiff's principal claims for coverage." Obj. at 19. To start

with, Insurers were required to produce all the information as set forth in the April 9 Order, regardless of what that information related to. D.E. 86. Their failure to obey a Court order has further delayed litigation, caused USTC to incur unnecessary expenses, and has resulted in USTC suffering through a new law firm's effort to "get up to speed" on a three-year-old dispute. USTC has therefore been prejudiced. *Beach Mart, Inc. v. L & L Wings, Inc.*, 302 F.R.D. 396, 415 (E.D.N.C. 2014), *aff'd*, 784 F. App'x 118 (4th Cir. 2019) (prejudice "measured in the additional cost and delay of trial"; resetting the case "is an inconvenience not only to the parties, but also to the court, and the court is mindful and protective of its limited resources.").

But beyond that, Insurers' unsupported characterization of the discovery sought by USTC is patently untrue. As set forth in great detail in USTC's Second Motion to Compel and related exhibits,[13] for nearly two years, USTC has been seeking basic information relating directly to Insurers' coverage defenses. By way of example only, in its Second Motion to Compel, USTC sought: (i) verified, interrogatory responses from each Insurer; (ii) written responses from each Insurer to USTC's document requests; (iii) documents from the Following Markets, including their claims files and underwriting documents; (iv) the lead Insurer's claims diary; (v) handwritten notes that were taken during a meeting discussing USTC's Claim; (vi) Insurers' factual and legal bases for their affirmative defenses and coverage positions; (vii) Insurers' bases for their denials in response to USTC's requests for admission, which became particularly relevant after deposition testimony established that at least one of Insurers' representative disagreed with Insurers' denials; and (viii) documents relating to Dr. Heard (the cause and origin fact witness) on whose analysis Insurers based their defenses. *See, e.g.*, D.E. 68, 68-15, 68-17, 68-19, 71-1, 76, 84. Each one of these categories of information, and many others, relate directly to Insurers' affirmative defenses.

Insurers' additional baseless suggestion that USTC may already have this information in its possession or that it does not need this information because it filed suit, (Obj. at 18-19), is not supported by anything in the record or even explained, and it should be dismissed. Insurers bear the burden of proving an exclusion applies if they want to escape their coverage obligations and USTC was entitled to receive the

---

[13] USTC incorporates herein the arguments in its Second Motion to Compel briefing. D.E. 68, 75, 84.

information that Insurers contend support their defenses. *Colony Tire Corp. v. Fed. Ins. Co.*, 217 F. Supp. 3d 860, 865 (E.D.N.C. 2016) ("[W]here an insurer seeks to rely on a provision excluding coverage, the burden is on the insurer to establish the exclusion."). Moreover, to the extent that USTC's discovery responses seek information relating to its bad faith claim, that discovery is legitimate, and the Insurers do not challenge Judge Numbers' finding in the April 9 Order that all of Insurers' discovery objections are overruled. D.E. 86 at 33-36. Insurers' reliance on random case law asserting that there can be no bad faith where there is an "honest disagreement" about coverage cannot be reconciled with the Insurers' admissions in their depositions, or Mr. Foulger's admission that he has no plans to bring his never-ending claim investigation to an end because Mr. Saville is handling matters for him in the litigation. D.E. 97-2 at 44:24-45:1-6.

Insurers also wrongfully claim that the Court has already found written and document discovery from Following Markets "is duplicative of discovery that would be obtained from the leading insurers." Obj. at 20. The Court specifically held the protective order was limited to deposition testimony—not written discovery—and warned Insurers that legitimate discovery requests were to be complied with. D.E. 66 at 4. And deposition testimony has affirmatively established that not all Insurers categorically agree on discovery, as at least one Insurer testified that he disagreed with the lead Insurer's responses to USTC's Requests for Admission. *See* D.E. 71-1 at 4. Judge Numbers' conclusion should be upheld

### 3. Insurers' Conduct Must Be Deterred

Judge Numbers concluded that the deterrence factor weighed in favor of default judgment because "there is an obvious need to deter parties from 'stalling and ignoring the direct orders of the court.'" O&M&R at 21 (citing *Mut. Fed. Sav. & Loan Ass'n*, 872 F.2d at 93) 22. Insurers do not object to this finding but, instead, shift the focus to discussions of Mr. Saville's alleged mental health issues and claim that sanctioning defendants here will not deter any undesirable conduct in the future. Likewise, Insurers pontificate that sanctioning Insurers will cause clients to become overly involved in their attorney's preparation of the case, have a chilling effect on the attorney-client relationship, and therefore be contrary

to well-settled law (though these theories are not supported by a single citation to the so-called "well-settled law"). Obj. at 20. These allegations are wholly unsupported and should be summarily rejected.

Even if Insurers' argument is considered, however, it demonstrates exactly why sanctions are appropriate here: Parties in litigation bear the responsibility of monitoring the litigation to ensure it stays on the right track. "A party to a lawsuit remains under a legal duty to protect his own interest. Responsibility for monitoring the status of a case, therefore, rests with the defendant corporation." *Net Const., Inc. v. C & C Rehab & Const., Inc*., No. 99CV-3371, 2002 WL 31268385, at *3 (E.D. Pa. Oct. 8, 2002). Insurers cannot be "unwilling[] to participate in good faith" in litigation for years, farm out an insurance claim to self-selected counsel whom they fail to monitor, and then when things go wrong, seek to avoid all the consequences and instead force their policyholder to bear the punishment. If there is truly is an epidemic of mental illness in the profession that affects 25% of all lawyers, Insurers who are sophisticated consumers of legal services, should be held accountable for failing to discharge their monitoring obligations, especially when they decided to pick non-panel counsel as Mr. Foulger did here. Ignoring litigation in U.S. courts expressly violates North Carolina law and should be deterred. Judge Numbers' conclusion was correct.

### 4. No Lesser Sanctions Are Appropriate

Insurers argue "if a sanction is appropriate here, it should be one that is far less stringent than an outright default against Defendants, and in any event should more appropriately be awarded against Mr. Saville." Obj. at 21. Insurers do not provide any citation in support of this objection, or any explanation for why they include this single sentence. Consequently, this argument is abandoned. *See Carty v. Westport Homes of N. Carolina*, *Inc.*, 472 F. App'x 255, 261 (4th Cir. 2012) (arguments not raised in objections to magistrate judge's recommendation are waived); *White v. U.S.*, No. 06-0068, 2012 WL 3023392, at *6 (E.D.N.C. July 24, 2012) (argument waived where party "did not specifically address . . . finding in his objections to the magistrate judge's recommendation").

Judge Numbers' conclusion that no lesser sanctions are appropriate here is correct. O&M&R at 22. Several courts around the country have upheld similar sanctions in similar circumstances. *See Powers v. Germaine*, No. 7:06-CV-187-D, 2008 WL 618903, at *5 (E.D.N.C. Mar. 6, 2008) (upholding dismissal

and rejecting arguments plaintiff was "unaware" of previous court's orders); *see also United States v. 7108 W. Grand Ave*, 15 F.3d 632, 633-34 (7th Cir. 1994) ("Malpractice, gross or otherwise, may be a good reason to recover from the lawyer but does not justify prolonging litigation against the original adversary. . . . Holding the client responsible for the lawyer's deeds ensures that both clients and lawyers take care to comply."); *Gidarisingh v. McCaughtry*, No. 04-CV-38, 2011 WL 2182044, at *8–9 (E.D. Wis. June 3, 2011) , *aff'd*, 451 F. App'x 572 (7th Cir. 2011) ("Deception of a client becomes the liability of the client's attorney and not the client's opponent."). Insurers did not monitor this litigation and have not shown any diligence in bringing their discovery into full and prompt compliance with the Court's Order, despite the Court's warnings throughout this case. There is no requirement for the Court to first award lesser sanctions, especially in light of its direct warnings. *Barclift v. Sentara Sentara Reg'l Med. Ctr., LLC*, No. 2:17-CV-00008-D, 2018 WL 1721947, at *2 (E.D.N.C. Mar. 20, 2018), *report and recommendation adopted sub nom.,* 2018 WL 1720760 (E.D.N.C. Apr. 9, 2018). After an explicit warning of default, "[a]ny other course would . . . place[] the credibility of the court in doubt and invite[] abuse." *Id.*

In reviewing all the arguments and evidence, Judge Numbers concluded that "because of [Insurers'] unwillingness to participate in good faith in this case for nearly 18 months, there is no lesser sanction that will effectively address their conduct." O&M&R at 22. Judge Numbers correctly drew from the Fourth Circuit in explaining that entering default on Insurers "will send 'an unmistakable message to them and others that the judicial system will not tolerate repeated misconduct never wholly remedied in the future'" and any other result "would 'send the opposite message that the court may be pushed, ignored and defied to the outermost limits so long as the noncomplying party has even an inadequate fallback act ready in the wings should the final curtain be falling.'" *Id.* at 23 (citing *Mut. Fed. Sav. & Loan Ass'n*, 872 F.2d at 94). For all of these reasons the O&M&R should be upheld.

Dated: September 15, 2021

MᴄGᴜɪʀᴇWᴏᴏᴅꜱ LLP

By:  */s/ Mark E. Anderson*
Mark E. Anderson (NC Bar No. 15764)
manderson@mcguirewoods.com
501 Fayetteville Street, Suite 500

Raleigh, North Carolina 27601
Phone: (919) 755-6600
Fax: (919) 755-6699

Shelby S. Guilbert (GA Bar No. 315101)
    sguilbert@mcguirewoods.com
Amy E. Dehnel (GA Bar No. 707836)
    adehnel@mcguirewoods.com
1230 Peachtree Street N.E., Suite 2100
Atlanta, GA 30309-3534
Phone: (404) 443-5500
Fax: (404) 443-5599

*Attorneys for Plaintiff U.S. Tobacco Cooperative Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of September, 2021, a copy of the foregoing **U.S. TOBACCO COOPERATIVE INC.'S RESPONSE IN OPPOSITION TO INSURERS' LOCAL CIVIL RULE 72.4(B) OBJECTIONS TO THE AUGUST 18, 2021 ORDER & MEMORANDUM & RECOMMENDATION OF MAGISTRATE JUDGE ROBERT T. NUMBERS, II**, with any and all attachments, was filed electronically with the Clerk of Court via the Court's CM/ECF system. Counsel for all parties in this case are registered CM/ECF users and will be served by the CM/ECF System:

Michael J. Tricarico
Kennedys CMK LLP
570 Lexington Avenue, 8th Floor
New York, NY 10022
Phone:  212-252-0004
Email: michael.tricarico@kennedyslaw.com

Seth Peter Buskirk
Don T. Evans, Jr.
Clark, Newton & Evans, PA
509 Princess Street
Wilmington, NC 27401-4130
Phone: 910-762-8743
Email: spb@clarknewton.com
         dte@clarknewton.com

James A. Saville
Hill Rivkins LLP
45 Broadway, Suite 1500
New York, NY 10006
Phone: 212-669-0618
Email: jsaville@hillrivkins.com


*/s/ Mark E. Anderson*
Mark E. Anderson

*Counsel for Plaintiff U.S. Tobacco Cooperative Inc.*

32